UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No.:
03 cv 12573 EFH

BERNADINE T. GRIFFITH )
    Plaintiff )
 )
vs. ) **VERIFIED COMPLAINT AND**
 ) **DEMAND FOR JURY TRIAL**
ONEBEACON INSURANCE COMPANY, )
ONEBEACON AMERICA INSURANCE )
COMPANY, MICHAEL A. SISTO, and )
KAREN ALLEN HOLMES )
    Defendants )

MAGISTRATE JUDGE Alexander

## COMPLAINT

Plaintiff, Bernadine T. Griffith, alleges as her complaint against Defendants OneBeacon America Insurance Company, formerly Commercial Union Insurance Company; CGU Insurance Company, formerly OneBeacon Insurance Company; Michael A. Sisto, and Karen Allen Holmes, as follows:

### JURISDICTION

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, and supplement jurisdiction under 28 U.S.C. § 1367 This suit is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. § 2000e-5(f)(1); Title II of the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. § 621 et seq, (hereinafter "ADEA"); and Section 107(a) of the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C.A. § 12117(a), which incorporates by reference §§ 706 (f) (1) and (3) of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. §

1

2000e-5(f)(1) and (3), pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C.A. § 1981a.

## VENUE

2. The discriminatory employment practices alleged herein to be unlawful were committed in Foxborough, Massachusetts and consequently venue in this judicial district is proper pursuant to 28 U.S.C.A. § 1391.

## NATURE OF THE ACTION

3. This is an action against the Defendants under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. § 2000e-5(f)(1)(2); Title II of the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. § 621 et seq.; and Title I, Section 503 of the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 et seq. for its unlawful discriminatory employment practices on the basis of **race, color, age, and disability**. The Defendants have intentionally and maliciously subjected the Plaintiff to a hostile work environment and retaliated against the Plaintiff, in part, because she filed and zealously prosecuted an April 29, 1997 charge of discrimination against her employer on the basis of her race, sex, age, and disability, a charge that was ultimately remanded for additional investigation in the Massachusetts Commission Against Discrimination on December 6, 1999. Defendants created a hostile work environment and subjected Plaintiff to retaliation, all unlawful discriminatory conduct which included: the Defendants breached its company promise to grant sick leave of absence; revoked Plaintiff's authorized accommodation; refused to allow Plaintiff's requested accommodation to work at home two days a week, a similar accommodation accorded

another white female co-worker on maternity leave; revoked Plaintiff's authorized certified medical leave; failed to administer fringe benefits to the Plaintiff; imposed medically restrictive job assignments on the Plaintiff; denied Plaintiff access to software manuals and books pertaining to her job; segregated Plaintiff from a company break room; excluded the Plaintiff from attending informal group meetings; failed to provide Plaintiff with training and admission to programs accorded other group employees; failed to give Plaintiff a $1,900.00 pay raise that it promised; improperly issued warnings and sanctions against the Plaintiff; refused to provide Plaintiff with record of her alleged absentee record; and, ultimately discharged Plaintiff from her employment, all in violation of Plaintiff's federally protected rights under the ADA, ADEA, and Title VII.

## THE PARTIES

4. The Plaintiff, Bernadine T. Griffith, is a citizen of the United States and a resident of Boxford, Essex County, Massachusetts. The Plaintiff, a black, disabled female, was 56-years old when she filed this second charge of discrimination in the Equal Employment Opportunity Commission.

5. The Defendants: OneBeacon Insurance Company, formerly Commercial Union Insurance Company (hereinafter "CU"); and, OneBeacon America Insurance Company, formerly CGU Insurance Company (hereinafter "CGU") are, jointly and severally, engaged in the insurance industry and are licensed in the Commonwealth of Massachusetts. On or about October 17, 2001, Commercial Union Insurance Company changed its name to OneBeacon America Insurance Company. On August 28, 2001, CGU Insurance Company changed its name to OneBeacon America Insurance Company. OneBeacon

America Insurance Company is a domestic corporation incorporated in the Commonwealth of Massachusetts and its principle place of business is One Beacon Street, Boston, MA 02108. OneBeacon Insurance Company is a foreign corporation incorporated in the Commonwealth of Pennsylvania and its principle place of business is 433 Walnut Street, Philadelphia, Pennsylvania. At all times relevant hereto each Defendant has done business in the Commonwealth of Massachusetts at the Foxborough facility location complained of herein, and has continuously had and/or did have at least twenty (20) employees.

6. The named-individual Defendants, Michael A. Sisto and Karen Allen Holmes, are employed by the said Defendant Employers. Michael A. Sisto and Karen Allen Holmes conducted business at the Employers' Foxborough, Massachusetts facility location, who either, jointly or individually, have each committed the specific alleged acts complained of herein, acting in the capacity as a supervisor and/or other person acting with authority of the company.

7. At all relevant times, Defendants have continuously been engaged in the insurance industry, affecting commerce within the meaning of Section 101(5) of the ADA, 42 U.S.C.A. § 12111(5), Section 107(7) of the ADA, 42 U.S.C.A. § 12117(a), which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S.C.A. § 2000e (g) and (h), and the ADEA.

8. Defendants are each an employer within the meaning of the ADA, ADEA, and Title VII.

4

## **PROCEDURAL REQUIREMENTS**

9. On October 5, 2000, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD") in Boston, Massachusetts. The charge was filed within three hundred (300) days after the occurrence of one or more of the unlawful employment practices alleged herein.

10. On September 30, 2003, the EEOC issued the Plaintiff a Notice of Right to Sue letter, stating that Plaintiff could file an action under the ADA, ADEA, and Title VII. Plaintiff filed the complaint in this case within ninety (90) days after the date on which she received the Notice of Right to Sue.

11. Consequently, all jurisdictional prerequisites to the institution of this lawsuit have been fulfilled, and Plaintiff has exhausted her administrative remedies as required by law.

## **STATEMENT OF FACTS**

12. On August 27, 1979, CU hired the Plaintiff, Ms. Griffith, a black female, age 35, as a computer operator.

13. For 22 years, Ms. Griffith satisfactorily performed the essential functions of her job. CU and CGU consistently rated her overall performance level as proficient.

14. In or around April of 1994, Ms. Griffith suffered a heart attack.

15. After recovering from quadruple-bypass heart surgery and upon returning to work in September of 1994, CU allowed her to take a reasonable accommodation.

16. CU's authorized reasonable accommodation permitted Ms. Griffith to modify her work schedule, to take her necessary medication at work, and to park in handicap parking.

17. CU recognized Ms. Griffith as a satisfactory employee by regularly generating satisfactory annual reviews and, in fact, promoted Ms. Griffith to the position of Senior Programmer Analyst on February 14, 1995. *See Exhibit 1, November 15, 1995 Performance Appraisal.*

18. On August 13, 1996, Ms. Griffith asked her new manager, Edmund Freeman, not to assign her tasks that had the potential to run past 5:45 PM because she had medication, exercise, and diet schedules that she had to adhere to at home every evening. She asked to work at home on Mondays and Fridays, as another programmer, Lori LeClerc, had when she had a baby.

19. In response to this request, Mr. Freeman became verbally abusive and he forced Ms. Griffith to disclose personal information about her health by threatening to fire her.

20. Mr. Freeman denied her request for a reasonable accommodation and he demanded that she work overtime. He informed her that he did not want her to be a part of the FormLink project.

21. On or about August 20, 1996, Ms. Griffith's attorney sent CU a letter requesting a reasonable accommodation. Counsel attached supporting medical documents to substantiate the finding of a heart disability. *See Exhibit 2, August 20, 1996 Attorney Bagdoian letter to Battistini at CU.*

22. On October 25, 1996, CU released a memo directing Mr. Freeman not to raise his voice, not to make any threatening comments to Ms. Griffith, to let Ms. Griffith work only from 9:30 to 5:45 PM, and not to work any overtime. *See Exhibit 3, October 25, 1996 Moynihan Memo to Ms. Griffith and Mr. Freeman.*

23. On October 30, 1996, Mr. Freeman stood by Ms. Griffith's cubicle and said "[d]o you know what a tar baby is"? Bob Petrarca, a co-employee stopped and asked "what"? While standing next to Ms. Griffith, Mr. Freeman repeated "[d]o you know what a tar baby is"? Mr. Petrarca responded, "yes, if you touch it, it sticks to you."

24. As a consequence of the "tar baby" remark, Ms. Griffith became very upset and distraught, finding the racial slur to be a hateful and hurtful comment. Ms. Griffith filed an internal complaint with Human Resources.

25. CU took no remedial steps to eradicate racial discrimination in the work force and continued to permit Mr. Freeman to work next to Ms. Griffith, thus inviting a continuous racial hostile environment to permeate on the floor.

26. Ms. Griffith sustained an inordinate amount of stress and feared for her safety at work, which exacerbated her heart condition.

27. In or around November 7, 1996, Barbara Medeiros replaced Mr. Freeman as Ms. Griffith's supervisor.

28. Thereafter, Ms. Medeiros and fellow co-employees in the group publicly humiliated Ms. Griffith by hurling insulting jokes and omitting her from informal meetings.

29. In 1996, Ms. Griffith complained to the company nurse, Lenore Woodley, that CU continued to fail to accommodate her disability; i.e., CU rejected Ms. Griffith's request to work out of her home two days a week and in the office three days a week.

30. In or around January 1997, when Ms. Griffith was allowed to arrive at work by 9:30 AM, Steve Tompkins and Lori LeClerc often greeted Ms. Griffith with "good morning Bernadine. Nice of you to join us." Ms. LeClerc had told her to "shut up, sit down, and get to work." Steve Tompkins called her "Miss In By Twelve."

31. Ms. Medeiros did not invite Ms. Griffith to the informal group meetings with Bob Petrarcas, Steve Tompkins, Lori LeClerc, and Rick Cantin, which often lasted up to thirty minutes at a time.

32. In or around February of 1997, Ms. Medeiros stopped scheduling staff meetings altogether, which effectively kept Ms. Griffith completely out of the group.

33. On or about April 15, 1997, the group returned from a long break and Bob Petrarca said that they needed a full-time QA person to test applications and Steve Tompkins said that Ms. Griffith could do it. Bob Petrarca laughed and said that was a "real bad shot at her."

34. On April 17, 1997, the group went on a break and Steve Tompkins said to Ms. Griffith in front of everyone "we don't want you to come anyway."

35. The group returned about thirty minutes later and Bob Petrarca said to Ms. Griffith with a smile on his face: "I hear your project is going slowly."

36. Other programmers in the group developed skills in writing image systems at CU while Ms. Griffith did not. Ms. Griffith was given clerical duties that consumed a lot of her regular hours.

37. Ms. Griffith, who was responsible for debugging software, did not have access to books and software manuals that explained how the code worked, while other employees were given individual books and software manuals on the code.

38. Ms. Griffith was regularly required to learn an application from an end user, and the employer would not issue her a copy of the software manual.

39. When Ms. Griffith reported that one employee changed her files on a project she was working on, management retaliated by threatening to place Ms. Griffith on probation.

This adverse employment condition caused Ms. Griffith to suffer stress, chest pains, and she feared for her job security.

40. On April 27, 1997, Ms. Griffith filed a charge of discrimination in the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission on the basis of race, sex, age and retaliation.

41. On May 7th and 23rd of 1997, Ms. Griffith sought medical attention for chest pains and work-related stress. Her physician ordered her to stay at home to limit work-related stress.

42. On July 1, 1997, Ms. Griffith, through her lawyers, asked her Employer to allow her to work two days at home and three days in the office.

43. This request for an accommodation was ignored, and Ms. Griffith worked the next two Saturdays to complete a project.

44. On July 9, 1997, Ms. Griffith over heard Ms. Medeiros say about her: she "asked to work at home, but she has a project to do . . . I'm really mad that Bernadine asked for an accommodation."

45. In response to Ms. Griffith's April 27, 1997 charge of discrimination filed in the MCAD and EEOC, CU stated that Mr. "Freeman admits making a remark about a 'tar baby' to another employee." *See Exhibit 4, Paragraph 7 of the June 25, 1997 CU's Position Statement.*

46. CU attempted to explain away this racial slur by noting that Mr. Freeman "was removed from his management." *See Exhibit 4, Paragraph 10 of the June 25, 1997 CU's Position Statement.*

47. CU further asserted in its June 25, 1997 Position Statement that "[a] pproximately 400 individuals work in the CU division in which Ms. Griffith is employed. These individuals are located in two floors of a large four-story office building. At the times of the recent incidents of which Ms. Griffith complains, Freeman's work area was some distance away, perhaps 30 feet from hers. No visual contact is possible between the work areas unless both individuals are standing. No verbal contact is practical from this distance in a busy office. Mr. Freeman's work area was not changed at the time of his reassignment because his duties did not require it. Because of their strained relationship, he has made a point of avoiding contact with Ms. Griffith when possible." *See Exhibit 4, Paragraph 9 of the June 25, 1997 CU's Position Statement.*

48. At this point in time, however, Mr. Freeman made hateful looks at Ms. Griffith and he posted a NRA sticker in his office area. On one occasion, Mr. Freeman almost struck Ms. Griffith when he intentionally threw his fist at her.

49. In or about 1996 to 1997, there were only two other black employees and both black employees were female.

50. By 1997, it was well established that Ms. Griffith's medical condition had substantially impaired her ability to work; she was required to adhere to a rigid schedule of medication, one that made her ill in the early mornings. Thus, necessitating the need to arrive at work at 9:30 AM and to leave work at 5:45 PM.

51. Ms. Griffith had asserted that she was a handicapped individual with a history of coronary artery disease, hypertension, and hyperlipidemia, since May of 1994.

52. In short, Ms. Griffith's medical condition required her to take short periods of rest at work, to not work overtime, and to receive medical treatment for periodic chest pains caused by the said hostile work environment.

53. Ms. Griffith's request for an accommodation to work at home two days a week and three days in the office was reasonable and posed no undue hardship on her employer because software and hardware could have been made available at home, like her employer did for another employee in her group, Lori LeClerc, who took a maternity leave.

54. Ms. Griffith's need to care for herself in the evenings included the tasks of taking additional medication, adhering to a certain diet, and regularly exercising at home.

55. Often, Ms. Griffith brought her work-related stress home, which affected the enjoyment of her family and husband. She was not able to rest in the evenings. She found herself anxious, nervous, exhausted, and fearful. She stopped exercising at night.

56. In or about 1997 to 1998, Ms. Griffith often worked late, 3 to 4 times a week, to meet a deadline; and, her husband often worried about her driving home alone late at night, on the days when she made up time.

57. In the 22-year history of her employment, neither CU nor CGU would allow Ms. Griffith to work at home.

58. On July 16, 1999, the MCAD initially made a determination to dismiss the first charge of said discrimination.

59. On December 6, 1999 the Commission remanded the charge for additional investigation.

60. Although Ms. Griffith's annual review should have been forthcoming in November 1999, CGU did not issue her review until January 5, 2000.

61. The January 5, 2000 Performance Appraisal Review found her to have functioned as a satisfactory employee, but it was the worst review in the history of her 22-year employment. *See Exhibit 5, January 5, 2000 Performance Appraisal Review.*

62. Ms. Griffith's supervisors, Michael A. Sisto and Karen Allen Holmes, attached an addendum memo allegedly written on January 5, 2000 by Monica Scanlon.

63. Monica Scanlon, however, was a former director who was demoted to project manager and had left the company in December 1999.

64. Accordingly, Ms. Griffith believed Michael A. Sisto and Karen Allen Holmes purposely and strategically generated the January 5, 2000 addendum memo, intending to ultimately discharge her from her employment in retaliation for her filing a complaint in the MCAD and the EEOC.

65. As part of the review, under the additional factors section, the review stated: "Bernadine is in a transitional period with her job due to the changes in the group and the sun setting of the Watermark Image systems. While she seems to be eager to get involved and learn the new systems her attendance is hampering this effort. Bernadine is conscientious to inform management and co-workers of her absences, but the work then must fall to others in the group." *See Exhibit 5, January 5, 2000 Performance Appraisal Review, Paragraph 7 on the second page.*

66. On May 23, 2000, Ms. Griffith complained in person to Michael A. Sisto and Karen Allen Holmes about the misrepresentations made in the January 5, 2000 Performance Appraisal Review.

67. Ms. Griffith requested to see the attendance report that her supervisor's had allegedly relied on when drafting the January 5, 2000 Performance Appraisal Review, but her supervisors denied her request to see her attendance report.

68. When challenged on the issue of missed deadlines, Karen Allen Holmes admitted Ms. Griffith had not missed any deadlines.

69. Accordingly, Ms. Griffith refused to sign the January 5, 2000 performance review, which indicated that she had a 3.5 overall job performance rating.

70. On January 7, 2000, Ms. Griffith's supervisors changed her overall job performance to a 3.0 rating. Ms. Griffith signed this review. *See Exhibit 6, January 7, 2000 performance review.*

71. On February 15, 2000, Ms. Griffith sent Karen Allen Holmes an email to inquire about the customary salary increase.

72. Karen Allen Holmes told Ms. Griffith that she was to receive a $1,900.00 raise retroactive back to November 1999.

73. Ms. Griffith never received the $1,900.00 raise.

74. Karen Allen Holmes did not respond to Ms. Griffith's April 18, 2000 email inquiry about the raise.

75. Michael A. Sisto did not respond to Ms. Griffith's requests for the status of her $1,900.00 raise.

76. From 1994 to 1997, Ms. Griffith did not have a problem supporting systems and writing programs in a timely manner after returning from her heart surgery.

77. But after Ms. Griffith filed the first charge of discrimination in 1997, she was treated differently -- her employer periodically assigned her non-programming assignments and/or clerical duties.

78. On August 26, 1999, her employer assigned her the task of moving heavy objects from one office area to another office area.

79. In or about the spring of 2000, CGU converted the kitchen and break/storage area into a break room for a select group of employees. CGU, however, would not allow Ms. Griffith access to this break room, even though she needed an area to rest.

80. Ms. Griffith, embarrassed and humiliated by this exclusion, was forced to rest in her car during lunch breaks and/or to find an empty room for a work break on cold days.

81. From 1997 to 2000, Monica Scanlon and Karen Allen Holmes scheduled training and career development classes for other members of the group, but they intentionally excluded Ms. Griffith from the same training and career development classes.

82. Also during this time period, CGU denied Ms. Griffith access to software manuals and books essential to performing her job.

83. Effectively, Ms. Griffith was forced to enroll in an evening Northeastern University's computer certification program in order to update her computer skills, while other group employees were able to receive training during the daytime, on company time, like Mary Ann Russo, a white female in her mid-thirties did.

84. Ms. Griffith attended Northeastern University in the evenings from 1999 to 2000. She obtained a 4.0 grade average.

85. In 1997, CGU hired Rick Cantin, a white male in his mid-thirties.

86. Mr. Cantin was given all of Ms. Griffith's work assignments shortly after he was hired.

87. After hiring Rick Cantin, CGU qualified him for a two-year retention program, a cash incentive program; at which time it sent Ms. Griffith, then an 18-year employee, a letter informing her she did not qualify for the same program.

88. In 1999, Michael A. Sisto approved group member Rick Cantin's request to take courses that prepared him for the Microsoft certificate's examination.

89. Barring Ms. Griffith from taking certificate programs, like Rick Cantin received, effectively prohibited Ms. Griffith from career advancement.

90. On or about April 1999, Monica Scanlon demoted Ms. Griffith from Sr. Programmer Analyst to Programmer Analyst II. Monica Scanlon, however, continued to assign Ms. Griffith tasking assignments at the higher level of a Sr. Programmer Analyst.

91. In 1999, even though CGU had agreed that it would accommodate Ms. Griffith's 1997 request for an accommodation to arrive by 9:30 AM and not to work past 7:00 PM, Monica Scanlon completely ignored Ms. Griffith's doctor's request that she leave work no later than 7:00 PM.

92. On August 14, 2000, Ellen Elliott was allowed to work from home when she returned from vacation with a cold.

93. In 1999, Michael A. Sisto transfer Margaret Conroy into Ms. Griffith's group. Michael A. Sisto allowed Margaret Conroy to work a ten-hour, four-day week, taking Fridays off.

94. On one occasion, Karen Allen Holmes had instructed Ms. Griffith to call Margaret Conroy's home on a Friday to ask for her password so she could run a procedure using her system ID.

95. Dan Page, who has similar duties to Ms. Griffith, was allowed to go home during the day whenever he was not feeling well.

96. Dan Page told Ms. Griffith that personnel instructed his managers to allow this accommodation because Dan presented a letter from his doctor asking for the accommodation.

97. In January 2000, Michael A. Sisto allowed Aihua Dai to take day classes on Tuesday and Thursday at an area college for the entire semester.

98. Aihua Dai arrived to work at about 4:30 PM and would work a few hours on these days.

99. In September 2000, Ms. Griffith over heard Aihua Dai say that he was allowed to leave at 3:30 PM to take another class for the semester.

100. In January 2000, Ms. Griffith requested an accommodation from CGU with respect to her hours and supported the request with a letter from her doctor recommending a 10:00AM to 6:15 PM schedule, as a reasonable accommodation. *See Exhibit 7, January 20, 2000 Lahey Clinic request*

101. Initially, in response to this request, Karen Allen Holmes advised Ms. Griffith that it was permissible to arrive by 10:15 AM.

102. To compensate for her arrival time, Ms. Griffith routinely stayed at work later than 6:15 PM and worked more hours than CGU's 7½-hour day requirement.

103. Other group members often arrived by 10:00 AM, and then left one hour earlier than Ms. Griffith did.

104. CGU allowed Rick Cantin, Steve Sugarman, and Ellen Elliott to take time off in exchange for working overtime to complete assignments.

105. CGU, however, did not allow Ms. Griffith to take time off when she worked overtime to complete her assignments.

106. Unlike others in Ms. Griffith's group, Lori LeClerc, Suzanne Walker, and Bob Petrarca, she was not given equipment or software that would enable her to work from home. Ms. Griffith asked to work from home on numerous occasions, since July 1, 1997. *See Exhibit 8, July 1, 1997 Erin O'Toole letter to Cathleen Moynihan at CU, with attached 7/31/97 Dr. Tramposch's "recommending decreasing to 3 days/week."*

107. On May 23, 2000, in breach of the employer's promise to allow Ms. Griffith a medical leave of absence, Michael A. Sisto and Karen Allen Holmes placed Ms. Griffith on a written warning not to take a leave or time off. *See Exhibit 9, May 23, 2000 Written Warning issued by Karen Allen Holmes.*

108. Michael A. Sisto and Karen Allen Holmes did not follow the company's sick time policy and they refused to state what rule or policy they relied on when determining that the company should issue a warning against Ms. Griffith. *See Exhibit 10, November 20, 1996 Bob Gowdy's Memo on Sick Time Policy.*

109. Michael A. Sisto and Karen Allen Holmes refused to allow Ms. Griffith to discuss her medical condition or her authorized accommodation.

110. When Ms. Griffith requested to see the attendance report that Michael A. Sisto and Karen Allen Holmes apparently relied on when issuing the May 23, 2000 Warning, they refused to provide Ms. Griffith with the attendance report.

111. Ms. Griffith left this May 23rd meeting because she was experiencing chest pains and her heart was racing.

112. Ms. Griffith immediately went to the personnel department and advised the department that she was suffering from chest pains.

113. Personnel, however, did not call an ambulance or offer any medical assistance. Rather they directed Ms. Griffith to call a co-worker to bring her pursue and coat and told her she could leave the building on her own.

114. Ms. Griffith left the building by herself and immediately drove to an emergency room to receive treatment.

115. Ms. Griffith obtained a medical note for the May 23, 2000 emergency medical treatment. *See Exhibit 11, May 23, 2000 doctor note excusing Ms. Griffith from work until May 24, 2000.*

116. On May 31, 2000, Ms. Griffith presented CGU with a Lahey Clinic doctor's note requesting a two-week leave due to illness. *See Exhibit 12, May 31, 2000 Lahey Clinic doctor's not.*

117. On June 5, 2000, Joanne Murphy in Foxborough Human Resources advised Ms. Griffith that the company would allow her to take a family medical leave under the Family and Medical Leave Act, and Ms. Murphy informed Ms. Griffith of the policy and procedure for the company's short-term medical leave absence. *See Exhibit 13, June 5, 2000 letter from Ms. Murphy to Ms. Griffith with attached June 2, 2000 certification under FMLA.*

118. On June 12, 2000, Ms. Griffith provided her employer with a Lahey Clinic medical note indicating that Ms. Griffith was being treated for stress-related problems, a problem that was "currently disabling for her employment." *See Exhibit 14, June 12, 2000 John Garrison, Ph.D., FAClinP Note.*

119. Ms. Griffith's treating physician and psychologist issued a return to full-time work on June 22, 2000. *See Exhibit 15, John Garrison, Ph.D. Note.*

120. Despite CGU having granted Ms. Griffith permission to take a medical leave under the FMLA, Karen Allen Holmes revoked the same and issued Ms. Griffith a Final Warning on July 27, 2000. *See Exhibit 16, July 27, 2000 Final Warning issued by Karen Allen Holmes.*

121. Like the May 23, 2000 Warning meeting, Karen Allen Holmes refused to discuss Ms. Griffith's medical leave under the company's sick leave policy, and she did not provide Ms. Griffith with an attendance report at the July 27, 2000 Final Warning meeting with Ms. Griffith.

122. Likewise, Michael A. Sisto refused to look at Ms. Griffith's letters from doctors, receipts, or reports explaining that some of her absences were due to physical stress caused by non-programming assignments.

123. In an effort to remedy CGU's unlawful discriminatory conduct of revoking Ms. Griffith's authorized medical leave and the improper issuance of said two warnings, Ms. Griffith's attorney sent CGU a comprehensive letter on August 10, 2000 requesting "CGU immediately: (1) retract the May 23, 2000 Written Warning and July 27, 2000 Probation/Final Warning from Ms. Griffith's personnel file and terminate her probation period; (2) provide Ms. Griffith with the flexible work schedule described above, including flexibility in arrival time, ability to seek medical treatment, and ability to take brief breaks; and (3) render to Ms. Griffith the $1,900.00 in compensation promised to her in January, 2000." *See Exhibit 17, August 10, 2000 Cristin L. Rothfuss letter to Michael A. Sisto at CGU.*

124. CGU did not respond to the August 10, 2000 written request for an accommodation and demand.