# EXHIBIT B

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS
### CIVIL ACTION NO.: 03 CV 12573 EFH

)
BERNADINE T. GRIFFITH           )
   Plaintiff                    )
                                )
vs.                             )
                                )
ONEBEACON INSURANCE COMPANY, )
ONEBEACON AMERICA INSURANCE )
COMPANY, MICHAEL A. SISTO, and )
KAREN ALLEN HOLMES              )
   Defendants                   )
_____ )

## AMENDED VERIFIED COMPLAINT
## AND DEMAND FOR JURY TRIAL

## COMPLAINT

Plaintiff, Bernadine T. Griffith, alleges as her complaint against Defendants: OneBeacon

America Insurance Company, formerly Commercial Union Insurance Company;

OneBeacon Insurance Company, formerly CGU Insurance Company; Michael A. Sisto,

and Karen Allen Holmes, as follows:

## JURISDICTION

1.   Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, and

     supplement jurisdiction under 28 U.S.C. § 1367  This suit is authorized and instituted

     pursuant to Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. § 2000e-

     5(f)(1); Title II of the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. §

     621 et seq, (hereinafter "ADEA"); and Section 107(a) of the Americans with Disabilities

     Act (hereinafter "ADA"), 42 U.S.C.A. § 12117(a), which incorporates by reference §§

     706 (f) (1) and (3) of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. §

1

2000e-5(f)(1) and (3), pursuant to Section 102 of the Civil Rights Act of 1991, 42
U.S.C.A. § 1981a.

## VENUE

2.    The discriminatory employment practices alleged herein to be unlawful were committed
      in Foxborough, Massachusetts and consequently venue in this judicial district is proper
      pursuant to 28 U.S.C.A. § 1391.

## NATURE OF THE ACTION

3.    This is an action against the Defendants under Title VII of the Civil Rights Act of 1964,
      as amended 42 U.S.C.A. § 2000e-5(f)(1)(2); Title II of the Age Discrimination in
      Employment Act of 1967, 29 U.S.C.A. § 621 et seq.; and Title I, Section 503 of the
      Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 et seq. for its unlawful
      discriminatory employment practices on the basis of **race, color, age, retaliation, and
      disability**. The Defendants have intentionally and maliciously subjected the Plaintiff to a
      hostile work environment and retaliated against the Plaintiff, in part, because she filed
      and zealously prosecuted an April 29, 1997 charge of discrimination against her
      employer on the basis of her race, sex, age, and disability, a charge that was ultimately
      remanded for additional investigation in the Massachusetts Commission Against
      Discrimination on December 6, 1999. Defendants created a hostile work environment
      and subjected Plaintiff to retaliation, all unlawful discriminatory conduct which included:
      the Defendants breached its company promise to grant sick leave of absence; revoked
      Plaintiff's authorized accommodation; refused to allow Plaintiff's requested
      accommodation to work at home two days a week, a similar accommodation accorded

2

another white female co-worker on maternity leave; revoked Plaintiff's authorized certified medical leave; failed to administer fringe benefits to the Plaintiff; imposed medically restrictive job assignments on the Plaintiff; denied Plaintiff access to software manuals and books pertaining to her job; segregated Plaintiff from a company break room; excluded the Plaintiff from attending informal group meetings; failed to provide Plaintiff with training and admission to programs accorded other group employees; failed to give Plaintiff a $1,900.00 pay raise that it promised; improperly issued warnings and sanctions against the Plaintiff; refused to provide Plaintiff with record of her alleged absentee record; and, ultimately discharged Plaintiff from her employment, all in violation of Plaintiff's federally protected rights under the ADA, ADEA, and Title VII.

## THE PARTIES

4.  The Plaintiff, Bernadine T. Griffith, is a citizen of the United States and a resident of Boxford, Essex County, Massachusetts. The Plaintiff, a black, disabled female, was 52-years old when she filed the first charge of discrimination in the Equal Employment Opportunity Commission and she was 56-years old when she filed the second charge of discrimination in the Equal Employment Opportunity Commission.

5.  The Defendants: OneBeacon Insurance Company, formerly CGU Insurance Company (hereinafter "CGU"), and OneBeacon America Insurance Company, formerly Commercial Union Insurance Company (hereinafter "CU") are, jointly and severally, engaged in the insurance industry and are licensed in the Commonwealth of Massachusetts. On or about October 17, 2001, Commercial Union Insurance Company changed its name to OneBeacon America Insurance Company. On August 28, 2001,

3

CGU Insurance Company changed its name to OneBeacon Insurance Company. OneBeacon America Insurance Company is a domestic corporation incorporated in the Commonwealth of Massachusetts and its principle place of business is One Beacon Street, Boston, MA 02108. OneBeacon Insurance Company is a foreign corporation incorporated in the Commonwealth of Pennsylvania and its principle place of business is 433 Walnut Street, Philadelphia, Pennsylvania. At all times relevant hereto each Defendant has done business in the Commonwealth of Massachusetts at the Foxborough facility location complained of herein, and has continuously had and/or did have at least twenty (20) employees.

6.    The named-individual Defendants, Michael A. Sisto and Karen Allen Holmes, are employed by the said Defendant Employers. Michael A. Sisto and Karen Allen Holmes conducted business at the Employers' Foxborough, Massachusetts facility location, who either, jointly or individually, have each committed the specific alleged acts complained of herein, acting in the capacity as a supervisor and/or other person acting with authority of the company.

7.    At all relevant times, Defendants have continuously been engaged in the insurance industry, affecting commerce within the meaning of Section 101(5) of the ADA, 42 U.S.C.A. § 12111(5), Section 107(7) of the ADA, 42 U.S.C.A. § 12117(a), which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S.C.A. § 2000e (g) and (h), and the ADEA.

8.    Defendants are each an employer within the meaning of the ADA, ADEA, and Title VII.

## PROCEDURAL REQUIREMENTS

9.   On October 5, 2000, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD") in Boston, Massachusetts. The charge was filed within three hundred (300) days after the occurrence of one or more of the unlawful employment practices alleged herein.

10.  On September 30, 2003, the EEOC issued the Plaintiff a Notice of Right to Sue letter, stating that Plaintiff could file an action under the ADA, ADEA, and Title VII. Plaintiff filed the complaint in this case within ninety (90) days after the date on which she received the Notice of Right to Sue in Docket No. 03-cv-12573 EFH

11.  On April 27, 1997, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD") in Boston, Massachusetts. The charge was filed within three hundred (300) days after the occurrence of one or more of the unlawful employment practices alleged herein.

12.  On March 16, 2004, the EEOC issued the Plaintiff a Notice of Right to Sue letter, stating that Plaintiff could file an action under the ADA and Title VII. Plaintiff filed the complaint in this case within ninety (90) days after the date on which she received the Notice of Right to Sue in Docket No 04-cv-10605, an action in which this Court sua sponte dismissed the said action and ordered the Plaintiff to insert via amendment into the first federal Complaint, i.e., the second EEOC Complaint, the second federal Complaint, i.e., the first EEOC Complaint. The Plaintiff continues to object to this amendment for reasons stated in her Motion to Consolidate, and to the dismissal of the said action.

13.    Consequently, all jurisdictional prerequisites to the institution of this lawsuit have been
       fulfilled, and Plaintiff has exhausted her administrative remedies as required by law.

## STATEMENT OF FACTS

14.    On August 27, 1979, CU hired the Plaintiff, Ms. Griffith, a black female, age 35, as a
       computer operator.

15.    For 22 years, Ms. Griffith satisfactorily performed the essential functions of her job.  CU
       and CGU consistently rated her overall performance level as proficient.

16.    In or around April of 1994, Ms. Griffith suffered a heart attack.

17.    After recovering from quadruple-bypass heart surgery and upon returning to work in
       September of 1994, CU allowed her to take a reasonable accommodation.

18.    CU's authorized reasonable accommodation permitted Ms. Griffith to modify her work
       schedule, to take her necessary medication at work, and to park in handicap parking.

19.    CU recognized Ms. Griffith as a satisfactory employee by regularly generating
       satisfactory annual reviews and, in fact, promoted Ms. Griffith to the position of Senior
       Programmer Analyst on February 14, 1995. *See Exhibit 1, November 15, 1995*
       *Performance Appraisal.*

20.    On August 13, 1996, Ms. Griffith asked her new manager, Edmund Freeman, not to
       assign her tasks that had the potential to run past 5:45 PM because she had medication,
       exercise, and diet schedules that she had to adhere to at home every evening.  She asked
       to work at home on Mondays and Fridays, as another programmer, Lori LeClerc, had
       when she had a baby.

21. In response to this request, Mr. Freeman became verbally abusive and he forced Ms. Griffith to disclose personal information about her health by threatening to fire her.

22. Mr. Freeman denied her request for a reasonable accommodation and he demanded that she work overtime. He informed her that he did not want her to be a part of the FormLink project.

23. On or about August 20, 1996, Ms. Griffith's attorney sent CU a letter requesting a reasonable accommodation. Counsel attached supporting medical documents to substantiate the finding of a heart disability. *See Exhibit 2, August 20, 1996 Attorney Bagdoian letter to Battistini at CU.*

24. On October 25, 1996, CU released a memo directing Mr. Freeman not to raise his voice, not to make any threatening comments to Ms. Griffith, to let Ms. Griffith work only from 9:30 to 5:45 PM, and not to work any overtime. *See Exhibit 3, October 25, 1996 Moynihan Memo to Ms. Griffith and Mr. Freeman.*

25. On October 30, 1996, Mr. Freeman stood by Ms. Griffith's cubicle and said "[d]o you know what a tar baby is"? Bob Petrarca, a co-employee stopped and asked "what"? While standing next to Ms. Griffith, Mr. Freeman repeated "[d]o you know what a tar baby is"? Mr. Petrarca responded, "yes, if you touch it, it sticks to you."

26. As a consequence of the "tar baby" remark, Ms. Griffith became very upset and distraught, finding the racial slur to be a hateful and hurtful comment. Ms. Griffith filed an internal complaint with Human Resources.

27. CU took no remedial steps to eradicate racial discrimination in the work force and continued to permit Mr. Freeman to work next to Ms. Griffith, thus inviting a continuous racial hostile environment to permeate on the floor.

28. Ms. Griffith sustained an inordinate amount of stress and feared for her safety at work, which exacerbated her heart condition.

29. In or around November 7, 1996, Barbara Medeiros replaced Mr. Freeman as Ms. Griffith's supervisor.

30. Thereafter, Ms. Medeiros and fellow co-employees in the group publicly humiliated Ms. Griffith by hurling insulting jokes and omitting her from informal meetings.

31. In 1996, Ms. Griffith complained to the company nurse, Lenore Woodley, that CU continued to fail to accommodate her disability; i.e., CU rejected Ms. Griffith's request to work out of her home two days a week and in the office three days a week.

32. In or around January 1997, when Ms. Griffith was allowed to arrive at work by 9:30 AM, Steve Tompkins and Lori LeClerc often greeted Ms. Griffith with "good morning Bernadine. Nice of you to join us." Ms. LeClerc had told her to "shut up, sit down, and get to work." Steve Tompkins called her "Miss In By Twelve."

33. Ms. Medeiros did not invite Ms. Griffith to the informal group meetings with Bob Petrarcas, Steve Tompkins, Lori LeClerc, and Rick Cantin, which often lasted up to thirty minutes at a time.

34. In or around February of 1997, Ms. Medeiros stopped scheduling staff meetings altogether, which effectively kept Ms. Griffith completely out of the group.

35. On or about April 15, 1997, the group returned from a long break and Bob Petrarca said that they needed a full-time QA person to test applications and Steve Tompkins said that Ms. Griffith could do it. Bob Petrarca laughed and said that was a "real bad shot at her."

36. On April 17, 1997, the group went on a break and Steve Tompkins said to Ms. Griffith in front of everyone "we don't want you to come anyway."

37. The group returned about thirty minutes later and Bob Petrarca said to Ms. Griffith with a smile on his face: "I hear your project is going slowly."

38. Other programmers in the group developed skills in writing image systems at CU while Ms. Griffith did not. Ms. Griffith was given clerical duties that consumed a lot of her regular hours.

39. Ms. Griffith, who was responsible for debugging software, did not have access to books and software manuals that explained how the code worked, while other employees were given individual books and software manuals on the code.

40. Ms. Griffith was regularly required to learn an application from an end user, and the employer would not issue her a copy of the software manual.

41. When Ms. Griffith reported that one employee changed her files on a project she was working on, management retaliated by threatening to place Ms. Griffith on probation. This adverse employment condition caused Ms. Griffith to suffer stress, chest pains, and she feared for her job security.

42. On April 27, 1997, Ms. Griffith filed a charge of discrimination in the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission on the basis of race, sex, age and retaliation.

43. On May 7th and 23rd of 1997, Ms. Griffith sought medical attention for chest pains and work-related stress. Her physician ordered her to stay at home to limit work-related stress.

44. On July 1, 1997, Ms. Griffith, through her lawyers, asked her Employer to allow her to work two days at home and three days in the office.

45.  This request for an accommodation was ignored, and Ms. Griffith worked the next two Saturdays to complete a project.

46.  On July 9, 1997, Ms. Griffith over heard Ms. Medeiros say about her: she "asked to work at home, but she has a project to do . . . I'm really mad that Bernadine asked for an accommodation."

47.  In response to Ms. Griffith's April 27, 1997 charge of discrimination filed in the MCAD and EEOC, CU stated that Mr. "Freeman admits making a remark about a 'tar baby' to another employee." *See Exhibit 4, Paragraph 7 of the June 25, 1997 CU's Position Statement.*

48.  CU attempted to explain away this racial slur by noting that Mr. Freeman "was removed from his management." *See Exhibit 4, Paragraph 10 of the June 25, 1997 CU's Position Statement.*

49.  CU further asserted in its June 25, 1997 Position Statement that "[a] pproximately 400 individuals work in the CU division in which Ms. Griffith is employed. These individuals are located in two floors of a large four-story office building. At the times of the recent incidents of which Ms. Griffith complains, Freeman's work area was some distance away, perhaps 30 feet from hers. No visual contact is possible between the work areas unless both individuals are standing. No verbal contact is practical from this distance in a busy office. Mr. Freeman's work area was not changed at the time of his reassignment because his duties did not require it. Because of their strained relationship, he has made a point of avoiding contact with Ms. Griffith when possible." *See Exhibit 4, Paragraph 9 of the June 25, 1997 CU's Position Statement.*

50.   At this point in time, however, Mr. Freeman made hateful looks at Ms. Griffith and he posted a NRA sticker in his office area. On one occasion, Mr. Freeman almost struck Ms. Griffith when he intentionally threw his fist at her.

51.   In or about 1996 to 1997, there were only two other black employees and both black employees were female.

52.   By 1997, it was well established that Ms. Griffith's medical condition had substantially impaired her ability to work; she was required to adhere to a rigid schedule of medication, one that made her ill in the early mornings. Thus, necessitating the need to arrive at work at 9:30 AM and to leave work at 5:45 PM.

53.   Ms. Griffith had asserted that she was a handicapped individual with a history of coronary artery disease, hypertension, and hyperlipidemia, since May of 1994.

54.   In short, Ms. Griffith's medical condition required her to take short periods of rest at work, to not work overtime, and to receive medical treatment for periodic chest pains caused by the said hostile work environment.

55.   Ms. Griffith's request for an accommodation to work at home two days a week and three days in the office was reasonable and posed no undue hardship on her employer because software and hardware could have been made available at home, like her employer did for another employee in her group, Lori LeClerc, who took a maternity leave.

56.   Ms. Griffith's need to care for herself in the evenings included the tasks of taking additional medication, adhering to a certain diet, and regularly exercising at home.

57.   Often, Ms. Griffith brought her work-related stress home, which affected the enjoyment of her family and husband. She was not able to rest in the evenings. She found herself anxious, nervous, exhausted, and fearful. She stopped exercising at night.

11

58. In or about 1997 to 1998, Ms. Griffith often worked late, 3 to 4 times a week, to meet a deadline; and, her husband often worried about her driving home alone late at night, on the days when she made up time.

59. In the 22-year history of her employment, neither CU nor CGU would allow Ms. Griffith to work at home.

60. On July 16, 1999, the MCAD initially made a determination to dismiss the first charge of said discrimination.

61. On December 6, 1999 the Commission remanded the charge for additional investigation.

62. Although Ms. Griffith's annual review should have been forthcoming in November 1999, CGU did not issue her review until January 5, 2000.

63. The January 5, 2000 Performance Appraisal Review found her to have functioned as a satisfactory employee, but it was the worst review in the history of her 22-year employment. *See Exhibit 5, January 5, 2000 Performance Appraisal Review.*

64. Ms. Griffith's supervisors, Michael A. Sisto and Karen Allen Holmes, attached an addendum memo allegedly written on January 5, 2000 by Monica Scanlon.

65. Monica Scanlon, however, was a former director who was demoted to project manager and had left the company in December 1999.

66. Accordingly, Ms. Griffith believed Michael A. Sisto and Karen Allen Holmes purposely and strategically generated the January 5, 2000 addendum memo, intending to ultimately discharge her from her employment in retaliation for her filing a complaint in the MCAD and the EEOC.

67. As part of the review, under the additional factors section, the review stated: "Bernadine is in a transitional period with her job due to the changes in the group and the sun setting

of the Watermark Image systems. While she seems to be eager to get involved and learn the new systems her attendance is hampering this effort. Bernadine is conscientious to inform management and co-workers of her absences, but the work then must fall to others in the group." *See Exhibit 5, January 5, 2000 Performance Appraisal Review, Paragraph 7 on the second page.*

68. On May 23, 2000, Ms. Griffith complained in person to Michael A. Sisto and Karen Allen Holmes about the misrepresentations made in the January 5, 2000 Performance Appraisal Review.

69. Ms. Griffith requested to see the attendance report that her supervisor's had allegedly relied on when drafting the January 5, 2000 Performance Appraisal Review, but her supervisors denied her request to see her attendance report.

70. When challenged on the issue of missed deadlines, Karen Allen Holmes admitted Ms. Griffith had not missed any deadlines.

71. Accordingly, Ms. Griffith refused to sign the January 5, 2000 performance review, which indicated that she had a 3.5 overall job performance rating.

72. On January 7, 2000, Ms. Griffith's supervisors changed her overall job performance to a 3.0 rating. Ms. Griffith signed this review. *See Exhibit 6, January 7, 2000 performance review.*

73. On February 15, 2000, Ms. Griffith sent Karen Allen Holmes an email to inquire about the customary salary increase.

74. Karen Allen Holmes told Ms. Griffith that she was to receive a $1,900.00 raise retroactive back to November 1999.

75. Ms. Griffith never received the $1,900.00 raise.

76. Karen Allen Holmes did not respond to Ms. Griffith's April 18, 2000 email inquiry about the raise.

77. Michael A. Sisto did not respond to Ms. Griffith's requests for the status of her $1,900.00 raise.

78. From 1994 to 1997, Ms. Griffith did not have a problem supporting systems and writing programs in a timely manner after returning from her heart surgery.

79. But after Ms. Griffith filed the first charge of discrimination in 1997, she was treated differently -- her employer periodically assigned her non-programming assignments and/or clerical duties.

80. On August 26, 1999, her employer assigned her the task of moving heavy objects from one office area to another office area.

81. In or about the spring of 2000, CGU converted the kitchen and break/storage area into a break room for a select group of employees. CGU, however, would not allow Ms. Griffith access to this break room, even though she needed an area to rest.

82. Ms. Griffith, embarrassed and humiliated by this exclusion, was forced to rest in her car during lunch breaks and/or to find an empty room for a work break on cold days.

83. From 1997 to 2000, Monica Scanlon and Karen Allen Holmes scheduled training and career development classes for other members of the group, but they intentionally excluded Ms. Griffith from the same training and career development classes.

84. Also during this time period, CGU denied Ms. Griffith access to software manuals and books essential to performing her job.

85. Effectively, Ms. Griffith was forced to enroll in an evening Northeastern University's computer certification program in order to update her computer skills, while other group

14

employees were able to receive training during the daytime, on company time, like Mary Ann Russo, a white female in her mid-thirties did.

86.  Ms. Griffith attended Northeastern University in the evenings from 1999 to 2000. She obtained a 4.0 grade average.

87.  In 1997, CGU hired Rick Cantin, a white male in his mid-thirties.

88.  Mr. Cantin was given all of Ms. Griffith's work assignments shortly after he was hired.

89.  After hiring Rick Cantin, CGU qualified him for a two-year retention program, a cash incentive program; at which time it sent Ms. Griffith, then an 18-year employee, a letter informing her she did not qualify for the same program.

90.  In 1999, Michael A. Sisto approved group member Rick Cantin's request to take courses that prepared him for the Microsoft certificate's examination.

91.  Barring Ms. Griffith from taking certificate programs, like Rick Cantin received, effectively prohibited Ms. Griffith from career advancement.

92.  On or about April 1999, Monica Scanlon demoted Ms. Griffith from Sr. Programmer Analyst to Programmer Analyst II. Monica Scanlon, however, continued to assign Ms. Griffith tasking assignments at the higher level of a Sr. Programmer Analyst.

93.  In 1999, even though CGU had agreed that it would accommodate Ms. Griffith's 1997 request for an accommodation to arrive by 9:30 AM and not to work past 7:00 PM, Monica Scanlon completely ignored Ms. Griffith's doctor's request that she leave work no later than 7:00 PM.

94.  On August 14, 2000, Ellen Elliott was allowed to work from home when she returned from vacation with a cold.

15

95.   In 1999, Michael A. Sisto transferred Margaret Conroy into Ms. Griffith's group.
      Michael A. Sisto allowed Margaret Conroy to work a ten-hour, four-day week, taking
      Fridays off.

96.   On one occasion, Karen Allen Holmes had instructed Ms. Griffith to call Margaret
      Conroy's home on a Friday to ask for her password so she could run a procedure using
      her system ID.

97.   Dan Page, who has similar duties to Ms. Griffith, was allowed to go home during the day
      whenever he was not feeling well.

98.   Dan Page told Ms. Griffith that personnel instructed his managers to allow this
      accommodation because Dan presented a letter from his doctor asking for the
      accommodation.

99.   In January 2000, Michael A. Sisto allowed Aihua Dai to take day classes on Tuesday and
      Thursday at an area college for the entire semester.

100.  Aihua Dai arrived to work at about 4:30 PM and would work a few hours on these days.

101.  In September 2000, Ms. Griffith over heard Aihua Dai say that he was  allowed to leave
      at 3:30 PM to take another class for the semester.

102.  In January 2000, Ms. Griffith requested an accommodation from CGU with respect to her
      hours and supported the request with a letter from her doctor recommending a 10:00AM
      to 6:15 PM schedule, as a reasonable accommodation. *See Exhibit* 7, *January 20, 2000
      Lahey Clinic request*

103.  Initially, in response to this request, Karen Allen Holmes advised Ms. Griffith that it was
      permissible to arrive by 10:15 AM.

16

104. To compensate for her arrival time, Ms. Griffith routinely stayed at work later than 6:15 PM and worked more hours than CGU's 7½-hour day requirement.

105. Other group members often arrived by 10:00 AM, and then left one hour earlier than Ms. Griffith did.

106. CGU allowed Rick Cantin, Steve Sugarman, and Ellen Elliott to take time off in exchange for working overtime to complete assignments.

107. CGU, however, did not allow Ms. Griffith to take time off when she worked overtime to complete her assignments.

108. Unlike others in Ms. Griffith's group, Lori LeClerc, Suzanne Walker, and Bob Petrarca, she was not given equipment or software that would enable her to work from home. Ms. Griffith asked to work from home on numerous occasions, since July 1, 1997. *See Exhibit 8, July 1, 1997 Erin O'Toole letter to Cathleen Moynihan at CU, with attached 7/31/97 Dr. Tramposch's "recommending decreasing to 3 days/week."*

*109.* On May 23, 2000, in breach of the employer's promise to allow Ms. Griffith a medical leave of absence, Michael A. Sisto and Karen Allen Holmes placed Ms. Griffith on a written warning not to take a leave or time off. *See Exhibit 9, May 23, 2000 Written Warning issued by Karen Allen Holmes.*

110. Michael A. Sisto and Karen Allen Holmes did not follow the company's sick time policy and they refused to state what rule or policy they relied on when determining that the company should issue a warning against Ms. Griffith. *See Exhibit 10, November 20, 1996 Bob Gowdy's Memo on Sick Time Policy.*

111. Michael A. Sisto and Karen Allen Holmes refused to allow Ms. Griffith to discuss her medical condition or her authorized accommodation.

17

112.   When Ms. Griffith requested to see the attendance report that Michael A. Sisto and Karen
       Allen Holmes apparently relied on when issuing the May 23, 2000 Warning, they refused
       to provide Ms. Griffith with the attendance report.

113.   Ms. Griffith left this May 23rd meeting because she was experiencing chest pains and her
       heart was racing.

114.   Ms. Griffith immediately went to the personnel department and advised the department
       that she was suffering from chest pains.

115.   Personnel, however, did not call an ambulance or offer any medical assistance.  Rather
       they directed Ms. Griffith to call a co-worker to bring her pursue and coat and told her
       she could leave the building on her own.

116.   Ms. Griffith left the building by herself and immediately drove to an emergency room to
       receive treatment.

*117.*   Ms. Griffith obtained a medical note for the May 23, 2000 emergency medical treatment.
       *See Exhibit 11, May 23, 2000 doctor note excusing Ms. Griffith from work until May 24,
       2000.*

*118.*   On May 31, 2000, Ms. Griffith presented CGU with a Lahey Clinic doctor's note
       requesting a two-week leave due to illness.  *See Exhibit 12, May 31, 2000 Lahey Clinic
       doctor's not.*

*119.*   On June 5, 2000, Joanne Murphy in Foxborough Human Resources advised Ms. Griffith
       that the company would allow her to take a family medical leave under the Family and
       Medical Leave Act, and Ms. Murphy informed Ms. Griffith of the policy and procedure
       for the company's short-term medical leave absence.  *See Exhibit 13, June 5, 2000 letter
       from Ms. Murphy to Ms. Griffith with attached June 2, 2000 certification under FMLA.*

18

*120.* On June 12, 2000, Ms. Griffith provided her employer with a Lahey Clinic medical note indicating that Ms. Griffith was being treated for stress-related problems, a problem that was "currently disabling for her employment." *See Exhibit 14, June 12, 2000 John Garrison, Ph.D., FAClinP Note.*

*121.* Ms. Griffith's treating physician and psychologist issued a return to full-time work on June 22, 2000. *See Exhibit 15, John Garrison, Ph.D. Note.*

*122.* Despite CGU having granted Ms. Griffith permission to take a medical leave under the FMLA, Karen Allen Holmes revoked the same and issued Ms. Griffith a Final Warning on July 27, 2000. *See Exhibit 16, July 27, 2000 Final Warning issued by Karen Allen Holmes.*

*123.* Like the May 23, 2000 Warning meeting, Karen Allen Holmes refused to discuss Ms. Griffith's medical leave under the company's sick leave policy, and she did not provide Ms. Griffith with an attendance report at the July 27, 2000 Final Warning meeting with Ms. Griffith.

*124.* Likewise, Michael A. Sisto refused to look at Ms. Griffith's letters from doctors, receipts, or reports explaining that some of her absences were due to physical stress caused by non-programming assignments.

*125.* In an effort to remedy CGU's unlawful discriminatory conduct of revoking Ms. Griffith's authorized medical leave and the improper issuance of said two warnings, Ms. Griffith's attorney sent CGU a comprehensive letter on August 10, 2000 requesting "CGU immediately: (1) retract the May 23, 2000 Written Warning and July 27, 2000 Probation/Final Warning from Ms. Griffith's personnel file and terminate her probation period; (2) provide Ms. Griffith with the flexible work schedule described above,

19

including flexibility in arrival time, ability to seek medical treatment, and ability to take brief breaks; and (3) render to Ms. Griffith the $1,900.00 in compensation promised to her in January, 2000." *See Exhibit17, August 10, 2000 Cristin L. Rothfuss letter to Michael A. Sisto at CGU.*

126. CGU did not respond to the August 10, 2000 written request for an accommodation and demand.

127. Ms. Griffith was next ill on September 11 – 13, 2000.

128. In reliance on the Company's sick leave policy and her authorized certification under the FMLA in year 2000, Ms. Griffith notified her employer that she was sick.

129. When Ms. Griffith returned to work, she over heard Karen Allen Holmes tell Mary Ann Russo: "they are going to offer Bernadine a package."

130. Nonetheless, CGU breached its promise to grant Ms. Griffith sick leave time, unlawfully revoked the reasonable accommodations it granted her, unlawfully revoked her authorized certification under FMLA, and intentionally and maliciously discharged Ms. Griffith on September 27, 2000 allegedly because Ms. Griffith called in sick in violation of the July 27, 2000 final warning. *See Exhibit 18, September 27, 2000 Mike Sisto letter to Ms. Griffith.*

131. Ms. Griffith complained about the long-term disability deduction withdrawn against her final paycheck to Human Resources after they fired her.

132. On October 13, 2000, CGU responded to Ms. Griffith's complaint by sending her a check in the amount of $353.38. The enclosed letter did not provide an explanation of nor did the Company provide information on disability benefits.

133. Although CU and CGU regularly deducted long-term disability from Ms. Griffith's paycheck, neither CU nor CGU ever informed Ms. Griffith of the employer's procedure and policy to obtain long-term disability.

134. CU and CGU did not recommend Ms. Griffith collect long-term disability, a benefit offered to other employees.

135. After CGU discharged Ms. Griffith, it intentionally and maliciously harassed her when it offered to give Ms. Griffith a retirement package after she filed her second charge of discrimination, knowing full well that it never intended to allow her to retire.

136. CGU revoked its said offer to allow Ms. Griffith to take early retirement.

137. On October 19, 2000, Ms. Griffith's attorney informed her that CGU had initiated negotiations to have Ms. Griffith accept a retirement package. *See Exhibit 19, October 19, 2000 Cris Rothfuss email to her client, Bernadine Griffith.*

138. Ms. Griffith's attorney advised Ms. Griffith via a post-representation letter that CGU intended to revoke the proposed retirement package because Ms. Griffith had filed a second charge of discrimination with the MCAD and EEOC. *See Exhibit 20, attorney letter to Ms. Griffith, dated October 23, 2000.*

139. On January 31, 2001, CGU sent Ms. Griffith a letter with a company retirement packet alleging that "(w)e have been advised of your intent to retire from CGU effective March 1, 2000." *See Exhibit 21, January 29,2001 Brian Hardiman letter to Ms. Griffith.*

140. To date, CGU has not contacted Ms. Griffith about retirement.

141. Notwithstanding the Plaintiff's many complaints and the Defendants' knowledge of the unlawful discriminatory conduct herein described, the Defendants have each failed to

21

adequately address the unlawful discriminatory conduct, have contributed to it and condoned it, thus creating a hostile work environment.

142.   In 2000, unlawful discriminatory acts herein complained of caused the Plaintiff to be unable to work due to job related stress for several weeks.

143.   The Plaintiff has sustained injury and damages as a direct and foreseeable result of the Defendants unlawful discriminatory acts, and she has not been able to return to work.

144.   On August 28, 2002, the Massachusetts Commission Against Discrimination found "probable cause" of the first charge of discrimination on the basis of racial and handicap discrimination. *See Exhibit 22, August 28, 2002 MCAD Investigative Fact Sheet.*

## COUNT ONE – ADA, TITLE I
(against all defendants)

143   Paragraphs 1 through 19 and 62 through 142 of this complaint are incorporated herein by reference as if fully pleaded in this First Count.

144   Plaintiff suffers from a physical impairment, which substantially limits her in the major life activity of working. Therefore, Plaintiff is a qualified disabled individual within the meaning of the ADA.

145   At all relevant times, Plaintiff was able to perform and performed satisfactorily the essential functions of her job with or without a reasonable accommodation.

146   Plaintiff requested a reasonable accommodation, orally and in writing, and Plaintiff submitted supporting medical documentation.

147   The Defendants failed to accommodate the Plaintiff's disability.

148   The Defendants intentionally and maliciously breached its promise to accord her a reasonable accommodation; revoked Plaintiff's authorized medical leave; breached its

22

company promise to grant a sick leave of absence; refused to accommodate Plaintiff's disability; refused to provide her with record of her alleged absentee record; refused to allow the Plaintiff's requested accommodation to work at home two days a week, a similar accommodation accorded another white female co-worker on maternity leave; and imposed medically restrictive job assignments on the Plaintiff that were not part of her job description.

149     Moreover, the Defendants unlawfully discharged the Plaintiff because of her disability; and, failed to administer fringe benefits available to Plaintiff that it provided to other terminated and/or retired handicapped employees.

150     The acts alleged above constitute unlawful employment discriminatory practices in violation of ADA Section 102(a) and 102(b)(1), 42 U.S.C.A. §§ 12112(a), 12112(b)(1). All conduct alleged above occurred during a legally cognizable time period at Defendants' Foxborough Massachusetts facility.

151     Defendants' intentional employment practices, as alleged above, deprived Plaintiff of equal employment opportunities and otherwise adversely affected her status as an employee, and were the result of Plaintiff's disability.

152     Defendant engaged in the above-described unlawful discriminatory conduct against Plaintiff with malice and/or a reckless disregard of Plaintiff's federally protected rights.


WHEREFORE, the Plaintiff respectfully requests that his Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation

23

interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## COUNT TWO – RETALIATION UNDER ADA
(against all defendants)

154   Paragraphs 1 through 19 and 62 through 153 of this complaint are incorporated herein by reference as if fully pleaded in this Second Count.

155   Defendants have violated Section 503 of the ADA, 42 U.S.C. § 12203, when Defendants intentionally and/or with a reckless disregard committed the following unlawful discriminatory acts: revoking Plaintiff's family medical leave; excluding her from a company break room, training, programs, and informal scheduled meetings; denying her access to software manuals and books pertaining to her job; improperly issuing false reviews, warnings and/or sanctions against the Plaintiff; refusing to give her a promised raise; refusing to provide fringe benefits; creating a hostile work environment; and ultimately terminating Plaintiff's employment as a result of Plaintiff's exercising rights and privileges protected by the ADA.

156   Defendants creating a hostile work environment and termination of Plaintiff's employment on the basis of her disability has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for future pecuniary losses, mental anguish, loss of enjoyment life, and other non-pecuniary losses.

24

157   By their actions set forth above, Defendants have, jointly and severally, engaged in unlawful retaliation against the Plaintiff for having filed a charge of discrimination, and have interfered with Plaintiff's exercise of her protected rights, in violation of ADA, 42 U.S.C. § 12117(a).

158   Defendants have acted maliciously and/or with reckless disregard of Plaintiff's federally protected rights by intentionally retaliating against Plaintiff, thereby entitling Plaintiff to punitive damages under ADA.

WHEREFORE, the Plaintiff respectfully requests that his Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## COUNT THREE – TITLE VII
(against all defendants)

159   Paragraphs 1 through 19 and 62 through 158 of this complaint are incorporated herein by reference as if fully pleaded in this Third Count.

160   The Plaintiff, a black female, is a member of a protected class.

161   The Defendants knew she was a member of a protected class.

162    The Defendants intentionally treated the Plaintiff differently from similarly situated co-workers who were not members of the protected class: Defendants subjected her to an un-welcomed, racial hostile work environment when they failed to properly investigate her complaints of racial discrimination; barred her from attending informal group meetings; denied her computer training and admission to programs accorded other white group employees; assigned her clerical tasking; did not give her access to manuals and books that other white co-employees enjoyed the use of; continued to employ and allow her supervisor to sit near her after this supervisor admitted to making a profoundly hurtful severe racial slur, calling Plaintiff a "tar baby"; refused to accommodate Plaintiff's disability by allowing her to work from home, a similar accommodation accorded another white female co-worker; revoked Plaintiff's medical leave; imposed medically restrictive job assignments on the Plaintiff that were not part of her job description; improperly issued warnings and sanctions against the Plaintiff; ultimately discharged her from her employment; and failed to administer fringe benefits available to the Plaintiff that other terminated and/or retired white employees received.

163    The intentional treatment of the Plaintiff differently from similarly situated co-workers who were not members of the protected class resulted in causing the Plaintiff to suffer adverse employment consequences.

164    The Defendants' discriminatory practices against the Plaintiff on the basis of her race and color are prohibited by federal law under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. § 2000e-5(f)(1).

WHEREFORE, the Plaintiff respectfully requests that this Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## COUNT FOUR – RETALIATION UNDER TITLE VII
(against all defendants)

165    Paragraphs 1 through 19 and 62 through 164 of this complaint are incorporated herein by reference as if fully pleaded in this Fourth Count.

166    Defendants have violated Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, when Defendants intentionally and/or with a reckless disregard committed the following acts: revoked Plaintiff's family medical leave; excluded Plaintiff from a company break room, training, programs, and informal scheduled meetings; denied her access to software manuals and books pertaining to her job; improperly issued reviews, warnings and/or sanctions against the Plaintiff; refused to give her a promised raise; refused to provide fringe benefits; created a hostile work environment; and ultimately terminated Plaintiff's employment as a result of Plaintiff's exercising rights and privileges protected by Title VII.

167    Defendants creating a hostile work environment and termination of Plaintiff's
       employment on the basis of her disability has caused, continues to cause, and will cause
       Plaintiff to suffer substantial damages for future pecuniary losses, mental anguish, loss of
       enjoyment of life, and other non-pecuniary losses.

168    By their actions set forth above, Defendants have, jointly and severally, engaged in
       unlawful retaliation against the Plaintiff for having filed a charge of discrimination, and
       have interfered with Plaintiff's exercise of her protected rights, in violation of Title VII,
       42 U.S.C.A. § 2000e.

169    Defendants have acted maliciously and/or with reckless disregard of Plaintiff's federally
       protected rights by intentionally retaliating against Plaintiff, thereby entitling Plaintiff to
       punitive damages under Title VII.

       WHEREFORE, the Plaintiff respectfully requests that this Court grant Plaintiff on this

       Count: (1) reinstatement of her position with the Defendant employer; (2) economic

       damages in the form of lost back pay, front pay, employment benefits, and medical

       insurance premiums and other pecuniary losses, together with pre and post-litigation

       interests, as permitted by law until paid in full; (3) compensatory damages for mental

       pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at

       trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to

       eradicate the effect of Defendants' unlawful employment practices; and (6) such other

       relief as this Court deems necessary.

## COUNT FIVE– AEDA, TITLE II
(against all defendants)

28

170    Paragraphs 1 through 19 and 62 through 169 of this complaint are incorporated herein by reference as if fully pleaded in this Fifth Count.

171    As described above, the Plaintiff engaged in activity protected by the ADEA.

172    Defendants, jointly and severally, subjected the Plaintiff to the unlawful discriminatory conduct described above in retaliation for this protected activity.

173    As a direct and foreseeable consequence of the Defendants' discriminatory conduct, the Plaintiff has suffered harm, injury, and damages.

    WHEREFORE, the Plaintiff respectfully requests that his Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## COUNT SIX –RETALIATION UNDER AEDA
(against all defendants)

174    Paragraphs 1 through 19 and 62 through 173 of this complaint are incorporated herein by reference as if fully pleaded in this Fourth Count.

175    Defendants have violated Title II of the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. § 621 et seq., when Defendants intentionally and/or with a reckless disregard

29

committed the following acts: revoking Plaintiff's family medical leave; excluding her from a company break room, training, programs, and informal scheduled meetings; denying her access to manuals and books pertaining to her job; improperly issuing reviews, warnings and/or sanctions against the Plaintiff; refusing to give her a promised raise; refusing to provide fringe benefits; creating a hostile work environment; and ultimately terminating Plaintiff's employment as a result of Plaintiff's exercising rights and privileges protected by ADEA.

176    Defendants creating a hostile work environment and termination of Plaintiff's employment on the basis of her disability has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for future pecuniary losses, mental anguish, loss of enjoyment life, and other non-pecuniary losses.

177    By their actions set forth above, Defendants have, jointly and severally, engaged in unlawful retaliation against the Plaintiff for having filed a charge of discrimination, and have interfered with Plaintiff's exercise of her protected rights, in violation of AEDA, 29 U.S.C. § 621.

178    Defendants have acted maliciously and/or with reckless disregard of Plaintiff's federally protected rights by intentionally retaliating against Plaintiff, thereby entitling Plaintiff to punitive damages under ADEA.

WHEREFORE, the Plaintiff respectfully requests that this Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation

interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## COUNT VII – BREACH OF EXPRESS OR IMPLIED CONTRACT
(Against Defendants CU and CGU only)

179 Paragraphs 1 through 19 and 62 through 178 of this complaint are incorporated herein by reference as if fully pleaded in this Seventh Count.

180 CU and CGU, severally and individually, promised Plaintiff that she could take the said reasonable accommodations, that she was entitled to take company sick leave, that she was certified under the FMLA to take short-term disability, and entitled to take sick leave.

181 In consideration of Defendants' promises, Plaintiff satisfactorily performed services for Defendants.

182 Plaintiff reasonably relied upon Defendants promises to her detriment.

183 Plaintiff took necessary steps to remediate loss and damages when she retained counsel, who demanded said accommodations and said curative remedies.

184 The Defendants have continuously failed, refused or neglected to respond to said demand.

185 As a direct and foreseeable consequence of the Defendants' breach, the Plaintiff has suffered harm, injury, and damages.

WHEREFORE, the Plaintiff respectfully requests that his Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) attorney's fees and costs of this action; and (5) such other relief as this Court deems necessary.

## COUNT EIGHT – ADA, TITLE I
(Against Defendants CU and CGU only)

186    Paragraphs 1 through 61 and 144 of this complaint are incorporated herein by reference as if fully pleaded in this Eighth Count.

187    Plaintiff suffers from a physical impairment, which substantially limits her in the major life activity of working. Therefore, Plaintiff is a qualified disabled individual within the meaning of the ADA.

188    At all relevant times, Plaintiff was able to perform and performed satisfactorily the essential functions of her job with or without a reasonable accommodation.

189    Plaintiff requested a reasonable accommodation, orally and in writing, and Plaintiff submitted supporting medical documentation.

190    The Defendants failed to accommodate the Plaintiff's disability.

191    The Defendants intentionally and maliciously breached its promise to accord her a reasonable accommodation; revoked Plaintiff's authorized medical leave; refused to accommodate Plaintiff's disability; refused to allow the Plaintiff's requested accommodation to work at home two days a week, a similar accommodation accorded

32

another white female co-worker on maternity leave; and imposed medically restrictive job assignments on the Plaintiff that were not part of her job description.

192    The acts alleged above constitute unlawful employment discriminatory practices in violation of ADA Section 102(a) and 102(b)(1), 42 U.S.C.A. §§ 12112(a), 12112(b)(1). All conduct alleged above occurred during a legally cognizable time period at Defendants' Foxborough Massachusetts facility.

193    Defendants' intentional employment practices, as alleged above, deprived Plaintiff of equal employment opportunities and otherwise adversely affected her status as an employee, and were the result of Plaintiff's disability.

194    Defendants engaged in the above-described unlawful discriminatory conduct against Plaintiff with malice and/or a reckless disregard of Plaintiff's federally protected rights.

WHEREFORE, the Plaintiff respectfully requests that his Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## COUNT NINTH – RETALIATION UNDER ADA
(Against Defendants CU and CGU only)

33

195    Paragraphs 1 through 61, 144, and 186 through 194 of this complaint are incorporated

herein by reference as if fully pleaded in this Ninth Count.

196    Defendants have violated Section 503 of the ADA, 42 U.S.C. § 12203, when Defendants

intentionally and/or with a reckless disregard committed the above-stated unlawful

discriminatory acts, as a result of Plaintiff's exercising rights and privileges protected by

the ADA.

197    Defendants creating a hostile work environment of Plaintiff's employment on the basis of

her disability has caused, continues to cause, and will cause Plaintiff to suffer substantial

damages for future pecuniary losses, mental anguish, loss of enjoyment life, and other

non-pecuniary losses.

198    By their actions set forth above, Defendants have, jointly and severally, engaged in

unlawful retaliation against the Plaintiff for having filed a charge of discrimination, and

have interfered with Plaintiff's exercise of her protected rights, in violation of ADA, 42

U.S.C. § 12117(a).

199    Defendants have acted maliciously and/or with reckless disregard of Plaintiff's federally

protected rights by intentionally retaliating against Plaintiff, thereby entitling Plaintiff to

punitive damages under ADA.


WHEREFORE, the Plaintiff respectfully requests that his Court grant Plaintiff on this

Count: (1) reinstatement of her position with the Defendant employer; (2) economic

damages in the form of lost back pay, front pay, employment benefits, and medical

insurance premiums and other pecuniary losses, together with pre and post-litigation

interests, as permitted by law until paid in full; (3) compensatory damages for mental

34

pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## COUNT TEN – TITLE VII
(Against Defendants CU and CGU only)

200    Paragraphs 1 through 61, 144, and 186 through 199 of this complaint are incorporated herein by reference as if fully pleaded in this Tenth Count.

201    The Plaintiff, a black female, is a member of a protected class.

202    The Defendants knew she was a member of a protected class.

203    The Defendants intentionally treated the Plaintiff differently from similarly situated co-workers who were not members of the protected class: Defendants subjected her to an un-welcomed racial hostile work environment when they failed to properly investigate her complaints of racial discrimination; barred her from attending informal group meetings; denied her computer training and admission to programs accorded other white group employees; assigned her clerical tasking; did not give her access to manuals and books that other white co-employees enjoyed the use of; continued to employ and allow her supervisor to sit near her after this supervisor admitted to making a profoundly hurtful severe racial slur, calling Plaintiff a "tar baby"; refused to accommodate Plaintiff's disability by allowing her to work from home, a similar accommodation accorded another white female co-worker; revoked Plaintiff's medical leave; and imposed medically restrictive job assignments on the Plaintiff that were not part of her job description.

204     The intentional treatment of the Plaintiff differently from similarly situated co-workers who were not members of the protected class resulted in causing the Plaintiff to suffer adverse employment consequences.

205     The Defendants' discriminatory practices against the Plaintiff on the basis of her race are prohibited by federal law under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.A. § 2000e-5(f)(1).

WHEREFORE, the Plaintiff respectfully requests that this Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## COUNT ELEVENTH – RETALIATION UNDER TITLE VII
(Against Defendants CU and CGU only)

206     Paragraphs 1 through 61, 144, and 186 to 205 of this complaint are incorporated herein by reference as if fully pleaded in this Fourth Count.

207     Defendants have violated Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, when Defendants intentionally and/or with a reckless disregard committed the above-stated acts, to include: excluded Plaintiff from a company break room, training,

programs, and informal scheduled meetings; denied her access to software manuals and books pertaining to her job and created a hostile work environment, as a result of Plaintiff's exercising rights and privileges protected by Title VII.

208    Defendants creating a hostile work environment on the basis of her race has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for future pecuniary losses, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

209    By their actions set forth above, Defendants have, jointly and severally, engaged in unlawful retaliation against the Plaintiff for having filed a charge of discrimination, and have interfered with Plaintiff's exercise of her protected rights, in violation of Title VII, 42 U.S.C.A. § 2000e.

210    Defendants have acted maliciously and/or with reckless disregard of Plaintiff's federally protected rights by intentionally retaliating against Plaintiff, thereby entitling Plaintiff to punitive damages under Title VII.

WHEREFORE, the Plaintiff respectfully requests that this Court grant Plaintiff on this Count: (1) reinstatement of her position with the Defendant employer; (2) economic damages in the form of lost back pay, front pay, employment benefits, and medical insurance premiums and other pecuniary losses, together with pre and post-litigation interests, as permitted by law until paid in full; (3) compensatory damages for mental pain and anguish in amounts to be proved at trial; (4) punitive damages to be proved at trial; (4) attorney's fees and costs of this action; (5) other affirmative relief necessary to

eradicate the effect of Defendants' unlawful employment practices; and (6) such other relief as this Court deems necessary.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury on all the issues raised by the Complaint.

Respectfully submitted,
BERNADINE T. GRIFFITH
By her Attorney,

Date: 8/18/04

Kathleen J. Hill        BBO# 644665
LAW OFFICE OF KATHLEEN J. HILL
92 State Street, Suite 700
Boston, MA 02109
617.742.0457 (O) / 617.742.4508 (F)

## CERTIFICATE OF SERVICE

I, Kathleen J. Hill, herein certify that I served a true and accurate copy of the foregoing Plaintiff's Amended on the counsel of record: Leah M. Moore, and Keith B. Muntyan, of Morgan, Brown & Joy, One Boston Place, Boston, Massachusetts by pre-paid U.S. Certified Mail and facsimile on this 19th day of August 2004.

Kathleen J. Hill

38