UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO.: 03 CV 12573 EFH

| | |
|---|---|
| BERNADINE T. GRIFFITH<br>Plaintiff<br><br>vs.<br><br>ONEBEACON INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE<br>COMPANY, MICHAEL A. SISTO, and<br>KAREN ALLEN HOLMES<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPPOSITION TO DEFENDANTS MICHAEL A. SISTO AND KAREN ALLEN HOLMES MOTION FOR JUDGMENT ON THE PLEADINGS

The plaintiff, Bernadine T. Griffith, opposes the Defendants Michael A. Sisto and Karen Allen Holmes Motion For Judgment on the Pleadings on the grounds that individual liability exists under the ADA, Title VII, and the ADEA in Massachusetts state and federal courts and, therefore, the this court should not dismiss plaintiff's claims against the individual defendants, as the plaintiff more fully states in her supporting memorandum of law.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION

### STATEMENT OF FACTS

The facts of the plaintiff's Amended Complaint specifically aver individual defendant participation as to Michael A. Sisto and Karen Holmes. In paragraph six of the Amended Complaint, the plaintiff averred that "the named-individual Defendants, Michael A. Sisto and Karen Allen Holmes, are employed by the said Defendant Employers. Michael A. Sisto and

1

Karen Allen Holmes conduct business at the Employers' Foxborough, Massachusetts facility location, who either, jointly or individually, have each committed the specific acts complained of herein, acting in the capacity as a supervisor and/or other person acting with authority of the company." (*See* Amended Complaint, page 4, ¶ 6.).

The Amended Complaint sets forth claims for discrimination and retaliation against the individual defendants when averring that "[o]n July 16, 1999, the Commission (MCAD) remanded the charge for additional investigation (the 1997 MCAD discrimination claim – originally 04cv10605EFH). (*See* Amended Complaint, page 12, ¶ 61.). The discriminatory and retaliatory actions taken by the individual defendants against the plaintiff, in pertinent part, concern the circumstances pertaining to the annual review; the customary salary increase; the hostile work environment; the differential treatment; revocation of a reasonable accommodation; denial of benefits; failure to act; and, ultimately the termination of employment. "Although Ms. Griffith's annual review should have been forthcoming in November of 1999, CGU did not issue her review until January 5, 2000. The January 5, 2000 Performance Appraisal Review found her to have functioned as a satisfactory employee, but it was the worst review in the history of her 22-year employment. Ms. Griffith's supervisors, Michael A. Sisto and Karen Allen Holmes, attached an addendum memo allegedly written on January 5, 2000 by Monica Scanlon. Monica Scanlon, however, was a former director who was demoted to project manager and had left the company in December in 1999. Accordingly, Ms. Griffith believed Michael A. Sisto and Karen Allen Holmes purposely and strategically generated the January 5, 2000 addendum memo, intending to ultimately discharge her from her employment in retaliation for her filing a complaint in the MCAD and the EEOC. As part of the review, under the additional factors

2

section, the review stated: 'Bernadine is in a transitional period with her job due to the changes in the group and the sun setting of the Watermark Image systems. While she seems to be eager to get involved and learn the new systems her attendance is hampering this effort. Bernadine is conscientious to inform management and co-workers of her absences, but the work then must fall to others in the group." (*See* Amended Complaint, page 12-13, ¶¶ 62-67, Exhibit 5, January 5, 2000 Performance Appraisal Review.).

"On May 23, 2000, Ms. Griffith complained in person to Michael A. Sisto and Karen Allen Holmes about the misrepresentations made in the January 5, 2000 Performance Appraisal Review. Ms. Griffith requested to see the attendance report that her supervisor's had allegedly relied on when drafting the January 5, 2000 Performance Appraisal Review, but her supervisors denied her request to see her attendance report. When challenged on the issue of missed deadlines, Karen Allen Holmes admitted Ms. Griffith had not missed any deadlines. Accordingly, Ms. Griffith refused to sign the January 5, 2000 performance review, which indicated that she had a 3.5 overall job performance rating. On January 7. 2000, Ms. Griffith's supervisors changed her overall job performance to a 3.0 rating. Ms. Griffith signed this review." (*See* Amended Complaint, page 13, ¶¶ 68-72, Exhibit 6, January 7, 2000 Performance Review.).

"On February 15, 2000, Ms. Griffith sent Karen Allen Holmes an email to inquire about the customary salary increase. Karen Allen Holmes told Ms. Griffith that she was to receive a $1,900.00 raise retroactive back to November 1999. Ms. Griffith never received the $1,900.00 raise. Karen Allen Holmes did not respond to Ms. Griffith's April 18, 2000 email inquiry about the raise. Michael Sisto did not respond to Ms. Griffith's requests for the status of her $1,900.00 raise." (*See* Amended Complaint, pages 13-14, ¶¶ 73-78.).

3

Further, the plaintiff averred that subsequent to the first charge of discrimination in 1997, "she was treated differently – her employer periodically assigned her non-programming assignments and/or clerical duties. On August 26, 1999, her employer assigned her the task of moving heavy objects from one office area to another office area. In or about the spring of 2000, CGU converted the kitchen and break/storage area into a break room for a select group of employees. CGU, however, would not allow Ms. Griffith access to this break room, even though she needed an area to rest. Ms. Griffith, embarrassed and humiliated by this exclusion, was forced to rest in her car during lunch breaks and/or to find an empty room for a work break on cold days." (*See* Amended Complaint, page 14, ¶¶ 79-82.)

Specifically, as to Karen Allen Holmes, the plaintiff averred: "From 1997 to 2000, Monica Scanlon and Karen Allen Holmes scheduled training and career development classes for other members of the group, but they intentionally excluded Ms. Griffith from the same training and career development classes. Also during this time period, CGU denied Ms. Griffith access to software manuals and books essential to performing her job. Effectively, Ms. Griffith was forced to enroll in an evening Northeastern University's computer certification program in order to update her computer skills, while other group employees were able to receive training during the daytime, on company time, like Mary Ann Russo, a white female in her mid-thirties did. Ms. Griffith attended Northeastern University in the evenings from 1999 to 2000. She obtained a 4.0 grade average." (*See* Amended Complaint, pages 14-15, ¶¶ 83-86.)

Specifically, as to Michael A. Sisto, the plaintiff averred: "In 1997, CGU hired Rick Cantin, a white male in his mid-thirties. Mr. Cantin was given all of Ms. Griffith's work assignments shortly after he was hired. After hiring Rick Cantin, CGU qualified him for a

two-year retention program, a cash incentive program; at which time it sent Ms. Griffith, then an 18-year employee, a letter informing her she did not qualify for the same program. In 1999, Michael A. Sisto approved group member Rick Cantin's request to take courses that prepared him for the Microsoft certificate's examination. Barring Ms. Griffith from taking certificate programs, like Rick Cantin received, effectively prohibited Ms. Griffith from career advancement." (*See* Amended Complaint, page 125, ¶¶ 87-91.)

As to Michael A. Sisto and Karen Allen Holmes, the plaintiff specially averred: "In 1999, Michael A. Sisto transferred Margaret Conroy into Ms. Griffith's group. Michael A. Sisto allowed Margaret Conroy to work a ten-hour, four-day week, taking Fridays off. On one occasion, Karen Allen Holmes had instructed Ms. Griffith to call Margaret Conroy's home on a Friday to ask for her password so she could run a procedure using her system ID. Dan Page, who has similar duties to Ms. Griffith, was allowed to go home during the day whenever he was not felling well. Dan Page told Ms. Griffith that personnel instructed his managers to allow this accommodation because Dan presented a letter from his doctor asking for the accommodation. In January 2000, Michael A. Sisto allowed Aihua Dai to take day classes on Tuesday and Thursday at an area college for the entire summer. Aihua Dai arrived to work at about 4:30PM and would work a few hours on these days. In September 2000, Ms. Griffith over heard Aihua Dai say that he was allowed to leave at 3:30 PM to take another class for the semester. In January 2000, Ms. Griffith requested an accommodation from CGU with respect to her hours and supported the request with a letter from her doctor recommending a 10:00AM to 6:15 PM schedule, as a reasonable accommodation. Initially, in response to this request, Karen Allen Holmes advised Ms. Griffith that it was permissible to arrive by 10:15AM. To compensate for her arrival time, Ms. Griffith routinely stayed at

5

work later that 6:15 PM and worked more hours than CGU's 7 ½-hour day requirement. Other group members often arrived by 10:00 AM, and then left one hour earlier than Ms. Griffith did. CGU allowed Rick Cantin, Steve Sugarman, and Ellen Elliott to take time off in exchange for working overtime to complete assignments. CGU, however, did not allow Ms. Griffith to take time off when she worked overtime to complete her assignments. Unlike others in Ms. Griffith's group, Lori LeClerc, Suzanne Walker, and Bob Petrarca, she was not given equipment or software that would enable her to work from home. Ms. Griffith asked to work from home on numerous occasions, since July 1, 1991." (*See* Amended Complaint, page 15-16, ¶¶ 95-108.).

Next, the plaintiff specifically averred: "On May 23, 2000, in breach of the employer's promise to allow Ms. Griffith a medical leave of absence, Michael A. Sisto and Karen Allen Holmes placed Ms. Griffith on a written warning not to take a leave or time off. Michael A. Sisto and Karen Allen Holmes did not follow the company's sick time policy and they refused to state what rule or policy they relied on when determining that the company should issue a warning against Ms. Griffith. Michael A. Sisto and Karen Allen Holmes refused to allow Ms. Griffith to discuss her medical condition or her authorized accommodation. When Ms. Griffith requested to see the attendance report that Michael A. Sisto and Karen Allen Holmes apparently relied on when issuing the May 23, 20000 Warning, they refused to provide Ms. Griffith with the attendance report." (*See* Amended Complaint, page 17-18, ¶¶ 109-112, Exhibit 9, May 23, 2000 Written Warning issued by Karen Allen Holmes.).

Continuing with specificity, the plaintiff averred: "Despite CGU having granted Ms. Griffith permission to take a medical leave under the FMLA, Karen Allen Holmes revoked the same and issued Ms. Griffith a Final Warning on July 27, 2000. Like the May 23, 2000

6

Warning meeting, Karen Allen Holmes refused to discuss Ms. Griffith's medical leave under the company's sick leave policy, and she did not provide Ms. Griffith with an attendance report at the July 27, 2000 Final Warning meeting with Ms. Griffith. Likewise, Michael A. Sisto refused to look at Ms. Griffith's letter from doctors, receipts, or reports explaining that some of her absences were due to physical stress caused by non-programming assignments. In an effort to remedy CGU's unlawful discriminatory conduct of revoking Ms. Griffith's authorized medical leave and the improper issuance of said two warnings, Ms. Griffith's attorney sent CGU a comprehensive letter on August 10, 2000 requesting 'CGU immediately: (1) retract the May 23, 2000 Written Warning and July 27, 2000 Probation/Final Warning from Ms. Griffith's personnel file and terminate her probation period; (2) provide Ms. Griffith with the flexible work schedule described above, including flexibility in arrival time, ability to seek medical treatment, and ability to take brief breaks; and (3) render to Ms. Griffith the $1,900.00 in compensation promised to her in January 2000.' CGU did not respond to the August 10, 2000 written request for an accommodation and demand. Ms. Griffith was next ill on September 11-13, 2000. In reliance on the Company's sick leave policy and her authorized certification under the FMLA in year 2000, Ms. Griffith notified her employer that she was sick. When Ms. Griffith returned to work, she over heard Karen Allen Holmes tell Mary Ann Russo: 'they are going to offer Bernadine a package.' Nonetheless, CGU breached its promise to grant Ms. Griffith sick leave time, unlawfully revoked the reasonable accommodations it granted her, unlawfully revoked her authorized certification under FMLA, and intentionally and maliciously discharged Ms. Griffith on September 27, 2000 allegedly because Ms. Griffith called in sick in violation of the July 27, 2000 final warning." (*See* Amended Complaint, page 19-20, ¶¶ 122-130; Exhibit

16, July 27, 2000 Final Warning issued by Karen Allen Holmes; Exhibit 17, August 10, 20000 Cristin L. Rothfuss letter to Michael A. Sisto at CGU; Exhibit 18, September 27, 2000 Mike Sisto letter to Ms. Griffith.).

Supporting exhibits to the Amended Complaint, which document correspondence to and from supervisors Michael A. Sisto and Karen Allen Holmes and the plaintiff, include: Exhibits 5, 6, 9, 16, 17, and 18. The Plaintiff attaches these Exhibits as Exhibit A, hereto.

ARGUMENT

This Honorable Court should deny the Defendants Michael A. Sisto and Karen Allen Holmes Motion for Judgment on the Pleadings because individual liability exists under the ADA, Title VII, and the ADEA[1] in Massachusetts' state and federal courts.[2] In *Morrison*, the 1st Circuit Court of Appeals declined to answer the question of individual liability under Title VII, noting that "the question has no very obvious answer." *Morrison v. Carleton Wollen Mills, Inc.*, 108 F.3d 429, 444 (1st Cir. 1997) (presumably giving considerable weight to Judge Parker's dissenting opinion in *Tomka v. Seiler Corp.* 66 F.3d 1295, 1313-17 (2nd Cir. 1995), which thoroughly addressed the flaws of the Miller/Tomka doctrine: the exemption of the small

---

[1] For purposes of brevity, the courts have generally presented ADA, Title VII, and ADEA in the same context when ruling on the issue of individual liability. Of significance, the ADA defines an employer as "a person engaged in an industry affecting commerce . . . and any agent of such person . . ." 42 U.S.C. § 12111(5) (A). Title VII defines "employer," in pertinent part, as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e (b).

[2] See *Ruffino v. State St. Bank & Trust Co.*, 908 F.Supp. 1019, 1047-1048 (D.Mass. 1995); *Chatman v. Gentle Dental Center of Waltham*, 973 F.Supp. 228, 232 n. 8 (D.Mass. 1997); *Chapin v. University of Mass. at Lowell*, 977 F. Supp. 72, 80 (D. Mass. 1997); *Morehouse v. Berkshire Gas Co.*, 989 F. Supp. 54, 61 (D.Mass. 1997); See also, *Hope v. San-Ran, Inc.*, 8 M.D.L.R. 1195, 1210-1211 (1986); *Harmon v. Malden Hosp.*, 19 M.D.L.R. 157, 157-158 (1997); *Raffurty v. Keyland Corp.*, 22 M.D.L.R. 125, 127 (2000); *Tunstall v. Acticell H'W Cosmetics*, 22 M.D.L.R. 284, 287-289 (2000). Other federal courts in the first circuit finding individual liability include: *Douglas v. Coca-Cola Bottling Co. of N. New England, Inc.*, 855 F.Supp. 518, 520 (D.N.H. 1994); *Weeks v. State of Maine*, 871 F.Supp. 515 (D. Me. 1994); *Wyss v. General Dynamics Corp.* 24 F. Supp. 202 (D.R.I. 1998).

employer from liability[3]; the consideration of employer's size when calculating liability caps[4]; and the pre-1991 limitation of remedies to back pay and equitable remedies.[5] ).

But perhaps, the strongest argument for individual liability is best centered on statutory construction: the plain meaning of the statute. In *Ruffino*, Justice Gertner correctly reasoned that courts who have answered the individual liability question by including "and any agent" in the definition of the "employer" under Title VII, thereby imposing liability under the doctrine of respondeat superior, "is disfavored as a matter of statutory construction and meritless." *Ruffino v. State St. Bank & Trust Co.*, 908 F.Supp. 1019, 1047-1048 (D.Mass. 1995). For the question is unambiguous under M.G.L. c. 151B:

> "specifically under M.G.L. c. 151B § 4 (4A) prohibits "any person" from interfering "with another person in the exercise of enjoyment of any right granted by this chapter." In addition, M.G.L. c. 151B § 4 (5) prohibits "any person, whether an employer or employee or not, to aid, incite, compel, coerce the doing of any of the acts forbidden under this chapter or attempt to do so." The distinction between the terminology used in M.G.L. c. 151B, § 4 (1) ("employer, by himself or his agent") and in Sections 4 (4A) and 4 (5) ("any person") bears notice. By its distinctly crafted terms, M.G.L. 151 B applies

---

[3] "The floor debates concerning Title VII suggest that the minimum employee threshold was not created to protect small "entities" from potential liability, but rather, it was deemed necessary under the Commerce Clause . . . Moreover, where Title VII's impact upon small businesses was debated, those debates voiced a concern that federal legislation not intrude upon the intimate – often family – ties which often exist in businesses employing only a handful of people." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1322 (2nd Cir. 1995) "The proposition that Congress was concerned with the impact of civil liability upon small "entities" is further undermined by the fact that employers and agents of those employers face unlimited civil liability for similar discriminatory acts under 42 U.S.C. § (s) 1981, regardless of the number of persons they employ." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1323 (2nd Cir. 1995).

[4] "Recalling that Title VII liability on the part of an employer's agent must be premised upon a prior finding that the complained-of conduct may properly be imputed to the employer as well. *Kotcher v. Rosa & Sullivan Appliance Center, Inc.*, 957 F.2d 59, 63 (2d Cir. 1992) (citing *Meritor*, 477 U.S. at 70-71). Consequently, under a literal reading of the statute, wherever Title VII liability is established, a remedy is available against the employer by respondeat superior, as well as against the employer and his agent together, jointly and severally. Therefore, the implication that an employer's agent would be forced to bear the full brunt of Title VII liability, without the agent's employer also bearing a portion of that liability, is illusory." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1323 (2nd Cir. 1995).

[5] "As for the availability of reinstatement relief against an employer's agent, the majority acknowledges that there are circumstances where a supervisor will have the authority to rehire, promote, and correct employment records. However, the majority reasons that the mere existence of this authority in some cases should not embolden us to hold agents liable for the reinstatement of a successful plaintiff. On the contrary, it is the majority which boldly chooses to foreclose individual liability in all cases arising under Title VII, contending, categorically, that back pay and reinstatement "can only be provided by employers," while admitting that there may be instances where individual defendants may have the authority to provide precisely the remedy sought by the plaintiff." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1322 (2nd Cir. 1995)

not only to employers acting through their principals and agents, but also to any person who aids and abets discriminatory or retaliatory conduct prohibited under Chapter 151B, as well as to any person who interferes with another's right to work free of unlawful discrimination and retaliation." *Ruffino v. State St. Bank & Trust Co.*, 908 F.Supp. 1019, 1047-1048 (D.Mass. 1995).

Likewise, the *Wyss* Court correctly reasoned when analyzing the plain meaning of the statute: "[t]o aid in this inquiry, the Supreme Court instructs us that 'Congress wanted courts to look to agency principles for guidance' . . . *Meritor* itself outlines the contours of Title VII liability for sexual harassment consistent with traditional agency principles. While the issue of individual liability was not before the Court in *Meritor*, its focus upon traditional agency principles suggests that traditional joint and several liability between an agent and an employer is logically consistent with the Court's broader discussion of sexual harassment actionable under Title VII." *Wyss v. General Dynamics Corp.*, 24 F.Supp. 2d 202 (D.R.I. 1998) (citing *Meritor Sav. Bank, FSB. V. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed. 2d 49 (1986) (citing Restatement (Second) of Agency §§ 219-237 (1958)) accord *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2285, 141 L.Ed. 2d 662 (1998), *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2269-70, 141 L.Ed.2d 633 (1998).

If a plaintiff alleges that a co-worker or a supervisory agent participated in discriminatory or retaliatory conduct in the complaint, the named-individual defendant may be held liable. *See Chapin v. University of Massachusetts at Lowell*, 977 F. Supp. 72, 80 (D.Mass. 1997); *Ruffino v. State Street Bank & Trust Co.*, 908 F.Supp. 1019, 1048 (D.Mass. 1995); *Morehouse v. Berkshire Gas Co.*, 989 F.Supp. 54, 61 (D.Mass. 1997). Where the facts of the complaint do not support individual defendant participation, the plaintiff must show that the individual defendant: (1) had knowledge of on going harassment but failed to act; and (2) the failure to act is causally connected to the adverse discriminatory employment action. *See Chapin v. University of*

*Massachusetts at Lowell*, 977 F. Supp. 72, 80 (D.Mass. 1997); *See also Hart v. Verizon Communications, Inc., Zobel, J.* (Mass. 2001). (succinctly analyzing the plain meaning of Title VII, 42 U.S.C. § 2000e-2 (a) (1), but dismissing the complaint against co-workers and a training manager because the complaint did not "allege the necessary level of supervisory powers to trigger liability").

## CONCLUSION

This Honorable Court should deny the Defendants Motion for Judgment on the Pleadings because individual liability exists under the ADA, Title VII, and the ADEA; and, the plaintiff has specifically plead the facts to show that Michael A. Sisto and Karen Allen Holmes participated in and aided and abetted the discriminatory or retaliatory conduct; each defendant intentionally and purposefully interfered with the plaintiff's right to work in an environment free of discrimination and retaliation; each individual defendant had knowledge of on going harassment but failed to act; and each individual defendant's failure to act is causally connected to the adverse discriminatory employment action, as is more specifically set forth in the plaintiff's Amended Complaint.

Respectfully submitted,
BERNADINE T. GRIFFITH
By her Attorney,

Date:  June 22, 2005

Kathleen J. Hill     BBO# 644665
LAW OFFICE OF KATHLEEN J. HILL
92 State Street, Suite 700
Boston, MA 02109
617.742.0457 (O) / 617.742.4508 (F)

11

## CERTIFICATE OF SERVICE

I, Kathleen J. Hill, certify that I served a true and accurate copy of the foregoing Plaintiff's Opposition to Defendants Michael A. Sisto and Karen Allen Holmes Motion for Judgment on the counsel of record: *Keith B. Muntyan and Leah M. Moore*, of Morgan, Brown & Joy, Two Hundred State Street, 11th Floor, Boston, Massachusetts 02109 by pre-paid U.S. Mail and facsimile on this 22st day of June 2005.

_____
Kathleen J. Hill     BBO# 644665