**Page 43**

the programs into a location?
 A. Software installations, that's right.
 Q. And then troubleshooting those programs and installations?
 A. That's right.
 Q. And all of the members in this group had that ability?
 A. Yes, to different degrees of knowledge.
 Q. With regards to what other areas of knowledge were required to work with these group with you other than the installation skills? What other skills does an employee need to possess?
 MR. MUNTYAN: Objection to the form of the question.
 A. Each individual would have different technical skills and experience, or not each one, but there would be any one person would have a different set of experience, technical experience and skill.
 Q. Okay. So with regards to, for example, if an employee were to apply, if an applicant were to apply for an IT position, what are the fundamental requirements of either education or

**Page 44**

training skills that an applicant would need to work in your group?
 A. If a person were applying to our group?
 Q. Yes.
 A. At the time we might be looking for experience with client server applications.
 Q. Okay.
 A. A variety of programming languages, design and systems analysis skills, maybe experience with quality assurance processes, documentation preparation, testing, develop testing plans, specific knowledge of imaging systems, specific knowledge of operating -- service operating systems and specific knowledge of main frame based or host based languages operating systems and tools.
 Q. Okay. Is there any preference to any particular certification or a particular program that an applicant should have completed?
 A. If an applicant came to us with certification in client server application development at the time.
 Q. Yes.
 A. And experience applying that

**Page 45**

certification, then that would probably make them attractive but it would be more a notch above that we look for.
 Q. Okay. This particular group of individuals, were they trained -- were they categorically -- are they at an advanced level or an entry level into the IT Department?
 A. That particular group?
 Q. This particular group -- well, because Miss Griffith in this particular period of time that she was working with you, she has 20 plus years of experience -- so most of the individuals as they would enter into the groups, are the projects for those individuals advanced and able to learn relatively quickly or are these projects fundamental, rudimentary maintenance of applications?
 How would you characterize the level of skill and expertise your group is required?
 A. We had some, some areas that I would consider to be fairly, you know, once you learned it, it was rudimentary.
 Q. Okay.
 A. But we were dealing at the time with

**Page 46**

some highly complex advanced technology uses at that time for our company.
 Q. By comparison of the other groups within the IT Department?
 A. There were groups that were certainly doing, who were maintaining technology that had been installed and used for many years. So if you want to consider that to be -- it wasn't brand new technology. It didn't mean it wasn't complex, and it didn't require high skills. We had some groups that were working with brand new technology beyond what we were working on.
 Q. Okay.
 A. It depended on the group and what their application required.
 Q. Well, how would you characterize in your opinion this particular group that you managed, the level of skills and expertise?
 A. You are speaking about the skills that this particular group of people possessed?
 Q. Yes.
 A. It ran the gamut in terms of skills and experience.
 Q. And where did Miss Griffith rank within

**Page 47**

this group of expertise and skills in your opinion?
 A. How do you mean? How do you want me to rank it?
 Q. Well, you offer how you would rank these individuals because I don't know how you would qualify the skills and the expertise on the basis of their sophistication of the multiple languages that they need to learn and know for programming.
 In order to do their particular job in this group, was she competent to do her job?
 A. Miss Griffith was competent for the assignments that we gave her.
 Q. And the other individuals in this extreme imaging group, were they competent to do their job?
 A. Yes.
 Q. Rick Cantin and Ellen Elliott?
 A. Yes, those two individuals were competent to do their job.
 Q. Okay. And how about the other individuals in this blueprint staff, were those individuals competent to do their job?

**Page 48**

 A. I want to make it clear that these -- this was not how we were divided up. I want to make that clear.
 This group -- there weren't three people working and these people working. So I just want to make that clear, but each of these individuals were, they were competent to do the job that they were asked to do.
 Q. How did you divide this group?
 A. Again --
 Q. You?
 A. It changed.
 Q. By?
 A. Depending on what we were required to do. It didn't change every month.
 Q. Right.
 A. But we did have realignment based on what we were being asked to produce in any given time frame.
 Q. Okay.
 A. So it didn't necessarily mean that if a person was working for this manager, that person would never work for the other manager.
 Q. Okay.

Case 1:03-cv-12573-EFH    Document 81-2    Filed 12/15/2005    Page 2 of 6

Griffith v. OneBeacon, et al.                                    Monica Scanlon, Vol. 1, 8/30/04

Page 49

1   A.   So I don't remember exactly how it
2   worked out. I remember by looking at the names
3   what most people did, but I know it has been too
4   long for me for me to remember exactly.
5   Q.   Other than Karen Holmes and Tom
6   Danforth, were there any other project leaders in
7   this group?
8   A.   No.
9   Q.   And are all of these individuals named
10  on this group programmers?
11  A.   Do you mean by title?
12  Q.   Yes.
13  A.   They all had different titles.
14  Q.   Which, if any, of these individuals
15  were by title categorized as programmers?
16  A.   I don't remember that that exact title
17  existed at that time.
18  Q.   Okay.
19  A.   Just programmer, I don't remember.
20  Q.   Senior programmer? I have seen
21  documents where Miss Griffith is identified as a
22  programmer -- senior programmer?
23  A.   Our titles change dramatically so I
24  will it do the best I can for you. But I don't

Page 50

1   recall this specific.
2   Q.   That title?
3   A.   Chris Genest did primarily programming
4   so that that was probably true.
5   Q.   Okay.
6   A.   I don't recall the exact titles, I'm
7   sorry.
8   Q.   So just generic?
9   A.   I know that programmer was in his
10  title, and it may have been --
11  Q.   Are there any other distinguishing
12  factors that you can tell me about when you look
13  at the names or the list of these people?
14  A.   I am not sure.
15  Q.   How with you would distinguish them
16  from one another, how you would make them
17  different and divide them apart?
18  A.   Of course by their expertise and skill
19  and their level of experience and what we were
20  trying to do.
21  Q.   So when you look at the expertise and
22  the level and the skills and the names of these
23  individuals, how would you characterize that?
24  Can you make that division for me now,

Page 51

1   the distinction, the difference?
2   A.   You want me to tell you about these
3   individuals?
4   Q.   Yes, as to how they compare, how was it
5   that you --
6   A.   Jen was a highly skilled, highly
7   talented nearly systems level programmer --
8   probably was a systems level programmer who could
9   code, debug, solve problems. It was just
10  amazing.
11       Aihua Dia and, I believe, Joe DeMarco
12  were trainees. Trainees had a special program
13  that the IT Department setup with H.R. bringing
14  the trainees in on a regular basis and they had
15  both come in as trainees -- so their expertise
16  was somewhat lower because they were both
17  trainees.
18  Q.   Right.
19  A.   I remember that Aihua Dia was very,
20  very fast in picking up the technology and would
21  do anything. I don't remember Joe if he did the
22  installations, I don't remember.
23       Tony DePina was a very, very
24  knowledgeable and skilled programmer both in the

Page 52

1   host environment and the client server
2   environment and he had a lot of knowledge of our
3   application base.
4        Chris Genest did programming and
5   started in the host and may have done a little
6   client server but mostly he supported our host
7   side and did a lot of maintenance on that.
8        I am skipping Tom and Karen. They had
9   more of a management role. Jackie Marzelli was
10  very knowledgeable in our application and in our
11  -- on our host side. I believe she came from a
12  group. I can't remember her skill base. Jeff
13  Neville was another, I believe he -- he started
14  on the host side and became one of our most
15  talented client server designers and programmers,
16  and Jane Rinkaus as I said she came from a help
17  desk and training group and played a role on our
18  group to do that kind of work including testing
19  and documentation.
20        Steve Sugarman, I think he was a
21  self-trained visual basic programmer and I can't
22  remember what his other background was but I
23  believe it was probably host based.
24        Suzanne Harris-Walker was an absolutely

Page 53

1   amazing visual basic programmer and technically
2   she was just very good, very strong.
3        Greg Wells was a self -- self-trained
4   about any language you can think of. If it was a
5   new language, Greg decided to learn it. So he
6   was multi-language, multi-base.
7        John Ziak was brought on to do
8   specifically testing. He did some installation,
9   and documentation, so it was role like that and
10  support -- support at the level of take the phone
11  call and record the problem.
12  Q.   Okay.
13  A.   And not solve the problem -- sometimes
14  he did.
15  Q.   Right.
16  A.   Rick Cantin was a very, very strong
17  client server base -- I think he was strictly
18  client server -- I am not sure -- programmer.
19        Ellen Elliott was another highly,
20  highly skilled almost systems level -- yes, I am
21  going to say it, yes, she knew that operating
22  system as well as the languages and could support
23  us from both perspectives. That is everyone
24  except her.

Page 54

1   Q.   How would you describe Miss Griffith?
2   A.   Bernadine had some visual basic skills
3   and was good at taking a problem and asking the
4   right questions, recording, you know, getting
5   information and going in and debugging it. She
6   did mostly debugging and some programming.
7   Q.   Okay. Thank you. That is great.
8        Directing your attention to the 1997
9   claim of discrimination, at some point in time
10  did you, when did you first learn of that charge
11  of discrimination?
12  A.   Can you say that again?
13  Q.   The 1997 claim of discrimination you
14  would have read in the complaints from that time
15  period?
16  A.   Right.
17  Q.   That was the racial slur, and the
18  disability discrimination claim?
19  A.   I don't know that I ever actually had
20  any details on that before I came to Keith's
21  office last week -- that is when I would have
22  read, actually got to read it.
23  Q.   With regards to the 1997 claim?
24  A.   Right.

Page 55:

1 Q. Okay. And so it is your testimony that
2 while you worked at OneBeacon Insurance, you were
3 unaware of the claim of racial discrimination?
4 A. I don't want to say, no, I don't think
5 I knew anything about that. I don't recall
6 knowing anything specific about that.
7 Q. Did you know anything in general about
8 the claim of racial discrimination?
9 A. I recall that when I visited H.R., I
10 believe mid 1999, there was a mention, no details
11 about a pending suit.
12 Q. And who did you speak with in H.R.?
13 A. Cathleen Moynihan.
14 Q. Okay. And that was mid 1999?
15 A. I think so. I think that that is my
16 best recollection.
17 Q. Do you recall whether or not you
18 reviewed any documents when you were meeting with
19 Cathleen Moynihan?
20 A. No, no, I did not review any documents.
21 Q. So you just spoke with her directly?
22 A. Yes.
23 Q. Was anyone else present in the room
24 besides Cathleen Moynihan and yourself?

Page 56:

1 A. Karen Holmes.
2 Q. And anyone else besides Karen Holmes?
3 A. No.
4 Q. All right. And after having that
5 discussion in general with regards to the racial
6 discrimination claim, what, if anything, what
7 steps did you take thereafter?
8 MR. MUNTYAN: Objection to the form
9 of the question.
10 A. I did not know it was a racial
11 discrimination. All I knew was that there was a
12 suit against the company.
13 Q. Okay. Did you inquire as to what the
14 suit against the company pertained to?
15 A. No.
16 Q. Did Miss Holmes inquire as to what the
17 suit pertained to?
18 A. No, not to my recollection.
19 Q. So Miss Moynihan -- what was the
20 purpose of her having this conference with you
21 and Miss Holmes then?
22 MR. MUNTYAN: Objection to the form
23 of the question.
24 A. We had requested to speak to Cathleen.

Page 57:

It wasn't the other way around. We requested the meeting.
Q. Okay. So you requested to speak with H.R.?
A. Yes.
Q. And was this request to speak with H.R. with regards to Miss Griffith or any other employees?
A. It was in regards to Miss Griffith.
Q. Okay. And what was the purpose of your meeting with Miss Moynihan then, the reason why you chose to request to meet with her?
A. We were -- we wanted assistance in how we should help resolve the attendance problem that we had with Miss Griffith.
Q. Okay. And what help, if any, did you receive from Miss Moynihan?
A. Miss Moynihan told us that there was a letter in her file from a -- from a medical individual, a doctor, about staggered hours and that -- I think that -- I think the issue was that we had, I told you about the flex hours.
Q. Right.
A. And the staggered and the hours in the

Page 58:

1 medical were outside of the range of that, so
2 Cathleen, Miss Moynihan was pointing that out to
3 us, and showed us that.
4 Q. Okay. And prior to having that meeting
5 with Miss Moynihan, what hours did Miss Griffith
6 work?
7 A. Do you mean what hours was she
8 assigned?
9 Q. Yes.
10 A. Was she expected to work, to come in?
11 Q. Right.
12 A. I believe -- to the best of my
13 recollection at the time, I believe it was 9:30
14 or that was what we expected, 9:30 to whatever
15 that adds up to at the end.
16 Q. That was the flex plan?
17 A. Yes, 9:30 plus.
18 Q. Okay.
19 A. That would be the maximum on the flex.
20 Q. And did she ask for your permission to
21 come in at 9:30?
22 A. Yes, because anyone who was on flex had
23 to set it up with us.
24 Q. When she asked you to setup the flex,

Page 59:

1 coming in at 9:30, what did she tell you the
2 reason why she needed to come in at 9:30?
3 A. I don't remember the conversation.
4 Q. Okay.
5 A. I don't recall it. We wouldn't have
6 required any reason as long as it worked for the
7 group. Anyone could ask for it as long as it
8 worked for the group.
9 Q. So are you saying that you were unaware
10 of Miss Griffith giving a reason, stating a
11 reason to you why she needed to come in at 9:30
12 prior to the summer of 1999?
13 MR. MUNTYAN: Objection to the form
14 of that question.
15 A. I think I knew that Bernadine, that
16 Miss Griffith had medication and health concerns
17 that made her perhaps want to come in at 9:30,
18 but there wasn't any -- I guess I am saying there
19 wouldn't be any need for that because as long as
20 it worked for the group, it was acceptable. The
21 company didn't require a reason.
22 Q. She never articulated medical issues or
23 medical concerns to you personally?
24 A. If you are saying do I remember that

Page 60:

1 specific conversation to set the hour at 9:30, I
2 don't recall that.
3 There were times when I was aware that
4 Miss Griffith did tell me she wasn't feeling well
5 or she had medical concerns.
6 Q. Were you aware that Miss Griffith
7 suffered a heart attack in 1994?
8 A. Yes.
9 Q. And how did you learn that
10 Miss Griffith suffered from a heart attack in
11 1994?
12 A. I do not remember how. I am sure it
13 was because I heard it from the people in the
14 office.
15 Q. Prior to your conferring with Miss
16 Moynihan and Miss Holmes with regards to Miss
17 Bernadine Griffith, did you ever sit down and
18 have a conference with Miss Griffith about her
19 timeliness, her attendance record?
20 A. Yes.
21 Q. And when did you have a conversation
22 with Miss Griffith?
23 A. It was more than once, and I don't know
24 the -- I can't tell you when.

Case 1:03-cv-12573-EFH    Document 81-2    Filed 12/15/2005    Page 4 of 6

Griffith v. OneBeacon, et al.                                    Monica Scanlon, Vol. 1, 8/30/04

**Page 61**

1  Q. Was that in 1998, 1999?
2  A. It would have been in both.
3  Q. Both years?
4  A. Yes.
5  Q. 1997?
6  A. I don't recall that far back.
7  Q. So from 1998 and 1999, how frequent
8  were the conversations with regards to absences?
9  A. I don't recall that.
10 Q. Did you make any records or write any
11 memos or any written notes of Miss Griffith's
12 absences?
13 A. I don't recall. That would normally
14 though be the job of the direct, whoever was
15 directly -- whoever Miss Griffith was directly
16 reporting to, but I don't recall that.
17 Q. And who did Miss Griffith directly
18 report to?
19 A. At times Miss Holmes, I can't tell you
20 it was the whole time.
21 Q. Right.
22 A. It was a possibility it was
23 reconfigured -- when she was in my group, in my
24 own group.

**Page 62**

1  Q. At times Miss Holmes, and by that I
2  understand you to mean because she was working on
3  a project that Miss Holmes was responsible for
4  that she would monitor her time?
5  A. Yes.
6  Q. Okay.
7  A. If she was in the group that reported
8  to Miss Holmes, Miss Holmes would...
9  Q. And at other times who did
10 Miss Griffith report to?
11 A. What I am saying is that within that
12 organization, you mean once her applications were
13 assigned to me?
14 Q. Right.
15 A. The group was reconfigured a couple of
16 times. I don't recall whether she ever reported
17 to Tom Danforth, those two were my primary --
18 there was a period of time when Rick Cantin
19 reported directly to me but it was a very brief
20 period of time, so she might have been in that
21 group. I'm sorry, I am having a hard time
22 remembering all of the details of that because
23 there was a lot of fluctuation.
24 Q. Was she responsible to or was it part

**Page 63**

1  of her duty to report to you?
2  A. At any time?
3  Q. Yes.
4  A. The only time that could possibly have
5  been true would be when the imaging, the existing
6  imaging piece moved over initially -- maybe
7  everyone might have reported to me until we
8  organized but that would be just a short period
9  of time.
10 Q. In addressing the issues of
11 Miss Griffith's absences, is Karen Holmes the
12 only individual then from the group, from your
13 group that ever had a conversation with you with
14 regards to Miss Griffith's absences?
15 A. I don't recall that, whether she is the
16 only one.
17 Q. With regards to an individual that is
18 responsible for overseeing the project that
19 Miss Griffith is working to, the individual that
20 Miss Griffith reports to -- is it anyone else
21 besides Karen Holmes while you were the managing
22 supervisor of this group?
23 A. Can you say that again please?
24 Q. Anyone else besides Karen Holmes that

**Page 64**

1  Miss Griffith would have reported to?
2  A. That is what I am saying. I can't
3  remember whether they were ever configured in
4  such that she, Miss Griffith, might have been in
5  a line that went up through Tom Danforth. I
6  can't remember that.
7       Primarily I believe it was Miss Holmes.
8  I am just saying I can't remember whether there
9  was ever another path in that time frame because
10 we reconfigured more than once.
11 Q. What was your policy for keeping track
12 of your employee's absences?
13 A. We did fill out time sheets. Each
14 individual person, staff member, filled out a
15 time sheet that assigned their time to specific
16 projects. We did not punch a clock if that is
17 what you mean.
18 Q. So there was no record of time in and
19 time out?
20 A. No, there was no official punching in
21 and out.
22 Q. Was it the honor system? Was it based
23 on the honor system of when you arrived and when
24 you left?

**Page 65**

1  A. What do you mean by that?
2  Q. Well, if there is no clock that you
3  punch in and punch out, how do you know if Rick
4  Cantin was there at 9:00 on a particular day?
5  A. Because we would be looking for every
6  single individual as they were coming in the
7  door, we were -- the work environment was so
8  dynamic that there was always problems to work on
9  so you would know if someone was there or not.
10      Generally you would know who was there
11 and it was, they were cubed so you could
12 basically know who was there.
13 Q. So by policy, what did you expect --
14 what were your expectations of your employees if
15 they were to arrive late, what did they need to
16 do?
17      Did they inform you or did they have to
18 inform Karen Holmes or was there a general way of
19 communicating I am sick today? What was the
20 steps that your employees had to do when they
21 were absent?
22 A. Call in to their immediate supervisor
23 to let them know that they were going to be sick
24 or late or they weren't going to be there.

**Page 66**

1  Q. And is it that particular supervisor's
2  discretion as to how to handle the -- for
3  example, directing my question to tardiness, if
4  an individual is going to be tardy, that
5  individual would call the supervisor.
6       Did that supervisor require the
7  employee to make up the time to work overtime
8  late that night, how did that particular
9  supervisor keep note of tardiness, keep track of
10 tardiness and resolve it?
11 A. It would be up to the supervisor as to
12 how he or she kept track of it.
13 Q. Yes.
14 A. The company policy, I believe, read
15 that the employee was expected to try to make the
16 time up.
17 Q. Okay. And were there for purposes of
18 performance reviews and annual reviews, there
19 were annual reviews of each employee, correct?
20 A. Yes.
21 Q. And with regards to part of the review
22 process, one's absence record or tardiness,
23 illnesses would be reflected in the performance
24 record?

Page 73

```
1   with Miss Griffith?
2       A.   Are you talking about specific
3   instances or are you talking about -- I don't
4   know how to answer that.
5           I recall conversations regarding
6   tardiness and/or absences.
7       Q.   Okay.  And what do you recall about
8   those conversations?
9       A.   Discuss that we needed to work
10  something out, how could we improve on this so
11  that we could depend on her availability more,
12  that would be -- what could we mutually do.
13      Q.   And what did Miss Griffith convey to
14  you about her absences?
15      A.   That they were beyond her control.
16      Q.   And why were they beyond her control?
17      A.   Because things just happened.
18      Q.   Such as what?
19      A.   There was a variety.
20          There were a couple of instances that I
21  remember, calls about traffic problems and I
22  remember some problem with her driveway one
23  winter and there was another one, and I remember
24  I got it in the documentation -- I read it in the
```

Page 74

```
1   documentation.  I remember another one about she
2   had gotten some flat tires and there was another
3   time that -- and there was a time when she had
4   really bad headache once, she hadn't slept the
5   night before, that there was the time when her
6   stomach was very upset, there was something to do
7   with a garage door not functioning -- I think it
8   stayed closed -- she couldn't get it open.
9           So there was a variety -- a variety of
10  times when there were reasons for absences or
11  tardiness.
12      Q.   *When you spoke with Miss Griffith and
13  you reviewed her tardiness and her absences, did
14  you show her records of her tardiness and her
15  absences?
16      A.   I am sure we discussed specific
17  instances, that would have -- yes, I am sure.
18      Q.   *So you kept track?
19      A.   There was a record for every one.
20  There was an official company record for each
21  person that outlined all absences.
22      Q.   *Okay.
23          And prior to going to speak with Miss
24  Moynihan in the summer of 1999 --
```

Page 75

```
1           MS. HILL:  Do you need to take a
2   break?
3           MR. MUNTYAN:  It is after 1:00.
4
5       (Short discussion off the record.)
6
7
8       (Whereupon at 1:05 p.m. to 1:35
        p.m., the lunch recess was taken.)
```

Page 76

```
1               AFTERNOON SESSION
2           MS. HILL:  Would you read the last
3   question back please.
4           (The preceding questions were read
5               back by Stenographer.)
6       Q.   So we are still on the absences with
7   regards to the absences then.
8           You have testified that you kept a
9   record of the absences as part of the policy?
10      A.   Right.
11      Q.   Okay.  And as well as the tardiness?
12      A.   Yes.
13      Q.   You were required to keep track of
14  tardiness and absences?
15      A.   I don't think I said that.  I said that
16  absences were recorded through the time sheet and
17  then verified.
18      Q.   Okay.
19      A.   But tardiness was not -- we didn't
20  punch in.
21      Q.   Right.
22      A.   It was the honor system that you
23  arrived on time.
24      Q.   Right.
```

Page 77

```
1           So then with regards to Miss Griffith
2   and conversations that you had with her regarding
3   her absences, what, if any, conversations did you
4   have with her about your dissatisfaction of the
5   frequencies of her absences?
6       A.   The absences and tardiness together was
7   what was presenting us a problem.
8           I think I named several instances that
9   I remember.
10      Q.   Right.
11      A.   And some of those we would have had
12  some conversation on.
13      Q.   Okay.
14      A.   Such as what can you do to help improve
15  this situation.
16      Q.   Okay.  And what steps, if any, did you
17  take after speaking with Miss Griffith to improve
18  the situation and when?
19      A.   What steps did I take to improve it?
20      Q.   Yes.
21      A.   I am not sure that I could take any
22  steps.  I couldn't take any action to get her in
23  the office more often or at a different time.
24  Miss Griffith would have to take that action.
```

Page 78

```
1   But I did ask her what, if anything, we could do
2   to help.
3       Q.   What did she say?
4       A.   As I said, the reasons for absences
5   were varied so I don't think we came to a
6   resolution of that and that is why we went down
7   to H.R. to say what can we do, what options do we
8   have, can you give us any advice onto how to
9   handle this situation and improve it.
10      Q.   Did Miss Moynihan give you a
11  recommendation on how to handle the absences?
12      A.   She didn't give us a recommendation on
13  how to handle it other than making sure we knew
14  when Miss Griffith was there and when she wasn't
15  obviously but she did as I said at that time show
16  us a copy or indicate, I don't remember whether
17  we saw it or just she told us about the content
18  of a medical statement or letter, I don't
19  remember if it was a letter or a form that was
20  some years old that had been submitted stating
21  that Miss Griffith needed hours shifted later in
22  the day, and I think we were trying to go at 9:00
23  at that point and we needed to try to a later
24  than 9:00, later than what we had been going
```

**Page 145**

```
 1    Q.   Do you recall this e-mail?
 2    A.   I would only recall the e-mail at the
 3  bottom because that was from me to each employee.
 4  I would not have been present for any of the
 5  other e-mails on this list.
 6    Q.   Do you recall then generating this
 7  e-mail on the bottom?
 8    A.   I do.
 9    Q.   What does that say, I am sorry?
10    A.   Do you want me to read it out loud?
11         Bernadine, this is an FYI. Do not
12  reply unless it is in error. You have ten days
13  left now. You plan to take 1.5 days by the end
14  of the year. You will carry 8.5 days over into
15  2000 and this was an e-mail to Bernadine from me
16  dated December 16th, 1999.
17    Q.   With regards to that e-mail, can you
18  please tell me what contacts or what was the
19  reason why you wrote that e-mail to Miss
20  Griffith?
21    A.   At the end of every year there was --
22  the company had a policy of how much vacation you
23  could carry over so near the end of every year, I
24  would send or communicate in some fashion, this
```

**Page 146**

```
 1  year I chose to send to each individual employee
 2  an individual statement to them only of their
 3  remaining time and whatever time they had
 4  indicated to me already that they wanted to use.
 5    Q.   Okay.
 6    A.   And this was to make sure that there
 7  was no confusion and that the records that I
 8  would be submitting to personnel for carry over
 9  would be reflected what the employee believed he
10  or she had for carry over vacation so they
11  wouldn't risk losing anything.
12    Q.   Okay. So at the conclusion of 1999
13  then this e-mail reflects that Miss Griffith
14  still had some time on the books, vacation time?
15    A.   As of December 16th.
16    Q.   As of December 16th?
17    A.   Yes.
18    Q.   She did not use up all of her time as
19  vacation days?
20    A.   That is correct. This would be what
21  our official record says.
22    Q.   Okay. And directing your attention to
23  Exhibit No. 6. It is dated Thursday March 21st,
24  1998. This addresses absences. Could you please
```

**Page 147**

```
 1  review that?
 2         MR. MUNTYAN: Could I review it just
 3  for a moment?
 4    Q.   Could you please review that memo.
 5    A.   Okay. This e-mail reflects -- it
 6  discusses a review with Bernadine on the
 7  frequency of her absences and the company policy,
 8  and it indicates that you are satisfied that the
 9  incidences were unavoidable and Bernadine has
10  made up the most recent one by putting in hours
11  on Saturday. Is that a correct statement? Is
12  that what is referred to in that e-mail? Is that
13  your statement?
14         MR. MUNTYAN: Objection to the form
15  of the question.
16    A.   That is my e-mail.
17    Q.   That is your e-mail?
18    A.   Yes.
19    Q.   Are the facts contained in that e-mail
20  accurate and true?
21    A.   The fact that I say that I am satisfied
22  that the incidences were unavoidable should not
23  be interpreted to mean that there was not an
24  impact of these multiple absences. This series
```

**Page 148**

```
 1  of e-mails reflects a requirement that the
 2  department had that if an individual, at this
 3  time anyway, that if an individual was absent
 4  three or more times in any six-month rolling
 5  period, the department head required that the
 6  manager either take action or say it is okay.
 7    Q.   Or document --
 8    A.   Or say it is okay.
 9    Q.   Right. So in this instance given this
10  particular time frame, there was no action taken
11  against Miss Griffith?
12    A.   Exactly. I did not want action to be
13  taken. And this was my response to basically get
14  a check mark to make it go away.
15    Q.   And this goes back to what I was asking
16  earlier and why I was asking earlier, did you
17  allow your employees for absences to work
18  overtime?
19    A.   No, I did not.
20         What this reflects is Bernadine
21  offering to me the information that she had
22  worked those two days. Those are past dates that
23  you can see from when the e-mail was generated
24  and I passed it along because it was another
```

**Page 149**

```
 1  thing that would help make the thing go away with
 2  the head of the department.
 3         I did not allow Miss Griffith or any
 4  other employee to specifically make up hours.
 5  When the absences impacted schedules, I did ask
 6  them to figure out a way to get back on schedule,
 7  and if that meant that they needed to put in
 8  extra hours to get there, then that is what I
 9  expected them to do once they were healthy again.
10    Q.   Did Miss Griffith work overtime while
11  under your department?
12    A.   She indicated to me that she put in
13  these two periods of time to make up for the sick
14  time.
15    Q.   In general in 1998 or 1999 did
16  Miss Griffith work overtime?
17    A.   On occasions I am sure that she put in
18  more than her minimum hours, yes.
19    Q.   With regards overall to your
20  supervision of Miss Griffith, having reviewed her
21  personnel record and her file and her complaint
22  now on behalf, in today, 2004, what is your
23  opinion of Miss Griffith as to whether or not, I
24  am asking for your opinion as to whether or not
```

**Page 150**

```
 1  Miss Griffith is deemed competent in your
 2  opinion?
 3         MR. MUNTYAN: Objection to the form
 4  of the question.
 5    A.   Competent in what?
 6    Q.   To have performed her job?
 7    A.   If you mean by competent did I feel
 8  that she was intelligent enough, did she have the
 9  base skills and could she execute those skills, I
10  believe that she could perform the skills that
11  were asked of her.
12    Q.   Did Miss Griffith perform the skills
13  that were asked of her while under your
14  management?
15    A.   Miss Griffith did not meet,
16  Miss Griffith performed the skills adequately.
17  She did not meet the output that was needed in
18  all instances.
19         Sometimes she did and sometimes she
20  didn't, and specifically because through
21  absences, tardiness or the inability to give
22  enough time, she wasn't able to meet the
23  schedules and the requirements.
24    Q.   And what schedules did she fail to
```