KAREN ALLEN HOLMES - NOVEMBER 18, 2004

**57**

1      Directing your attention to
2  the performance appraisal, Bates Nos. 125
3  and 126 -- are you familiar with that
4  performance --
5  A  Yes.
6  Q  -- appraisal? And is that your signature
7  on the bottom of page 125?
8  A  Yes.
9  Q  Okay. And are you the supervisor that is
10  responsible for providing this performance
11  appraisal of Ms. Griffith?
12  A  I was.
13  Q  Okay. And directing your attention to the
14  rating system on page 125 -- are you in
15  agreement with the rating system that's on
16  the right-hand side, the numbers 3, 3, 3,
17  3, 2, 3, 3 --
18  A  Yes, I am.
19  Q  -- as it runs down?
20      Overall rating the performance
21  of this particular year, which is 11/98
22  through 11/99, it concludes that on
23  page 126 that Ms. Griffith received a 3; is
24  that correct?

**58**

1  A  Yes.
2  Q  And a 3, according to the key, is
3  proficient --
4  A  Yes.
5  Q  -- isn't that true?
6  A  Yes.
7  Q  Okay. And so under your supervision for
8  this time period, through November of 1999,
9  is it fair to say that you would rate
10  Ms. Griffith as being a proficient
11  employee?
12  A  Yes.
13  Q  Okay. Attached to this particular
14  evaluation -- I'm handing you what's been
15  marked as Exhibit No. 2 (handing). Are you
16  familiar with that document?
17      MS. MOORE: For the record,
18  Exhibit No. 2 is DEF 00- --
19      MS. HILL: I'll ask her to
20  identify it, Counsel, please.
21      MS. MOORE: It's DEF 0082,
22  which is entitled "Interoffice Memorandum,"

**59**

1  performance appraisal - attachment."
2      MS. HILL: Counsel, if you
3  would, please, I'd like to have the
4  deponent identify the document. It's
5  already been marked as Exhibit No. 2.
6  Q  Taking a look at Exhibit No. 2,
7  Ms. Holmes -- are you familiar with that
8  document?
9  A  Yes.
10  Q  And what is that document, Ms. Holmes?
11  A  It's an addendum or a memo that Monica
12  Scanlon wrote to attach to my performance
13  review.
14  Q  Okay. And what's the date of that memo?
15  A  January 5, 2000.
16  Q  And was that memo written on January 5,
17  2000?
18      MS. MOORE: Objection.
19  A  I would believe so.
20  Q  Okay. And on January 5, 2000, that memo
21  was written from Monica Scanlon?
22  A  (Nodding.)
23  Q  Was Monica Scanlon employed with CU on
24  January 5, 2000?

**60**

1  A  Monica left the employment in December of
2  1999; and for 30 days past, they left her
3  in the system to clean up things -- you
4  know, do e-mails and send -- so she worked
5  with Tom and I over the month of January
6  and had access to the system. She just
7  didn't come into the office. And that's
8  all I know.
9  Q  So was she still employed with CU --
10      MS. MOORE: Objection.
11  Q  -- in January of 2000?
12  A  I don't know.
13  Q  When you mean she was left in the system --
14  explain what you mean.
15  A  Well, she had e-mail access through
16  January 30, because she communicated with
17  myself and Tom Danforth.
18  Q  Okay. When you departed in May of 2002,
19  were you still left in the system?
20  A  I left in 2003, I think. I don't know.
21  I'm -- hang on. No.
22  Q  Okay. But Monica Scanlon was still left in

81

```
 1         supervision?
 2  A      Yes.
 3  Q      Which is a table, and you chart the
 4         vacation days and sick days?
 5  A      It's an Excel spreadsheet --
 6  Q      Okay.
 7  A      -- in Excel. And so when I get up here
 8         where it says "Allocated" (pointing) --
 9  Q      Okay.
10  A      -- all it does is -- this is Bernadine
11         (pointing). So you can see that she has
12         8.5 vacation days that are carryover, so
13         she starts out with that. And as you put a
14         minus 1 in, you know, each time it -- it
15         either adds or subtracts so that the
16         employees -- I could know, you know, how
17         much time they had left. Because most
18         people, you know, didn't keep track of --
19         they didn't keep track of their own
20         vacation, and they would come and say, "How
21         many days do I have left?"
22  Q      Okay. Was this particular table kept on
23         your computer system, or was it on your
24         secretary's computer system?
```

82

```
 1  A      This is mine.
 2  Q      On yours?
 3  A      Yes.
 4  Q      Okay. And did you distribute copies of
 5         attendance records to any other employee at
 6         CU?
 7              MS. MOORE: Objection.
 8  A      Just their own. I was -- I tried to at
 9         least, you know, two or three times a year
10         give this sheet to each individual --
11  Q      Okay.
12  A      -- so that they knew, you know, what they
13         had.
14  Q      Was there any other system or procedure you
15         kept for tracking of an employee's
16         attendance --
17              MS. MOORE: Objection.
18  Q      -- other than this table that we have
19         before us?
20  A      I created a job performance record.
21  Q      Okay. And what's the job performance
22         record that you -- please describe that.
23  A      That was a sheet I made to keep track of
24         specific employees' arrival times and when
```

83

```
 1         they called in.
 2  Q      Their arrival times?
 3  A      Their arrival times.
 4  Q      Did you also keep track of their departure
 5         time?
 6  A      No.
 7  Q      Just the arrival?
 8  A      Just the arrivals.
 9  Q      How was it that you were able to be
10         certain, if at all, that an individual had
11         worked a full day?
12              MS. MOORE: Objection.
13  A      Well, if I got into work at 8:30, I knew
14         that, you know, there were people already
15         in or watched when people came in, then I
16         knew what time they were to go home.
17  Q      But you didn't check specifically to see if
18         they had left?
19  A      No. Because -- because there were
20         different people that came in later, and
21         I'm not -- you know, I didn't stay until
22         7:00 every night to monitor that. So, no,
23         I kept no record of when people left.
24  Q      Did you require the employees under your
```

84

```
 1         supervision to check in with you when they
 2         arrived each morning?
 3  A      No.
 4              MS. MOORE: Objection.
 5  Q      So how is it that you were able to be
 6         certain whether an individual had duly
 7         arrived each morning?
 8  A      Because I walked around the floor.
 9  Q      You walked around the floor?
10  A      Yeah, the area where we all sat.
11  Q      How long did it take you to walk around the
12         floor each morning?
13  A      Ten seconds --
14  Q      Okay.
15  A      -- barring "good morning" or a chat with
16         someone.
17  Q      And what time did you walk around the floor
18         each morning?
19              MS. MOORE: Objection.
20  A      I don't recall. Several times.
21  Q      When's the first time in which you walked
22         around the floor to check to see if your
23         employees were present each morning?
24              MS. MOORE: Objection.
```

Page 85

1  A  Around 9:30ish.
2  Q  Approximately 9:30 you would walk around
3     the floor to make certain that the
4     individuals in the group were present and
5     working?
6  A  Correct.
7  Q  Okay. Did you also walk around subsequent
8     to 9:30 if an individual or one of your
9     members wasn't present at that time?
10 A  Yes.
11 Q  Okay.
12           THE WITNESS: Kathleen -- I'm
13    sorry -- can we take a break?
14           MS. HILL: Sure.
15           (Off the record)
16           (A break was taken.)
17           (Back on the record)
18           MS. HILL: Could I have the
19    next one marked as Exhibit 4.
20           (Exhibit No. 4, the 4/12/00
21            performance job record for
22            Bernadine Griffith, was marked
23            for identification.)
24 Q  Ms. Holmes, on your break, the next

Page 86

1     document was marked Exhibit No. 4. If you
2     would take a look at that document, Exhibit
3     No. 4, and identify that with the Bates
4     numbers; and state what that document
5     pertains to, if you would, please
6     (handing).
7  A  It's job performance record, and it's
8     DEF 0093 and DEF 0094.
9  Q  It's your performance job record?
10 A  Yes.
11 Q  Is this the typical performance job report
12    that you kept and maintained on each of the
13    employees under your supervision?
14 A  No.
15 Q  This format. I'm sorry?
16 A  No.
17 Q  Did you create performance job records for
18    any other employees under your supervision?
19 A  Yes.
20 Q  Okay. And what's the difference between
21    their job performance record, if any, and
22    this particular record?
23 A  The only difference would be the facts

Page 87

1  Q  Okay.
2  A  These pertain to Bernadine. The other ones
3     would be the days, dates, and times of the
4     other person.
5  Q  Right. That's what I mean. Is this your
6     standard procedure for tracking of
7     employees' job performance under your
8     control?
9           MS. MOORE: Objection.
10 A  Yes.
11 Q  And what was the purpose of generating a
12    performance job report -- or performance
13    job record? I'm sorry.
14 A  I had some concerns about the patterns with
15    two employees. Bernadine was one of them.
16 Q  And who was the other employee?
17 A  Mary Ann Russo.
18 Q  Okay.
19 A  You know, having excessive absenteeism or
20    tardiness.
21 Q  So you created a performance job record
22    with regards to Mary Ann Russo and
23    Bernadine Griffith?
24 A  Yes, I did.

Page 88

1  Q  Any other individuals did you generate a
2     performance job record?
3  A  No, I did not.
4  Q  Okay. All right. Directing your attention
5     to the Bates No. 93, the first page of this
6     record -- the first date on this record is
7     April 12, 2000. Is that the first date and
8     time that you entered in 2000 in
9     Ms. Griffith's performance job record?
10 A  Yes.
11 Q  So prior to April 12, 2000, there was no
12    performance job record on Ms. Griffith?
13 A  That's correct.
14 Q  Directing your attention to Exhibit
15    No. 3 -- is that the only documentation of
16    Ms. Griffith's attendance record that you
17    personally created prior to April 12, 2000?
18           MS. MOORE: Objection.
19 A  Are you asking me if --
20 Q  Take a look at that.
21 A  I need to be clear on what you're asking.
22    Are you asking me if this document -- I'm
23    talking about the 2000 attendance for

89

1  Exhibit 3 -- I need -- please ask the
2  question again.
3 Q Sure. I was directing your attention first
4  to Exhibit No. 4.
5 A Correct.
6 Q And I had noted that you started keeping a
7  written record of Ms. Griffith's
8  performance job record on April 12, 2000.
9 A Correct.
10 Q And you had established that you did not
11  keep any other performance job record
12  pertaining to Ms. Griffith prior to
13  April 12, 2000.
14 A Correct.
15 Q So my question, then, is: With regards to
16  her attendance record -- directing your
17  attention to Exhibit No. 3 -- is this the
18  only written form of documentation that you
19  kept with regards to Ms. Griffith's
20  attendance?
21       MS. MOORE: Objection.
22 A I believe so.
23 Q Okay. So apart from Exhibit No. 3 and
24  Exhibit No. 4, did you have a system in

90

1  place to keep record of Ms. Griffith's
2  attendance or job performance, other than
3  these two documents that we have before us?
4 A No. This is how I did it.
5 Q Okay. All right. So directing your
6  attention to Exhibit No. 4 --
7 A Yes.
8 Q Prior to April 12, 2000, was Ms. Griffith
9  tardy on any date?
10 A Yes.
11       MS. MOORE: Objection.
12 Q And when was Ms. Griffith tardy?
13 A I couldn't tell you.
14 Q How do you know she was tardy prior to
15  April 12, 2000?
16 A Because I started this after noticing a
17  late time of arrival with her.
18 Q And what was Ms. Griffith's arrival time in
19  year 2000?
20 A It was supposed to be 10 a.m.
21 Q And why was Ms. Griffith's arrival time
22  supposed to be at 10 a.m.?
23 A Her doctor requested it.

91

1  time be at 10 a.m.?
2       MS. MOORE: Objection.
3 A I don't remember.
4 Q Okay.
5 A I was given a note. Bernadine gave me a
6  note.
7 Q And when did Ms. Griffith give you the
8  note?
9 A I don't remember. I --
10 Q Okay.
11       MS. MOORE: Were you finished
12  answering?
13       THE WITNESS: Yes.
14 A When she gave me the note, I accommodate
15  the note.
16 Q Okay. And when Ms. Griffith gave you the
17  note sometime in 2000 for her start time to
18  be at 10 a.m., did you discuss the arrival
19  of Ms. Griffith being able to arrive at
20  10 a.m., with any other employee --
21       MS. MOORE: Objection.
22 Q -- at CU?
23 A I don't know.
24 Q Did you discuss it with Michael Sisto?

92

1 A Yes.
2 Q And when did you discuss it with Michael
3  Sisto?
4 A I don't remember.
5 Q Did you make the decision yourself solely
6  to permit Ms. Griffith to come in at
7  10 a.m.?
8       MS. MOORE: Objection.
9 A Yes.
10 Q Okay. Is that something that CU afforded
11  the supervisors -- I'm sorry. Strike that.
12       Did the supervisor have
13  discretion to grant late arrival time?
14       MS. MOORE: Objection.
15 A Yes.
16 Q Ms. Scanlon, in her deposition, referred to
17  it as flex time. Is that your
18  understanding of what you were providing
19  Ms. Griffith was flex time?
20       MS. MOORE: Objection.
21 A I guess you could call it that.
22 Q Okay. When Ms. Griffith requested to come
23  in at 10 a.m., did you speak with

Page 141

1 with regards to the policy and procedures
2 of how you should address the assignments
3 of Ms. Griffith's production support, as
4 you've stated?
5     MS. MOORE: Objection.
6 A No.
7 Q Was it your discretion as to reassigning a
8 production support project to another
9 individual on the team?
10     MS. MOORE: Objection.
11 A Can you just restate that, please?
12 Q Yes. Was it solely your discretion to
13 assign the production support tasking that
14 Ms. Griffith covered, to another individual
15 in your team?
16 A Yes.
17 Q Did Michael Sisto review your decision to
18 reassign Ms. Griffith's work while she was
19 out under the FMLA Act?
20     MS. MOORE: Objection.
21 A What are you asking me? Did Mike review
22 the work that I reassigned?
23 Q Yes.
24 A No.

Page 142

1 Q Did Michael Sisto approve of the
2 reassignment of Bernadine Griffith's work
3 to another employee?
4     MS. MOORE: Objection.
5 A We didn't do that. We had jobs to do, and
6 so he was just looking that the jobs got
7 done. I don't think he was looking at what
8 specific person was doing what specific
9 job.
10     As long as we were meeting our
11 quotas of answering our service center
12 tickets -- that's a system where the
13 problem reports were in -- he wasn't -- he
14 was managing me, but he wasn't asking --
15 you know, he wasn't like, Who's doing every
16 single detail?
17 Q Were you able to meet the quota for the
18 month of June, then, even though
19 Ms. Griffith was out sick?
20 A Yes.
21 Q Okay. And for how long was Ms. Griffith
22 out sick for the Family and Medical Leave

Page 143

1 Q -- under the Family and Medical Leave Act?
2     MS. MOORE: Objection.
3 A I don't recall. I would have to look at
4 the record.
5 Q If you would, look at the record, please,
6 then, according to your documentation
7 (handing).
8 A So that you know, I'm looking at the 2000
9 attendance record for Bernadine Griffith.
10 It's DEF 91 and DEF 92. So I count 18
11 days.
12 Q Okay.
13     MS. MOORE: For the record, it
14 appears on here as though gray shading
15 begins on June 1 and ends on June 3, 2000.
16     MS. HILL: And ends -- I'm
17 sorry -- when?
18     MS. MOORE: I'm sorry.
19 June 23, 2000.
20 Q Is that correct, Ms. Holmes? That's your
21 understanding of when the FMLA is recorded
22 on that particular document?
23 A Yes.
24 Q Okay. And how is it that you arrived

Page 144

1 at that Ms. Griffith was on Family and
2 Medical Leave Act on June 1?
3 A I answered that question that human
4 resources told me.
5 Q Okay. And were you contacted by human
6 resources on each day when you recorded
7 that she was out on Family and Medical
8 Leave Act?
9     MS. MOORE: Objection.
10 A No. They called and told me that she was
11 on FMLA and then -- you know, I guess
12 they'd let me know when she was going to be
13 returning.
14 Q Okay.
15 A But they didn't call me daily, that I
16 recall.
17 Q Okay. So the last day on this record,
18 then, is the 23rd of June that it shows
19 that Ms. Griffith was on the Family and
20 Medical Leave Act.
21 A (Nodding.)
22 Q Did human resources call you on the 23rd to

**165**

1 Q That's what you've referenced is page 35?
2 A Right. But out of the Associate Relations, Associate Handbook. I don't believe that would be it (pointing).
5 Q Okay.
6 A I don't have that book.
7 Q Did you give Ms. Griffith that book that you've referenced?
9 A I don't recall.
10 Q "Please see attached, page 35 of the Associate Relations, Associate Handbook." Did you give Ms. Griffith a copy of that handbook --
14   MS. MOORE: Objection.
15 A I don't remember.
16 Q -- when you wrote this?
17 A I don't remember.
18 Q Okay. So with regards to the excessive absences and tardiness -- let's see.
20   MS. HILL: Can I have that marked as Exhibit No. 9.
22   (Exhibit No. 9, DEF 0118, was marked for identification.)
24 Q I'm handing you what's been marked

**166**

1 Exhibit No. 9 (handing).
2 A Mm-mm, yes.
3 Q Would you please identify that document.
4 A It's DEF 0118, page 35 with no title on the paper. There's no title of this document. You know what I'm saying? There's subtitles on the document --
8 Q Right.
9 A -- and it's DEF 118.
10 Q Okay. Is that the document that you were referring to in your May 23, 2000, Associate Disciplinary Action Notice?
13 A Yes.
14 Q So what is CU's policy pursuant to page 35 of this document with regards to excessive absences?
17   MS. MOORE: Objection.
18 A Do you want me to read this?
19 Q No, no. Just tell me what your understanding of what "excessive absences" is, according to page 35 of the Associate Relations, Associate Handbook.
23 A It's frequent, unplanned absences.
24 Q Okay. Anything else? Just frequent,

**167**

1 unplanned absences?
2 A Yes. But the other thing to note on this page is the next paragraph --
4 Q Okay.
5 A -- which is the FMLA, "If you have a serious health condition that qualifies under the FMLA, you are not limited to a particular number of occurrences, as long as you provide proper documentation."
10 Q So --
11 A I mean, this -- this page has, you know, information that I got on both things from here.
14 Q And so what is it about this particular page that you are attempting to convey to Ms. Griffith in this notice?
17 A Both excessive absence but that if there's -- excessive absences, which obviously the disciplinary action is addressing; but also if there's serious health issues, there's other avenues than calling in sick.
23 Q Okay. And were you present when this Associate Disciplinary Action Notice was

**168**

1 given to Ms. Griffith?
2 A Yes.
3 Q Okay. And so did you discuss that with Ms. Griffith, that she had other avenues to take if she were sick?
6   MS. MOORE: Objection.
7 A I don't recall.
8 Q Do you recall referring to this page 35 and addressing these two issues under "Excessive Absence" and "Family Medical Leave Act" with Ms. Griffith?
12   MS. MOORE: Objection.
13 A I don't recall.
14 Q Do you recall whether Ms. Griffith had any questions about excessive absences at this time?
17 A I don't recall.
18 Q Okay. Was anyone else present when you had the conversation with Ms. Griffith pertaining to this Associate Disciplinary Action Notice?
22 A Yes.
23 Q Who else was present in the room?
24 A Mike Sisto.

173

1    days"; is that correct?
2  A  Yes, that's what it says.
3  Q  And No. 1, "One week advance notice of
4     vacation days"; No. 2, "No absence from
5     work"; No. 3, "No tardiness."
6  A  (Nodding.)
7  Q  Did Ms. Griffith have any questions with
8     regards to the corrective action that you
9     required on this particular notice?
10          MS. MOORE: Objection.
11 A  I don't recall. Can I make a statement
12    about that?
13 Q  Sure.
14 A  I don't really -- I remember there was a
15    meeting, and I remember that Bernadine was
16    angry; and that's really all I remember
17    about the meeting. And Bernadine left the
18    meeting angry and did not sign this.
19          So I -- I'm never going to be
20    able to remember anything that was said or
21    given. I -- that's my recollection. And
22    so that's what I'd like to say about that.
23 Q  Do you remember where Ms. Griffith left
24    after this meeting?

174

1          MS. MOORE: Objection.
2  A  We were in an office, and she got up and
3     walked out and slammed the door, and I
4     don't know where she went at that point.
5  Q  Was Ms. Griffith at work for the remainder
6     of the day subsequent to this meeting?
7  A  I don't believe so.
8  Q  And do you know whether or not she left CU?
9          MS. MOORE: Objection.
10 A  Later on I was told by HR that she had
11    left.
12 Q  And where did Ms. Griffith leave for?
13         MS. MOORE: Objection.
14 A  I don't know. I think -- all I know is
15    that human resources said that she left,
16    she wasn't feeling well, and that she was
17    not coming back that day.
18 Q  And did Ms. Griffith report back to work
19    with a note later?
20         MS. MOORE: Objection.
21 A  I don't recall.
22 Q  A medical note --
23         MS. MOORE: Objection.
24 A  I don't recall.

175

1  Q  -- saying that she was at the emergency
2     room?
3          MS. MOORE: Objection.
4  A  I don't recall seeing a note.
5  Q  You don't recall any absence from CU on
6     May 23?
7          MS. MOORE: Objection.
8  A  I know that she left, and that's -- and
9     human resources told me that she left and
10    that she wasn't feeling well. That's what
11    I know from May 23.
12 Q  Subsequent to May 23, did you have a
13    conversation with Ms. Griffith about the
14    corrective action that she needed to take
15    with regards to this notice?
16 A  I don't recall.
17 Q  Okay. With regards to the corrective
18    action on this particular notice, was it
19    permissible for Ms. Griffith to be out
20    sick?
21 A  I don't think that's clear here.
22 Q  Okay. Was it permissible for Ms. Griffith
23    to be out on family/medical leave?
24 A  Yes.

176

1  Q  Okay. Directing your attention to
2     Exhibit 8 now -- if you could take a look
3     at that and identify that particular
4     document.
5          THE WITNESS: Kristin, I'm
6     looking at Associate Disciplinary Action
7     Notice, DEF 114, DEF 115, dated July 27,
8     2000.
9  Q  Ms. Holmes, is that your handwriting on
10    page 114?
11 A  Yes, it is.
12 Q  And is that also your handwriting on
13    page 115?
14 A  Yes, it is.
15 Q  Is anyone else's handwriting on either of
16    those two pages?
17 A  Yes, on DEF 115.
18 Q  And whose handwriting is that?
19 A  It appears to be Lisa Studholme, I believe.
20 Q  And who is Lisa Studholme?
21 A  She was a human resources -- I don't
22    know -- associate.
23 Q  Okay. And by that you mean other
24    writing -- you're referring only to her