**21**

```
         were you reviewed?
              MS. MOORE:  Objection.
Q.  Was there a written final review?
A.  I don't recall.
Q.  Did you sign and date, execute any formal
    review --
              MS. MOORE:  Objection.
Q.  -- when you left your position?
A.  I don't recall.
Q.  When was your last job evaluation at
    OneBeacon Insurance?
              MS. MOORE:  Objection.
A.  I don't recall the exact date.
Q.  Were you reviewed annually?
A.  Yes.
Q.  Were you reviewed in 2000?
A.  I don't recall exactly.  Probably.
Q.  From 1984 to 2000, were you reviewed every
    single year?
              MS. MOORE:  Objection.
A.  Most likely, yes.
Q.  Were you reviewed in 2001?
A.  Most likely.
Q.  Did you receive any retirement?
           SHEA COURT REPORTING SERVICES
                 (617) 227-3097
```

**22**

```
              MS. MOORE:  Objection.
A.  Meaning?  I mean, I am not at a retireable
    age.
Q.  Did you receive an offer for early
    retirement?
              MS. MOORE:  Objection.
A.  No.
Q.  What is your age?
A.  I am 42.
Q.  Did you receive any other benefits other
    than the severance?
              MS. MOORE:  Objection.
A.  No.
Q.  Did you contribute to a 401(k) plan?
A.  Yes.
Q.  What did you do with your 401(k) plan?
              MS. MOORE:  Objection.
A.  I think I just left that in the OneBeacon
    401(k) account.  I had the option to leave
    it in there.
Q.  Now at some point in time you became
    Ms. Griffith's supervisor; correct?
              MS. MOORE:  Objection.
A.  Correct.
           SHEA COURT REPORTING SERVICES
                 (617) 227-3097
```

**23**

```
 1  Q.  When did you first become Ms. Griffith's
 2      supervisor?
 3  A.  Can you clarify supervisor?  Meaning direct
 4      supervisor?
 5  Q.  Well, you tell me.  What was your position
 6      over Ms. Griffith?
 7  A.  I was the manager over that functional unit
 8      which Ms. Griffith was a part of.
 9  Q.  What's the name of the functional unit which
10      you were manager over?
11  A.  It was, as I recall, called IT Services.
12  Q.  How many employees were in the IT Services
13      Department?
14            MS. MOORE:  Objection.
15  A.  Approximately -- it varied from month to
16      month.  I would say approximately 50 to 70.
17  Q.  What were your duties as a manager over that
18      department?
19            MS. MOORE:  Objection.
20  A.  To support and maintain certain computer
21      systems for OneBeacon, and also
22      administrative responsibilities for the
23      associates in my group.
24  Q.  Were you the direct supervisor to Bernadine
           SHEA COURT REPORTING SERVICES
                 (617) 227-3097
```

**24**

```
 1      Griffith, or was there another supervisor or
 2      manager beneath you?
 3            MS. MOORE:  Objection.
 4  A.  Yes, there was another supervisor and
 5      manager beneath me.
 6  Q.  Who was the supervisor or manager beneath
 7      you?
 8            MS. MOORE:  Objection.
 9  A.  It changed.  At what point in time?
10  Q.  Well, what's the first date that you became
11      a supervisor of Bernadine Griffith?
12  A.  It was probably early in 1998.
13  Q.  1998?
14  A.  Yes.
15  Q.  So in 1998, who did Ms. Griffith report to
16      by way of supervisors, directly to you or
17      to any other individuals?
18  A.  There was another individual.
19  Q.  Who was the other individual?
20  A.  Monica Scanlon.
21  Q.  Was there any other individual besides
22      Monica Scanlon in 1998 that Ms. Griffith
23      reported to?
24  A.  I don't recall at that time.
           SHEA COURT REPORTING SERVICES
                 (617) 227-3097
```

**25**

Q. Other than Monica Scanlon, was there any other lateral supervisor that was under you in 1998?
A. Yes.
Q. Who was the other lateral supervisor or other lateral supervisors?
A. A gentleman by the name of Tom Scionti, a woman by the name of Tressie Statton. Another gentleman, Joe Zuchowicz. That's all I can recall at this point.
Q. In 1999, who were the supervisors -- who was Bernadine Griffith's direct supervisor?
A. I believe at that point -- I'm not sure of the exact date -- it probably was Karen Holmes.
Q. Any other individual?
A. A direct supervisor?
Q. Correct.
A. Not that I can recall.
Q. With regards to charges of discrimination as they would be handled within your department, did you individually have a procedure or implement a policy for handling charges of discrimination?

SHEA COURT REPORTING SERVICES
(617) 227-3097

**26**

   MS. MOORE: Objection.
A. Clarify that. Individually? I don't understand.
Q. As a supervisor, you had some procedure or some plan for handling a charge of discrimination; right?
   MS. MOORE: Objection. That hasn't been testified to. You can answer the question.
A. No, I personally did not have a plan.
Q. You didn't have a plan that you implemented for charges of discrimination while you were a supervisor?
   MS. MOORE: Do you know what a charge of discrimination is?
   THE WITNESS: Maybe that needs to be clarified.
Q. If you don't understand a particular term, just let me know.
A. What I don't understand is "personally." I did not personally have a -- I used the company's policies and procedures.
Q. So there was a company policy and procedure for handling a charge of discrimination?

SHEA COURT REPORTING SERVICES
(617) 227-3097

**27**

1    MS. MOORE: I am going to object to
2  that question. When you say "charge of
3  discrimination," are you talking about
4  something filed at the MCAD because that is
5  what we would use when we use the term
6  charge of discrimination --
7    MS. HILL: Let's see what he knows.
8    MS. MOORE: Please don't interrupt.
9  Q. Do you understand what a charge of
10    discrimination means? What does that mean
11    to you?
12 A. As I understand, somebody is charging
13    someone else with being discriminatory.
14 Q. There could be more than one charge, right,
15    of discrimination? One way of thinking, it
16    could be internal where an employee charges
17    discrimination and that employee goes
18    directly to human resources; right?
19 A. Okay.
20 Q. And then there could be another way of
21    charging discrimination where an employee
22    goes outside of the employer and files a
23    complaint, like to the MCAD; right?
24 A. Okay.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**28**

1    MS. MOORE: Objection.
2  Q. I am going to ask you with regards to your
3    internal charges of discrimination where an
4    employee makes a charge of discrimination to
5    human resources, while you were a
6    supervisor, while Ms. Griffith was under
7    your supervision, did any employees in your
8    department make a charge of discrimination
9    to the human resource department?
10    MS. MOORE: Objection.
11 A. I'm going to have to say I don't recall.
12 Q. While Ms. Griffith was under your
13    supervision, did Ms. Griffith make a charge
14    of discrimination to your human resource
15    department?
16    MS. MOORE: Objection.
17 A. To be honest, I don't know if she did or
18    didn't.
19 Q. Did you ever have an opportunity to sit down
20    and discuss with Ms. Griffith a complaint of
21    discrimination?
22    MS. MOORE: Objection.
23 A. No.
24 Q. A charge of discrimination, internal

SHEA COURT REPORTING SERVICES
(617) 227-3097

93

Q. Did you review any documents this morning that you specifically wrote?
A. Not that I can recall, no.
Q. Back to this particular document here, the next paragraph says Corrective Action. Did you ask Ms. Griffith to specifically take these steps as the corrective action?
A. Did I specifically ask Ms. Griffith?
     MS. MOORE: Objection.
Q. Yes. Did you?
A. No.
Q. Did anyone in the room ask Ms. Griffith to take these corrective steps?
     MS. MOORE: Objection.
A. Again, I don't recall during this meeting who did the speaking and talked to this.
Q. What do you recall about this meeting at this time now?
A. Again, I recall it was a meeting in the HR conference room at the OneBeacon building. There's myself -- I don't recall -- I believe Karen Holmes was present, and I believe one or two representatives from human resources were present at the meeting.

SHEA COURT REPORTING SERVICES
(617) 227-3097

94

Q. Who was present from human resources at this meeting?
A. I believe their names were Lisa Studholme from human resources, and I'm not as sure on the other person. I believe it was Nancy Snyder.
Q. At this particular meeting, did Ms. Griffith agree with what is written here in this disciplinary action notice?
     MS. MOORE: Objection.
A. Give me a little more detail on how you want me to say whether she agreed or disagreed. Was it verbally? Did she put her signature on a paper to agree to this? I mean, which one?
Q. Describe to me what happened. Take it from the start. Do you know who called Ms. Griffith to attend this meeting?
A. I do not recall for this meeting who called her. It could have been Karen, it could have been someone from HR. I don't recall.
Q. Who decided that this meeting should take place?
A. I think it was -- it wasn't any one

SHEA COURT REPORTING SERVICES
(617) 227-3097

95

individual. We worked with human resources to go over this situation, and then I believe -- it was probably a group decision between, you know, myself, Karen, and human resources, and even my superiors to go ahead and do this.
Q. Which of your superiors okayed you to go ahead and do this?
A. At the time I reported to Tom Hibbert, H-i-b-b-e-r-t.
Q. Did Tom Hibbert direct you to have this meeting with Ms. Griffith?
A. What do you mean by "direct"?
Q. Did he tell you to have this meeting with Ms. Griffith?
A. As I recall, not directly to have the meeting, but to follow the human resources process and procedures to handle these situations.
Q. What was the human resource process and procedure to handle this situation?
A. Okay, again, I'm not a human resource person and I don't recall the specific steps, but there was a process to do verbal warnings

SHEA COURT REPORTING SERVICES
(617) 227-3097

96

and then a written warning process, a disciplinary action process that had to be followed.
Q. So is it your understanding that this was a disciplinary action?
     MS. MOORE: Objection.
A. Yes, it says that at the top.
Q. Is it your understanding that the meeting was called for to enforce this disciplinary action?
     MS. MOORE: Objection.
A. As far as I understood, yes.
Q. Well, what is your understanding of why the meeting took place?
     MS. MOORE: Objection.
A. Didn't I -- I thought I just answered that?
Q. Well, you tell me in your words what was the purpose for the meeting.
     MS. MOORE: Objection.
A. We had to communicate to Bernadine the disciplinary action notice that is right before me here.
Q. Why was Ms. Griffith being disciplined?
A. It was related to her absent -- really

SHEA COURT REPORTING SERVICES
(617) 227-3097

**97**

    violation of the corporate policy for attendance, absenteeism, tardiness.
Q. How did Ms. Griffith violate the corporate policy for attendance?
    MS. MOORE: Objection.
A. Again, from how I understand it, is having more occurrences of absenteeism than the company allowed.
Q. How many occurrences of absenteeism did the company allow Ms. Griffith to have?
    MS. MOORE: Objection.
A. I don't recall. Again, it's been a few years. I don't recall the number, the exact number.
Q. What is your understanding of the company's sick policy?
    MS. MOORE: Objection. His understanding now? His understanding at the time? The company's policy then? The company's policy at the time? What are we talking about?
Q. All my questions are at May 23, 2000; okay?
A. Okay.
Q. What is your understanding of the company's

**98**

policy on May 23, 2000?
A. That there was, again, related -- I am going to give it specific to the violation part. Again, I don't recall the whole absenteeism or sick policy, but as I recall, if there was more than a certain number of occurrences where you called in sick -- not number of days but occurrences -- if you went beyond that number of occurrences, then you were in violation of the sick or absenteeism policy, and you were subject to disciplinary action.
Q. How many occurrences did --
A. Again, I don't recall the exact number. If I gave you a number, it would be an approximation. I could give you an approximation.
Q. Give me an approximation how many occurrences.
A. I believe, approximately, it was three.
Q. Three for what time frame?
    MS. MOORE: Objection.
A. I think it was during a year, within a year, I believe.

**99**

Q. At that meeting, did you or someone else at the meeting give a copy of this disciplinary warning to Ms. Griffith?
A. Yes. I am sure it was given to her. I don't know who exactly physically handed her the copy of it.
Q. Was Ms. Griffith also given this copy of the company policy that is marked as Exhibit 7?
    MS. MOORE: Objection.
A. Again, not recalling exactly, but I'm -- I can almost say that it was.
Q. What else took place at that meeting?
A. Can you give me -- narrow it down for me, will you?
Q. Sure. I am just looking for your memory of the events and what happened, who said what and what was the end result. Just tell me the next thing you remember.
A. At a general level, a general, Bernadine was called in. There was myself, I believe Karen was there, and one or two representatives from human resources was in the meeting. We sat, Bernadine sat down, and we started discussing the final warning,

**100**

going over what was outlined here. After we discussed that -- as I recall, Bernadine had a folder of documents with her, and then she stood up and she started discussing these documents and events that happened prior to my even being there with other associates, issues revolving around her health conditions -- again, trying to recall -- and just going on and on and on about issues and discussing things that really were not pertinent, you know, to what we were -- that meeting was to outline, what the meeting was to discuss.
Q. What was pertinent to what the meeting was to discuss?
A. Again, the meeting was to talk about her absenteeism and tardiness and what she needed to do to correct that.
Q. What did you tell her she needed to do to correct that?
    MS. MOORE: Objection.
A. Again, I don't remember the specifics, okay, but we probably discussed what is outlined on this document, okay?

**101**

Q. Okay.
A. About -- you want me to go into the details about what is here?
Q. Well, you have had an opportunity to read this document?
A. Right.
Q. Is there anything other than what is written on this document that you recall discussing?
    MS. MOORE: Objection.
A. No. Again, our objective was to stick to these points and that was it.
Q. Did you stick to these points then?
A. As far as I recall, yes, we did or -- yes.
Q. How did the meeting end?
A. As best I can recall, Bernadine -- she spoke for a few minutes with these documents, and bringing up instances with associates that happened years ago that really were not pertinent to this. We let her talk for a few minutes, and then had -- and I don't recall who said it, but they said, "Bernadine, it's really not pertinent to this. That's it. Go back to your desk," or whatever, and the meeting was over.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**102**

Q. She was told to go back to her desk?
A. Again, they're not specific words, but the meeting broke up. Again, I won't say, "Go back to your desk," no.
Q. Who broke up the meeting?
A. I think at one point I may have said, "Bernadine, what you're telling us is not relevant or not pertinent to these objectives," and one of the HR representatives may have said something or broke the meeting up. I can't recall exactly who broke the meeting up, but --
    (Whereupon off the record it is decided to break for lunch at 1:15 p.m.)
    AFTERNOON SESSION
    RECOMMENCING AT 2:25 P.M.
    MS. HILL: Could I have this marked, please, as an exhibit?
    (Exhibit 8, Meeting with Bernadine Griffith to Administer Disciplinary Action, so marked.)
    BY MS. HILL:
Q. Good afternoon, Mr. Sisto. Before you left, we were last talking about your meeting with

SHEA COURT REPORTING SERVICES
(617) 227-3097

**103**

Bernadine Griffith on May 23, 2000. I have just passed you a document marked Exhibit No. 8. Would you please take your time to look at that document and identify it for us, please?
    (Witness reading over document.)
A. Okay.
Q. Could you identify the document, please?
A. It says Meeting with Bernadine Griffith to Administer Disciplinary Action.
Q. Who wrote the memo?
A. It doesn't say specifically who wrote the memo.
Q. Do you know who wrote the memo?
A. By the looks of it, I probably wrote the memo.
Q. What do you mean "I probably wrote the memo"?
A. Well, again, just recognizing my writing style and then recollection of this memo and the meeting, I am pretty sure I wrote this document.
Q. When did you write that memo?
A. Probably either -- or very shortly after

SHEA COURT REPORTING SERVICES
(617) 227-3097

**104**

May 23, 2000, probably the same day.
Q. The same day?
A. Yes.
Q. In this memo it states that you and Karen Holmes were present for the 5-23 meeting; is that correct?
A. Yes.
Q. Only you three were present at that meeting?
A. Yes.
    MS. MOORE: Objection.
Q. With regards to your reciting the facts and events of that day, is that memo correct?
A. As best as I can recall reading through this, yes.
Q. Directing your attention to the part where -- section where you wrote that Bernadine went on to state that she's being harassed and treated unfairly in work because she is given assignments to projects she's unfamiliar with, is that what you were talking about earlier when you were saying she was talking about unrelated subject matters?
A. Yes, yes. Again, when we met with her to

SHEA COURT REPORTING SERVICES
(617) 227-3097

**105**

talk about her attendance, she started talking about matters that were unrelated to her attendance.

Q. Now that you have read this memo, does that refresh your recollection as to the specifics of what Bernadine talked about at that meeting?

MS. MOORE: Objection. Go ahead.

A. Yeah. It helps my memory on that, yes.

Q. Do you recall what she was discussing specifically on that day?

MS. MOORE: Objection.

A. Again, the only thing I can go by is what specifically is written here, you know, that she was -- felt like she was being harassed, treated unfairly, given assignments and projects that she's unfamiliar with. You want me to continue to read it? But --

Q. No. What I am asking is do you recall specifically what her words were now that you have had an opportunity to refresh your recollection?

A. No, I cannot remember the specific words, no.

**106**

Q. As a consequence of Ms. Griffith stating these complaints to you about being harassed and treated unfairly in her work, what, if any, steps did you take to investigate these allegations?

MS. MOORE: Objection.

A. Again, I don't -- I didn't feel that what she was stating here -- I wasn't agreeing with what she was stating here as being correct.

Q. What about what she stated wasn't correct?

MS. MOORE: Objection.

A. Say that again? I want to make sure I answer you properly.

Q. What about -- what is it about her statements that she made at this meeting that was not correct?

A. Well, she was stating that she was being harassed, treated unfairly, given assignments to projects she's unfamiliar with, learning program languages on her own, but assignments given to her were not related, other staff members stroll in at different times during the day. That was

**107**

really totally -- all this was unrelated to Bernadine's attendance issues. That is what we were to talk about, her attendance, being late. It was not to talk about her being harassed, her being treated unfairly. If she had these issues, she could have went to HR and discussed them with HR, and then HR would have contacted me, and then I would have pursued it that way.

Q. Did HR contact you about these allegations that you have documented here?

MS. MOORE: Objection.

A. I don't recall. I do not believe so.

Q. Did you speak with Miss Holmes about Bernadine being harassed and treated unfairly in work?

MS. MOORE: Objection.

A. I do not recall. Potentially I may have discussed with Karen -- again -- but I do not recall discussing this. Again, our objective was Bernadine's attendance and lateness.

Q. So is it your testimony that you didn't speak with Miss Holmes about Ms. Griffith

**108**

being harassed and treated unfairly at work?

MS. MOORE: Objection. Asked and answered.

A. I don't recall, so since I don't recall, I am going to have to say no.

Q. Did you speak to Miss Holmes about Ms. Griffith being given assignments to projects that she was unfamiliar with?

MS. MOORE: Objection.

A. Again, I do not recall, but again, it was Karen's responsibility since she was the main supervisor to assign work to her staff based upon their knowledge and the work effort.

Q. Did you speak with Miss Holmes about Ms. Griffith learning programming languages on her own?

MS. MOORE: Objection.

A. No, I don't recall that, talking to her about that.

Q. Did you speak with Ms. Holmes about Ms. Griffith receiving assignments that were given to her that were not related?

MS. MOORE: Objection.

### 173

1  A.  My main office was out of the Philadelphia
2      headquarters or location.
3  Q.  How often were you in Philadelphia from
4      1998 to 2000?
5  A.  Meaning how many times per month or --
6  Q.  Right, what percentage of the days were you
7      in Philadelphia?
8  A.  I am going to give you an approximation.
9      Approximately 75 percent of my time was in
10     Philly, 25 percent of my time was in
11     Foxboro, Massachusetts at our data center
12     there.
13 Q.  How about in the year 2000, what percentage
14     of your time was in the Foxboro facility?
15 A.  Again, it varied.  I didn't have a set
16     schedule, but I am going to say about the
17     same, 75 percent Philadelphia, 25 to 35
18     percent in Foxboro.
19 Q.  Do you believe you are personally liable for
20     the termination of Ms. Griffith?
21          MS. MOORE:  Objection.  Don't
22     answer that question.
23 Q.  Do you believe you are responsible for
24     terminating Ms. Griffith?

SHEA COURT REPORTING SERVICES
(617) 227-3097

### 174

1          MS. MOORE:  Objection.
2  Q.  Go ahead.  Are you responsible for
3      terminating her?
4  A.  Am I responsible?
5  Q.  Yes.
6  A.  No, I do not believe I am responsible.
7  Q.  Who do you believe is responsible for
8      terminating Ms. Griffith?
9          MS. MOORE:  Objection.  You can
10     answer.
11 A.  I think Ms. Griffith is responsible for
12     terminating herself, getting herself
13     terminated.
14 Q.  How do you think she's responsible for
15     getting herself terminated?
16 A.  Again, we've had multiple warnings and
17     written correspondence with Ms. Griffith on
18     the issue and how she needed to correct that
19     to maintain her job and her employment, and
20     she broke those stipulations and guidelines
21     that we laid down at every juncture of the
22     way.
23 Q.  With regards to the other allegations, I
24     just want to ask you whether or not you

SHEA COURT REPORTING SERVICES
(617) 227-3097

### 175

1      agree or disagree with some statements,
2      whether or not you think it's true.
3          Is it true or false that
4      Ms. Griffith satisfactorily performed the
5      essential functions of her job?
6          MS. MOORE:  Objection.  When are
7      you talking about?
8  A.  Yeah, what period?
9  Q.  For the 22 years that Ms. Griffith was
10     employed.
11 A.  I can't speak for 22 years.
12 Q.  For the years from 1998 to 2000, is it true
13     that Ms. Griffith satisfactorily performed
14     her job?
15          MS. MOORE:  Objection.
16 A.  From what I understand, her work performance
17     when she was there was adequate.
18 Q.  When you mean "adequate," do you mean that
19     as proficient, as what is listed on her
20     performance appraisal, that her work
21     performance was, in fact, proficient from
22     1998 to 2000?
23          MS. MOORE:  Objection.
24 A.  I am going to say adequate.

SHEA COURT REPORTING SERVICES
(617) 227-3097

### 176

1  Q.  Does adequate mean satisfactory?
2  A.  Satisfactory.  It's how you define
3      proficient.
4  Q.  Is it true that Ms. Griffith suffered a
5      heart attack in April of 1994?
6          MS. MOORE:  Objection.
7  A.  I'm not aware of that.
8  Q.  Are you aware that Ms. Griffith suffered a
9      heart attack at all?  Has anyone ever told
10     you that?
11          MS. MOORE:  Objection.
12 A.  No.
13 Q.  Are you aware that Ms. Griffith was
14     subjected to a quadruple bypass heart
15     surgery?
16          MS. MOORE:  Objection.
17 A.  No.  I did not -- I'm not aware of that
18     specific information.
19 Q.  And that subsequent, from April 1994, she
20     then thereafter returned to work at CU in
21     September of 1994?
22          MS. MOORE:  Objection.  I am going
23     to object to this whole line of questioning
24     as counsel is reading from the complaint,

SHEA COURT REPORTING SERVICES
(617) 227-3097

**113**

Bernadine was brought into the room. Someone, again, spoke to this notice, this document, and explained to her that, you know, she had violated the initial written warning, this was her final warning. Again, it went through the stipulations laid out here. And then as I recall, okay, when we were done speaking about that, you know, Bernadine had got up and had a folder full of documents and started talking about issues and events and things related to her health that just were not -- did not pertain to this.

Q. What issues about Ms. Griffith's health did she talk about that was not related to this?

A. Again, don't know the specifics, don't recall the specific words or what was said, but she brought up issues that she has a disability, she has -- I think her illness was heart problem related. It was revolved around that. She spoke of other issues within CU or OneBeacon that happened with other associates. Again, she kind of went into one issue after another, and as I

SHEA COURT REPORTING SERVICES
(617) 227-3097

**114**

recall, we let her speak for a couple of minutes, and then basically the conversation was not relevant or pertinent to what we, you know, what we established the meeting for, and we just said, "The meeting is over," basically. Not in those terms, but "This is what we wanted to communicate. Do you understand? You know what we are telling you?" And again, I don't recall her response to the end of the meeting because she kind of got off on a tangent on her own.

Q. So you're saying that specifically -- let's see if I could point to the section here. I think the Corrective Action -- are you saying that at that meeting this corrective action, this was specifically told to Ms. Griffith?

   MS. MOORE: Objection.

A. Yes.

Q. Who told Ms. Griffith to take these steps under the corrective action?

A. I did not specifically recall who verbally spoke this. It could have been me, it could have been Lisa, it could have been Karen.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**115**

1  But one of the three or four, whomever was
2  in that room, went over this.
3  Q. Is it your understanding that Ms. Griffith
4     understood the corrective action?
5        MS. MOORE: Objection.
6  A. I don't -- be honest, I don't know if she
7     understood it or not. In English we
8     reviewed it and verbally talked about it.
9     Now whether she understood, I can't speak
10    for what was going on in her head.
11 Q. Did you ask her if she understood what
12    corrective action she needed to take?
13 A. I don't recall specifically, but again,
14    part of the process is once this is given
15    or explained to an associate, they have an
16    opportunity to write comments, to sign it.
17    She refused, as I recall, to sign it or put
18    any comments down, so then she got off on
19    her tangent. So a copy was given to her, as
20    I believe, so the best we could take out of
21    that meeting was that she understood what we
22    were telling her. I mean, at that point she
23    got a little off in a tangent.
24 Q. So looking at the corrective actions that

SHEA COURT REPORTING SERVICES
(617) 227-3097

**116**

1  Ms. Griffith is told to take, she's told to
2  not be absent or tardy to work for a period
3  of 90 days, or call in vacation days. 1,
4  One week advance notice of vacation days.
5  2, No absences from work. 3, No tardiness.
6  That corrective action, what do you
7  understand that to mean?
8        MS. MOORE: Objection.
9  A. What do I understand it to mean?
10 Q. Yes.
11 A. Me personally?
12 Q. Yes.
13       MS. MOORE: Objection.
14 A. Okay. That for number one, one week advance
15    notice of vacation days, meaning if she
16    needs to take a vacation day, she has to let
17    her supervisor, Karen, know a week ahead of
18    time. No absences from work, okay, means no
19    unscheduled absences from work. No
20    tardiness from work, I would interpret that
21    as your start time is 9:30, 10:00 o'clock,
22    whatever that is when you should be at your
23    seat or within the building to start work.
24    That's my interpretation.

SHEA COURT REPORTING SERVICES
(617) 227-3097

SHEA COURT REPORTING SERVICES


 


### 117

Q. But you didn't ask Ms. Griffith if that is what she understood that to mean, did you?
   MS. MOORE: Objection.
A. Again, the process I was told was to sit down Ms. Griffith and we were to explain this to her. She had the opportunity to ask questions if she didn't understand anything. That was the purpose of the meeting. I would have been more than happy to go through this line by line, word by word until she was clear. She did not ask any questions, as I recall. She did not sign that she agreed with it. She gave me no indication that she cared. And then she started on her tangent with other issues that were not related to this, so I don't feel it's my responsibility to assume that she doesn't understand this.
Q. Did you ask her, though, specifically if she understood those three steps?
   MS. MOORE: Objection.
A. I don't recall specifically, but what I normally do, okay, or how we normally handle this, you go through it, and then as you're

### 118

going through, "Do you understand? Do you have any questions?" You give people the opportunity to ask that. "Do you understand? Do you have any questions?" Again, we had an HR representative involved to make sure we were doing things correctly. I am sure Lisa would have asked the question, "Do you have any questions? What don't you understand?" Again, you know, there was no questions written down here, no indication that she did not understand, so my assumption was that she understood it. Why would she then go on a tangent about how related to this -- how other issues tied into this if she didn't understand what we were telling her? I mean, so --
Q. At this meeting did you discuss with Ms. Griffith what she should do if she is ill?
A. I do not recall. I believe the reason why we had human resources in there is to explain if she has an illness, she has options. And again, I'm not a human resource knowledgeable person. There were

### 119

avenues she could take if she had to be -- not come to work, which was FMLA, and we had disability policies, short-term disability policies that she could use to cover those situations.
Q. Directing your attention back to Exhibit No. 5, Exhibit No. 5 on the corrective steps, are those the same corrective steps on Exhibit No. 5 as are on Exhibit No. 6?
A. I will have to compare them one to one.
Q. Sure.
   MS. HILL: If I could have this marked as the next exhibit, please?
   (Exhibit 9, Letter dated July 1, 1997, so marked.)
   (Exhibit 10, Work Clearance Note, so marked.)
   (Exhibit 11, Lahey Clinic document dated 1-20-00, so marked.)
Q. Are those two corrective actions the same or are those two separate meetings?
A. From the best of my ability here, they appear to be the same.
Q. Now I am handing you what is marked as

### 120

Exhibit No. 9. Would you please take a look at Exhibit No. 9 and read it, if you didn't see it this morning, please?
   (Witness reading over document.)
A. Okay.
Q. Could you identify that document?
A. It looks like, again, Bernadine Griffith/Request for Accommodation, title of the document.
Q. What's the date and who's the author and who's it written to?
   MS. MOORE: Objection.
A. The date, July 1, 1997. The author seems to be Erin M. O'Toole.
Q. Do you know who those two individuals are, the author and Erin O'Toole?
A. Clarify? You said "two individuals."
Q. Yes, I am sorry. Well, Erin O'Toole, do you know who she is?
A. I do not know who Erin is.
Q. How about Miss Moynihan?
A. Miss Moynihan was head of human resources or a human resource person, I can't recall what capacity, for CGU or CU human resources.