Page 148

1  to Rick Coury and you told him that Suzanne
2  Walker had said "Up yours" in the ladies' room
3  you also told him about other things that were
4  happening that you found objectionable?
5      A   Yes.
6      Q   Okay. What else did you tell him about?
7      A   Rubber bands and paper clips being thrown,
8  the tops of yogurt containers being thrown in a
9  frisbee manner, the mouse pad being thrown right
10 outside my cube.
11     Q   Other than the rubber bands and the paper
12 clips and the yogurt tops and the mouse pads, did
13 you complain about anything else being thrown?
14     A   Yes.
15     Q   What else?
16     A   A paper airplane being -- was sailed or
17 flew into my cube and flew by my eyes, close to
18 my eyes, in my line of vision.
19     Q   Anything else?
20     A   I believe that's it.
21     Q   Okay. Is there any reason why you
22 wouldn't remember something else that happened?
23     A   Is there any -- I don't understand the
24 question.

Page 149

1      Q   I'm trying to figure out if you're -- I'm
2  trying to make sure that you've told me
3  everything you remember, and I'm just saying is
4  there some reason today that you night remember
5  something that occurred?
6      A   I couldn't answer that.
7      Q   Okay. With regard to the rubber bands and
8  the paper clips, do you know who was throwing
9  them?
10     A   Yes.
11     Q   Who?
12     A   Ed Sobel.
13     Q   Just Ed Sobel?
14     A   Owen Davies.
15     Q   Is there anyone else?
16     A   In general or just at me?
17     Q   Let's just go with in general.
18     A   There's no one else.
19     Q   Okay. When you said they were throwing
20 rubber bands and paper clips, were they only
21 throwing them at you?
22     A   I only recall the ones that sailed in my
23 cube while I was there.
24     Q   So there could have been other ones being

Page 150

1  thrown around at the same time as there were ones
2  that were going into your cube?
3      A   I was only aware of the ones that came in
4  my cube.
5      Q   Did you see at any time, even if it wasn't
6  on this particular time, paper clips or rubber
7  bands being thrown around generally in the
8  office?
9      A   It was not a general practice.
10     Q   Okay. Did you see them at any time?
11     A   Excuse me. The question again?
12     Q   At any time did you see paper clips or
13 rubber bands being thrown around the office other
14 than the times when you say they were being
15 thrown at you?
16     A   No.
17     Q   Okay. Why is it you believe they were
18 being thrown at you?
19     A   Because they came within my personal
20 space, my vicinity, close to my body.
21     Q   Did you see Ed Sobel throwing rubber bands
22 at you?
23     A   I saw him shooting them. I said throwing,
24 but I meant shooting. Yes.

Page 151

1      Q   Was he aiming at you?
2      A   He was aiming toward my cube and I was
3  there, so I would say yes.
4      Q   Could you see him aiming at you?
5      A   Yes.
6      Q   Could you see when -- Was Mr. Sobel also
7  throwing paper clips?
8      A   Yes.
9      Q   Was he aiming those at you?
10     A   Some were, yes.
11     Q   When you say "some were," what does -- how
12 are you making that distinction?
13     A   Sometimes they fell out of the rubber
14 band.
15     Q   Okay.
16     A   Like you prime the rubber band to put the
17 paper clip in there --
18     Q   Okay.
19     A   -- sometimes they fell out --
20     Q   So he would --
21     A   -- and only the rubber band would project.
22     Q   Okay. So the action that you're
23 describing, are you saying that Mr. Sobel and
24 Mr. Davies would take paper clips, put a rubber

Bernadine Griffith

Page 152

1 band around one end, draw it back in order to use
2 it as a base to shoot the rubber band?
3  A Correct.
4  Q Okay. And sometimes in releasing the
5 rubber band, in addition to the rubber band
6 flying, the paper clip would fly as well?
7  A Correct.
8  Q So they weren't just taking paper clips
9 and just pegging them in your office?
10  A No, they were not.
11  Q Okay. So if they were using a -- a paper
12 clip and paper clip through -- I'm sorry. If the
13 paper clip came into your office, it was because
14 they were using it as a slingshot for the rubber
15 band?
16  A Correct.
17     MS. HILL: Objection to "they." Could you
18 clarify who "they" is, please.
19  Q Ms. Griffith, do you know who I'm talking
20 about when I say "they"?
21  A I -- I thought Owen Davies and Ed Sobel.
22  Q Correct. That's who I was talking about
23 and I think we were talking about during that
24 whole time. If at any time you don't understand

Page 153

1 what I'm saying, please make sure to let me know,
2 and I'll clarify. Okay?
3  A Okay.
4  Q Thanks.
5     Other than -- Strike that.
6     Mr. Davies, did you see him aim rubber
7 bands at you?
8  A Yes.
9  Q And was he standing up and aiming them
10 over into your cubicle, or what was he doing?
11  A Yes, he was.
12  Q Okay. And was Mr. Sobel doing the same
13 thing, standing up and aiming them into your
14 cubicle?
15  A When I saw, yes.
16  Q Okay. Did you say anything to them?
17  A No.
18  Q You never said "Stop"?
19  A No.
20  Q You never said "I think that's
21 inappropriate"?
22  A No.
23  Q What did you do?
24  A I continued to work.

Page 154

1  Q So you just sat there?
2  A I continued to work.
3  Q Right. But you didn't move?
4  A Sometimes I did.
5  Q I guess what I'm asking you is did you
6 ever get up from your desk where you were working
7 and leave your cubicle --
8  A Yes.
9  Q -- at the time they were throwing rubber
10 bands paper clips?
11  A Yes.
12  Q Where did you go?
13  A The ladies' room, the copy room.
14  Q Did you ever complain about the rubber
15 bands and the paper clips being thrown when you
16 got up and left your cubicle?
17  A No.
18  Q At any point did you complain about the
19 rubber bands and the paper clips that Mr. Sobel
20 and Mr. Davies were throwing?
21  A Yes.
22  Q When?
23  A To Rick Coury.
24  Q When?

Page 155

1  A When I complained about Suzanne screaming
2 "Up yours" in my face.
3  Q Okay. Did you believe Mr. Sobel's and
4 Mr. Davies' actions with the rubber bands were
5 motivated by racial animus?
6  A Yes.
7  Q Why?
8  A It was the atmosphere and it was the
9 type -- They weren't doing it to the other female
10 members in our group, and they were -- I just
11 believed it.
12  Q Were they doing it to the other males in
13 the group?
14  A Not that I know of.
15  Q You were the only one that you know of
16 that Mr. Sobel and Mr. Davies fired rubbers bands
17 or paper clips at?
18  A Correct.
19  Q Okay. Where, with regard to where your
20 cubicle was, was the cubicle of Mr. Sobel?
21  A It was behind me.
22  Q Okay. So you were adjoining?
23  A No. It was behind me and an aisle over to
24 the right.

Page 160

1  A  Correct.
2  Q  Who threw the paper airplane?
3  A  Ed Sobel.
4  Q  How do you know that?
5  A  He stood -- He was on -- He was in the
6  cube next to mine, and he stood up and he sailed
7  the -- the paper airplane toward Suzanne, who was
8  sitting behind me.
9  Q  Okay. So Ed Sobel stood up, threw a paper
10 airplane aiming for Suzanne Walker --
11 A  Correct.
12 Q  -- and it --
13 A  In her direction.
14 Q  -- and it landed in your cubicle?
15 A  Right. Took a swing and...
16 Q  When was the -- When did Mr. Sobel throw
17 the paper airplane with regard to the meeting
18 that -- the group meeting that Mr. Coury had?
19 A  Before.
20    (Discussion off the record.)
21 Q  Did anyone throw anything after Rick Coury
22 had the group meeting?
23 A  No, I don't believe so.
24 Q  Okay.

Page 161

1  A  No.
2  Q  Let's go back to Suzanne Walker. Okay?
3  A  Okay.
4  Q  After Suzanne Walker said "Up yours" for
5  the first time in the ladies' room around 1996,
6  what was the next time that you felt you had a
7  hostile encounter with her?
8  A  When she changed the code in my program
9  and said she did not.
10 Q  And do you have an idea -- Was this in
11 1996?
12 A  I would say 1996.
13 Q  Was this before or after Mr. Freeman made
14 the tar baby comment?
15 A  This was before.
16 Q  How do you know that she changed the code
17 in your program?
18 A  When I -- When I confronted her about it
19 she admitted. First she said she didn't change
20 anything. And I had a back-up copy of my code,
21 and I showed her a print-out where there was a
22 code change from the date stamp on the file. And
23 she admitted that she made that change, and she
24 justified it by saying that she needed -- that it

Page 162

1  did not break anything. But it had.
2  Q  Did she say why she made the change in the
3  code?
4  A  She did not say.
5  Q  Did you ask her why?
6  A  Yes, I did.
7  Q  And what did she say?
8  A  She didn't answer that.
9  Q  Okay. Did you complain about the fact
10 that Suzanne Walker changed the code in your
11 program?
12 A  Yes, I did.
13 Q  To whom did you complain?
14 A  Ed Freeman.
15 Q  When did you complain?
16 A  The very day that I discovered it.
17 Q  Okay. And what did Mr. Freeman do?
18 A  He was a bystander in the con -- in the
19 conversation that I had with Suzanne, and I was
20 justifying why my code should be returned the way
21 it was because it worked according to the specs
22 that I was given.
23 Q  Did Ms. Walker have access to people's
24 computers to change their code?

Page 163

1  A  Yes.
2  Q  Do you know if she changed code in other
3  people's programs?
4  A  I do not know.
5  Q  The program in which she changed the code,
6  was that the program that the two of you were
7  working on?
8  A  Correct.
9  Q  Okay. And for that program she was senior
10 to you, meaning she had higher rank?
11 A  Correct.
12 Q  After the incident when Ms. Walker changed
13 your code, when was the next time you had an
14 interaction with her that you felt was hostile?
15    (Pause.)
16 A  When she wanted to know what assignment I
17 was working on and why.
18 Q  Okay. Was this the first incident you
19 were telling me about, or is this another one?
20 A  This is another one.
21 Q  Okay. So she asked you about what program
22 you were working on and why?
23 A  Correct.
24 Q  Was this in 1996?

Bernadine Griffith

Page 164

1  A  I'd say around 1996, 1997.
2  Q  Okay. Was it after Mr. Griffith — I'm
3  sorry. Was it after Mr. Freeman made the tar
4  baby comment?
5  A  It was before.
6  Q  Okay. Why was she asking you what program
7  you were working on?
8  A  That's what I asked her. "Why?"
9  Q  And what was her response?
10 A  "Why are you asking me why?"
11 Q  Okay. And did you say something in
12 return?
13 A  I said "Because you're asking me, and I
14 want to know why."
15 Q  Okay. Did she say anything?
16 A  Other than "You know why."
17 Q  Did you know why?
18 A  Yes.
19 Q  And why was that?
20 A  Because Ed Freeman told me to do it. He
21 gave me my assignment.
22 Q  Okay. I'm confused.
23    You testified that Ms. Walker asked you
24 why you were working on a particular program.

Page 165

1  A  Correct.
2  Q  And in response you said "Why are you
3  asking me what program I'm working on?"
4  A  Correct.
5  Q  And she said "You know why I'm asking you
6  what program you're working on"?
7  A  Correct.
8  Q  And your response — Strike that.
9     Why did she believe that you knew why she
10 was asking you what program you were working on?
11 A  I could not tell you that.
12 Q  Was there something special about the
13 program you were working on?
14 A  I could not tell you that.
15 Q  Okay. Was she supervising your work on
16 that program?
17 A  No.
18 Q  Was she working with you on that program?
19 A  No.
20 Q  Had she been working on that program
21 before you were told to work on that program?
22 A  I don't know.
23 Q  Was that the end of your conversation, her
24 saying to you "You know why I'm asking you why

Page 166

1  you're working on this"? Was that the end of her
2  conversation with you at that time?
3  A  Yes.
4  Q  Did you complain about that incident?
5  A  No.
6  Q  Okay. Why did you think that was hostile?
7  A  Because of the tone and — of the
8  conversation.
9  Q  And why did you think that had to do with
10 your race?
11 A  Others were not treated that way.
12 Q  By Suzanne?
13 A  By Suzanne.
14 Q  Could it have been that she just didn't
15 care for your personality?
16 A  I couldn't speculate on — on that.
17 Q  Did you consider that?
18 A  Excuse me.
19 Q  Did you consider that it could have been
20 that she just really didn't care for your
21 personality as opposed to disliking you because
22 you were black?
23 A  I don't know how to answer that. I —
24 Q  Okay. And —

Page 167

1  A  I tried to work professionally with her
2  when I had to and even when I didn't.
3  Q  Okay. But what I'm asking you is when —
4  You said definitively you believe that she was
5  engaging with you in this way because she
6  disliked you because you were black.
7     And my question is when you decided that
8  the reason why she was interacting with you in
9  this way was because you were black did you
10 consider that maybe she just didn't care for your
11 personality and it didn't have anything to do
12 with your race?
13 A  I did not because I — because of the way
14 Suzanne treated other people and the way she
15 treated me. I don't believe — She never had,
16 that I know of, a grievance with me. And I
17 didn't have any interactions with her unless I
18 had to.
19 Q  By not having a grievance with you do you
20 mean that to your knowledge you don't know why
21 she would have reason to dislike you?
22 A  Correct.
23 Q  And so your conclusion was, because you
24 didn't know why she would have reason to dislike

10 (Pages 164 to 167)

Page 168

1  you, that she must dislike you because you were
2  black?
3      A  Say that again, please.
4          MS. MOORE: Can you read it back.
5          (Record read.)
6      A  I don't know if it was my conclusion, but
7  I know that I was being treated differently than
8  what she was treating others.
9      Q  Okay. And you believed that the reason
10 you were being treated differently was because
11 you were black?
12     A  Yes.
13     Q  Okay. Other than changing the code in the
14 program, the comment about "Up yours" and the
15 interaction that we just discussed about her
16 questioning you about why you were working on a
17 particular program, was there any other incident
18 you had with Suzanne Walker that you felt was
19 hostile or motivated by race?
20     A  No.
21     Q  Did you believe that the incident with
22 Ms. Walker that started our discussion about her
23 where she said she didn't want to work on a
24 program with you and referred you to Ed Freeman,

Page 169

1  was that a time that you believed your
2  interaction was based on race discrimination?
3      A  Yes.
4      Q  Okay. Did you end up working with
5  Ms. Walker on that program, this one where she
6  told you if you didn't -- she didn't want to work
7  with you and if you had a question about it to
8  talk to Mr. Freeman?
9      A  Yes.
10     Q  Okay. Did you work with her on any other
11 program after that time?
12     A  I don't believe so.
13     Q  Okay. Other than complaining to Mr. Coury
14 about Ms. Walker's comment to you in or around
15 1996 in the ladies' room where she said "Up
16 yours," did you ever complain to another manager
17 about Ms. Walker?
18     A  Ed Freeman.
19     Q  And when did you complain to Mr. Freeman
20 about Ms. Walker?
21     A  When she announced that Ed Freeman did not
22 want me working on the project and that he didn't
23 want me working in the group.
24     Q  Okay.

Page 170

1      A  And I also complained when she changed my
2  code, when she changed the code in the -- in the
3  part of the program that I was responsible for.
4      Q  Other than these two times, did you ever
5  complain about Ms. Walker? I'm sorry. And the
6  time to Mr. Coury.
7          So other than the time to Mr. Freeman when
8  you complained about Ms. Walker with regard to
9  her saying that Mr. Freeman didn't want her
10 working in the group, when you complained about
11 Ms. Walker changing the code in your program and
12 when you complained about Ms. Walker saying "Up
13 yours" to Mr. Coury, did you ever complain about
14 Ms. Walker?
15     A  No.
16     Q  How else do you believe you were
17 discriminated against based on your race while
18 you were at CU?
19     A  Other people were allowed to take day --
20 take training during the daytime.
21     Q  Who was allowed to take training during
22 the daytime?
23     A  Suzanne Walker. I can't recall everyone
24 in the group. Rick -- Rick Canton, MaryAnn

Page 171

1  Russo. I can't remember. There were a few other
2  people in the group. I can't recall their names.
3      Q  We'll come back to them.
4      A  And also Aihua Dai was allowed to take day
5  courses for semesters and come in late, and Rick
6  Canton was allowed also to take courses for -- to
7  prepare him for certification.
8          And I was called upon to debug programs
9  that these people wrote and implemented. I was
10 called on to debug these programs without having
11 the same training that they had.
12     Q  Let's go one by one.
13         What training did Suzanne Walker have that
14 you were denied?
15     A  She had FileNet. She had -- I know of
16 FileNet. I don't know of all of the other things
17 that -- that she received training for.
18     Q  Did you ask to have training on FileNet?
19     A  Yes.
20     Q  When?
21     A  I believe it was around 1999.
22     Q  Who did you ask to receive training in
23 FileNet?
24     A  Monica Scanlon.

Page 172

1  Q  Where was the training in FileNet held?
2  A  They were off sites. I believe one was in
3  Chicago and another was in -- It was on the west
4  coast.
5  Q  Other than asking Ms. Scanlon in 1999 if
6  you could have FileNet training, did you ask
7  anyone else?
8  A  No.
9  Q  What was Ms. Scanlon's response to you
10 requesting FileNet training?
11 A  She said "We'll see."
12 Q  Would you have been willing to travel to
13 Chicago to receive the training?
14 A  Yes.
15 Q  Would you have been willing to travel to
16 the west coast to receive the training?
17 A  Yes.
18 Q  Wasn't one of your requests of
19 accommodations that you not be forced to travel?
20 A  That was not true.
21 Q  You didn't request to --
22 A  I did not.
23 Q  -- not have to travel?
24 A  I did not.

Page 173

1  Q  If you had gone to the FileNet class and
2  the class had begun at 8 o'clock in the morning
3  and lasted until 8 o'clock at night, how would
4  you have managed to take the class?
5  A  We're speculating here?
6  Q  No. I'm simply asking you if a class --
7  if a class began -- if the FileNet class began at
8  8 o'clock in the morning would you have been able
9  to attend it?
10 A  I would say yes. Speculation, yes.
11 Q  Okay. But you weren't able to be at work
12 at 8 o'clock in the morning?
13 A  Not if I worked until 9 or 9:30 the night
14 before.
15 Q  But you requested and your doctor said you
16 could work -- that it was best for you to work
17 between -- sometime after -- reporting to work
18 sometime after 8 o'clock and stopping sometime
19 before 6 o'clock. Is that correct?
20 A  That was months after I had endured, I
21 would say, two years of from 9 -- from 8:45 until
22 sometimes 9 o'clock or 9:30 at night on a regular
23 basis. And because -- due to my health issues I
24 needed the rest, and I didn't get it. Once I got

Page 174

1  the rest, then it's a different story.
2  Q  So it's your testimony that you were only
3  coming to work sometime after 9 o'clock and
4  leaving sometime before 7 o'clock as requested by
5  your doctor during a two-year span where you
6  needed to rest?
7  A  I didn't say that.
8  Q  Okay. When were you -- When did your
9  doctor require to you come to work sometime after
10 9 o'clock and to leave sometime before 7 o'clock?
11 A  That was the original -- The original
12 accommodation agreement that Kathleen Moynihan,
13 manager of personnel, wrote said that they
14 would -- the company has decided to support my
15 doctor's recommendation that I work 8:45 to 5:45,
16 I believe -- 8:30 to 5:45.
17 Q  Okay.
18 A  Those accom -- That was not honored. That
19 accommodation was not honored. I had an open-end
20 day. I never knew what time I could go home
21 because of the various projects that came up that
22 were assigned to me. And I had no idea of
23 when -- Sometimes I could finish my work around
24 7:30 or 8. Sometimes it was later.

Page 175

1  Q  Okay. I just want you to stay focused on
2  the question that I'm asking.
3  A  Okay.
4  Q  Okay?
5     The earliest time requested by your doctor
6  for you to report to work was 8:30. Is that
7  correct?
8  A  I believe so.
9  Q  And it's my understanding -- And we'll
10 talk about it a little later -- that as time went
11 on your doctors requested that you work starting
12 after 8:30 all the way up until 10 o'clock in the
13 morning. Is that correct?
14 A  Correct.
15 Q  What I'm asking you is that if you were
16 working restrictive hours from 8:30 until 5:45,
17 how could you attend a class that lasted longer
18 than those hours?
19 A  I was not working restricted hours.
20 Q  In 1999?
21 A  In 1999.
22 Q  You were not working restricted hours?
23 A  Correct.
24 Q  Okay. Do you remember any other programs

Bernadine Griffith

Page 176

1  Ms. Walker had other than FileNet that you were
2  not able to -- training you were not able to
3  receive?
4    A  Excuse me. Say that again.
5    Q  Anything other -- Any training other than
6  FileNet that Ms. Walker had that you --
7    A  That I am aware of, of the training that
8  was going around?
9    Q  (Counsel nodded.)
10   A  No.
11   Q  Rick Canton, what training did Mr. Canton
12 have that you did not have?
13   A  He received FileNet.
14     (Pause.)
15   A  That's the one that I'm aware of.
16   Q  You mentioned he was part of a
17 certification program?
18   A  He took a course to prepare to take the
19 Microsoft certification program.
20   Q  Who did Mr. Canton report to at that time?
21   A  I believe Monica Scanlon.
22   Q  Did you ever request to take the prep
23 course for the Microsoft certification program?
24   A  No.

Page 177

1    Q  Did you ever request to take the Microsoft
2  certification program?
3    A  No.
4    Q  Anything other than FileNet and the
5  Microsoft certification program that Mr. Canton
6  was able to do that you were not?
7    A  Not that I'm aware of.
8    Q  What class was MaryAnn Russo permitted to
9  take that you were not permitted to take?
10   A  These are day courses, and it was Visual
11 Basic.
12   Q  Who was MaryAnn Russo reporting to?
13   A  Karen Holmes.
14   Q  Okay. Did you request to take the Visual
15 Basic course?
16   A  The day course, no.
17   Q  And it's the day course, the Visual Basic
18 day course that MaryAnn Russo took?
19   A  Correct.
20   Q  But you never requested to take that
21 course?
22   A  Correct.
23   Q  Anything else MaryAnn Russo was permitted
24 to take that you were not permitted to take?

Page 178

1    A  Not that I know of.
2    Q  Any other certification program she was
3  allowed to do that you were not allowed to do?
4    A  Not that I'm aware of.
5    Q  Aihua Dai, what was he permitted to do
6  that you were not permitted to do --
7    A  Aihua --
8    Q  -- as far as taking courses of being part
9  of programs?
10   A  I'm sorry. I interrupted you.
11   Q  It's okay.
12   A  What did you say?
13   Q  What program or course was Mr. Dai allowed
14 to take that you were not allowed to take?
15   A  Aihua Dai was allowed -- According to
16 Aihua Dai and what he told me, he was taking
17 courses -- day courses to complete his bachelor's
18 degree.
19   Q  Do you know what his bachelor's degree was
20 in?
21   A  No, I do not.
22   Q  Did you ask if you could take classes to
23 finish your bachelor's degree?
24   A  No, I did not.

Page 179

1    Q  Who did Aihua Dai report to?
2    A  Tom Danforth.
3    Q  Did Mr. Dai report to Tom Danforth during
4  the time you reported to Karen Holmes?
5    A  Yes, he did.
6    Q  To your knowledge did Mr. Dai ever report
7  to Karen Holmes?
8    A  To my knowledge, no.
9    Q  You also mentioned that Mr. Dai was
10 permitted to take day courses and come in late.
11 Could you tell me a little bit more about what
12 you meant by that?
13   A  His workday started around 4 o'clock.
14   Q  PM?
15   A  PM.
16   Q  Do you know what time he left?
17   A  Before 6 o'clock.
18   Q  Is that what -- He worked Monday through
19 Friday?
20   A  I believe it was three days a week that he
21 did that.
22   Q  For how long?
23   A  A semester.
24   Q  On the other two workday weeks [sic] do

13 (Pages 176 to 179)

Page 180

1  you know what his schedule was like?
2  A  Seven and a half hour day.
3  Q  Do you know when he came in in the
4  morning?
5  A  Not always, no.
6  Q  And that's because he came in before you
7  came in.  Is that correct?
8  A  That's correct.
9  Q  Do you know when he left at night?
10  A  Before I did.
11  Q  Okay.  And that could have been any time,
12  or was there a cut-off time where he always left?
13  A  I would imagine it was just -- dep -- I
14  really couldn't say.
15  Q  You don't know?
16  A  Excuse me.
17  Q  You don't know?
18  A  Know what?
19  Q  When he left at the end of the day.
20  A  Every day?
21  Q  Right.
22  A  Sometimes I did.
23  Q  And for the sometimes that you did know,
24  when did he leave?

Page 181

1  A  Before -- I would say around 5:30.
2  Q  Do you know if Mr. Dai worked weekends
3  during this time when he was -- during the
4  semester where he was taking day courses?
5  A  I don't know.
6  Q  And you don't know that because you didn't
7  work weekends?
8  A  I worked some weekends.
9  Q  But you didn't routinely work weekends,
10  did you?
11  A  That's correct.
12  Q  So there would be really no way for you to
13  know if he worked weekends or not.
14  A  If he worked weekends or not?
15  Q  Right.
16  A  That's correct.
17  Q  After he finished the semester program,
18  did he go back to working a regular five-day
19  workweek reporting in the morning before you came
20  to work and leaving sometime before you did in
21  the evenings?
22  A  Yes.
23  Q  So the 4 o'clock PM to 6 o'clock PM three
24  day a week schedule was only say for half of the

Page 182

1  year?
2  A  Correct.  He said he didn't have to make
3  up the time he was away from the office.
4  Q  Do you know if he made it up?
5  A  I do not know if he made it up.  I know he
6  told me that he was not required to make up that
7  time.
8  Q  Any other people who took training courses
9  who were allowed to enter into programs that you
10  were not permitted to enter?
11  A  Enter into programs?
12  Q  (Counsel nodded.)
13  A  I don't quite understand that.
14  Q  You talked about Mr. Patton -- I'm
15  sorry -- Rick Canton being able to enter a
16  Microsoft certification program.  I'm just trying
17  to figure out if there was anyone else other than
18  Suzanne Walker, Rick Canton, MaryAnn Russo and
19  Aihua Dai who either entered programs or took
20  classes or courses that you were not permitted to
21  take.
22      MS. HILL:  She didn't testified to that.
23  Objection.  She did not testify to that.  She
24  testified that she couldn't take FileNet.  That's

Page 183

1  the only one she testified that she could not
2  take.  She didn't testify --
3      MS. MOORE:  Ms. Hill --
4      MS. HILL:  -- that she didn't enter in --
5  couldn't take certification.  You're confusing
6  that, and you're -- Pay attention.
7      MS. MOORE:  I'm not confusing anything.  I
8  didn't say she testified --
9      MS. HILL:  You just said --
10      (Simultaneous voices.)
11      MS. MOORE:  I didn't interrupt you.  Please
12  don't interrupt me.
13      MS. HILL:  Okay.
14      MS. MOORE:  I'm not asking -- not
15  recharacterizing what she testified to.  The
16  record will reflect that.  And I would ask that
17  you limit your objections simply to form.
18      MS. HILL:  That is form.  Misstating her
19  testimony is incorrect.
20      MS. MOORE:  And I would ask that you
21  simply state "Objection."
22  Q  Ms. Griffith, other than Ms. Walker,
23  Mr. Canton, Ms. Russo and Mr. Dai, was there
24  anyone else that you remember who was able to

Page 184

1 take any sort of class or course or was permitted
2 to enter a program which you were not permitted
3 to enter or take?
4      MS. HILL: Objection to the form.
5      (Pause.)
6   Q  Do you understand my question,
7 Ms. Griffith?
8   A  Yeah.
9   Q  Can you answer it, please.
10     THE WITNESS: Should I answer it?
11     MS. HILL: What do you understand her
12 to --
13     THE WITNESS: It's confusing.
14     MS. HILL: Well, then --
15  Q  You just said you understood my question.
16     MS. MOORE: And I would ask you not to
17 coach the witness.
18  Q  Do you understand my question?
19  A  No. It's confusing.
20  Q  Okay. You mentioned four people who were
21 able to take training courses or programs, and
22 you said you weren't able to take those. Do you
23 remember that?
24  A  Yes.

Page 185

1   Q  Okay. Those four people were Suzanne
2 Walker, Rick Canton, MaryAnn Russo and Aihua Dai.
3 Is that correct?
4   A  Correct.
5   Q  Was there anyone else?
6   A  That I am aware of, I would have to say
7 no.
8   Q  Okay.
9      MS. MOORE: We'll take a break.
10     (Recess taken.)
11     MS. MOORE: Okay. We're back on the
12 record.
13     Could you read back the last question and
14 answer.
15     (Record read.)
16  Q  Ms. Griffith, the fact that you did not
17 have the FileNet training, did that hamper you in
18 any way?
19  A  Yes.
20  Q  How?
21  A  I was required to debug problems that were
22 FileNet related, and I didn't have the training.
23 So I put extra effort in to try to resolve the
24 problems, and Monica Scanlon said that I had

Page 186

1 developed into -- the skill of debugging, that I
2 had developed that skill. And I developed that
3 skill without the FileNet training that the
4 people who wrote the prob -- the programs had,
5 and I didn't have that.
6   Q  So that sounds like a good thing.
7   A  What is a good thing?
8   Q  That you were able to develop --
9   A  Without the training.
10  Q  Mm-hmm.
11  A  Correct.
12  Q  Other --
13  A  But it was harder --
14  Q  I bet.
15  A  -- I mean without the training.
16  Q  I bet.
17     Anything other than having to sort of
18 teach yourself or use manuals to do the training
19 of yourself to debug? Any other harm that you
20 experienced because you didn't receive the
21 FileNet training?
22  A  I didn't have manuals.
23  Q  Were there manuals generally available?
24  A  No.

Page 187

1   Q  Did you work with anyone after they'd
2 returned from FileNet training to go over FileNet
3 basics?
4   A  Say that again, please.
5   Q  Did you ever work with anyone who did go
6 to the FileNet training to gain some knowledge or
7 basic information about the program?
8   A  I did.
9   Q  Who did you work with?
10  A  Chen, C H E N.
11  Q  Is that a first name or last name?
12  A  I'm trying to remember. I believe that's
13 his last name.
14  Q  Were you told to work with Chen in order
15 to catch up on the FileNet training?
16  A  Yes.
17  Q  Did you feel you could go back to Chen
18 with questions about FileNet training?
19  A  About FileNet training. I'm not quite
20 sure -- You mean the knowledge of --
21  Q  Yes.
22  A  -- FileNet?
23     Yeah. Yes.
24  Q  Did you go back to Chen with questions

Page 188

1  about FileNet?
2  A  I did.
3  Q  Other than the training issues we just
4  discussed and the entrance into programs that we
5  just discussed, how else did you feel that you
6  were discriminated against based upon your race?
7  A  I was harassed by Monica Scanlon because
8  of -- She said I had to work on my -- on my
9  health issues, and I told her I didn't know what
10 she meant about working on my health issues.  I
11 received hostile treatment when Monica would call
12 me in to have me work on my health issues.
13 Q  Okay.  I'm going to stop you because I'm
14 confused.  Okay?
15 A  Okay.  Those were her words.
16 Q  The health issues were --
17 A  Exactly.
18 Q  When were you harassed by Ms. Scanlon?
19 A  I believe it was during the summer of
20 1999.  It might have been also 1998, but I
21 believe it was the summer of 1999.
22    (Pause.)
23 Q  How were you harassed by Ms. Scanlon?  And
24 specifically what I'm asking you is what was the

Page 189

1  first time you were harassed by Ms. Scanlon?
2  A  It was during a meeting when she called me
3  into her office, and she wanted know if I
4  would -- truly had flat tires on 128 when I was
5  traveling to work on 128.  I told her "Yes.  I
6  brought receipts that were date and time stamped
7  from the tire people and also AAA, and you
8  refused to look at them."
9     Monica's response was hostile.  "I didn't
10 ask you to show me any receipts."
11    And my response was "How can I prove
12 otherwise, that these things happened, when you
13 refuse to see my evidence that I had a flat tire?
14 They were cleaning -- sweeping 128 and sweeping
15 up a lot of nails, and I was not the only person
16 pulled over to the side of the road because of
17 flat tires."
18    Then -- Oh, you have another question?
19 Q  No.  Keep going.
20 A  During that meeting -- You have to ask me
21 a question.  I'm not sure what you want --
22 Q  Okay.  That's fine.
23    I'm going to try to characterize for you
24 what I understood you to be saying, and you tell

Page 190

1  me if I'm wrong.  Okay?
2  A  Okay.
3  Q  At some time during the summer of 1999 you
4  had flat tires and were late to work.
5  A  Correct.
6  Q  Correct?
7     And Ms. Scanlon called you into her office
8  to discuss the fact that you were late and had
9  flat tires?
10 A  That was one subject.
11 Q  Okay.  And the incidents that occurred in
12 that office during that conversation in the
13 summer of 1999 is the first time that you felt
14 that Monica Scanlon harassed you?
15 A  I didn't say it was the first time.  I
16 don't know if I could go with that first time.
17 Q  Okay.  Then let's leave the situation with
18 the tires and we'll come back to it, and you tell
19 me the first time that Ms. Scanlon harassed you.
20 A  I would have to say, if we're going to say
21 first time, I can remember that incident where
22 she called me into her office and said that --
23 about the flat tires.  She wanted to know if I
24 was true -- if I truly had flat tires, and I told

Page 191

1  her "Yes.  I brought receipts in that were
2  date/time stamped, and you wouldn't look at
3  them."
4  Q  Okay.
5  A  And then she said that "Well, we want to
6  talk about what we can do about you and your
7  health."  And I'm trying to get this as accurate
8  as possible.
9  Q  I understand.  Was there anything else?
10 A  It was more to the conversation, but --
11 Q  Okay.  So the first time you felt harassed
12 by Monica Scanlon was when she brought you into
13 her office to talk to you about being late and
14 the flat tire incident.
15 A  Correct.
16 Q  Is that correct?  Okay.
17    Did you want to say something?
18 A  Well, I thought I was going to say the
19 next time.
20 Q  Okay.  One second.  We'll get there.
21    So at some point during the summer of 1999
22 Monica tells you to come into her office.  She
23 wants to talk to you about whether or not you
24 really had flat tires on 128.  Correct?

16 (Pages 188 to 191)

Page 256

1  Q  Any other way you felt like you were
2  retaliated against for any reason?
3  A  I feel I was retaliated against when I
4  was -- when I was instructed to lift heavy carts
5  and computer parts, which was something that was
6  not something that a heart patient, I believe,
7  would be asked to do.
8  Q  Did your doctor tell you not to lift
9  things?
10 A  Yes.
11 Q  Which doctor?
12 A  The -- No. What the point in time?
13 Q  At the time in which you said you were
14 lifting things.
15 A  You mean at the time I was asked to lift
16 things?
17 Q  Yes.
18 A  Okay. I had been told not to lift
19 anything heavier than ten pounds. This was after
20 my surgery. And I hadn't been told anything
21 different. And when I went back to my doctor
22 after the incident where I was asked to lift
23 heavy computer equipment and things, I went back
24 to my doctor for a clarification on that. And

Page 257

1  she wrote that I was to have a lift limit of, I
2  believe, ten pounds.
3  Q  And who -- which doctor was this?
4  A  Doctor Moner, M O N E R.
5  Q  And when did you go to see her for this
6  clarification?
7  A  This would have been in 1999, I believe
8  around August or September.
9  Q  Okay. Who told you to lift something?
10 A  Karen Holmes.
11 Q  What did she tell you to lift?
12 A  I was supposed to empty out industrial
13 crates that were rented by the company.
14 Q  Why -- Did she tell only you to do this?
15 A  She sent me a memo. I don't know if she
16 told other people. But you asked me who -- who
17 told me, and it was Karen Holmes.
18 Q  She sent you a memo?
19 A  She sent me a memo.
20 Q  Was it an E mail?
21 A  It was an -- Yes, in E mail form.
22    MS. MOORE: Could you mark this, please.
23    (Exhibit 2 marked for identification.)
24 Q  Ms. Griffith, right now what I'm showing

Page 258

1  you has been marked as Exhibit 2. I've given
2  your counsel a copy as well. At the bottom of
3  the page are the letters "DE" and the numbers
4  "0272." This is an E mail. The title line has
5  "Griffith, comma, Bernadine T."
6     Would you review the document, please.
7  A  Yes.
8  Q  Okay. Would you read, please, what it
9  says in the second message in the center of the
10 page where it says "Bernadine."
11 A  "Bernadine, see me about the stuff in the
12 server room that may belong to Image. Thanks.
13 Karen."
14 Q  Did you see Karen about it?
15 A  Yes.
16 Q  And what did you -- what did she say to
17 you?
18 A  She told me to empty the crates.
19 Q  Okay. Had you told Karen that you
20 couldn't lift anything or that you couldn't lift
21 more than ten pounds?
22 A  No, I didn't.
23 Q  Okay. At the time she asked you to help
24 unpack did you say to her "I can't do this. I

Page 259

1  can't lift more than ten pounds"?
2  A  I did tell her that I shouldn't be lifting
3  that -- those crates.
4  Q  Did you tell her why?
5  A  I believe I did.
6  Q  Did you tell her you weren't going to do
7  it?
8  A  No.
9  Q  You did it anyway?
10 A  No.
11 Q  You didn't do it?
12 A  I did not.
13 Q  Why didn't you do it?
14 A  Because I knew it would probably have
15 me -- hurt me physically, and I didn't want to
16 have another heart attack.
17 Q  Did she ask you why you weren't going to
18 do it?
19 A  No.
20 Q  Was that the end of your conversation,
21 just that you weren't going to do it?
22 A  I didn't -- It -- Okay. I told her that
23 it wouldn't be good for me to do this.
24 Q  Okay.

Page 268

1    (Pause.)
2    A    I -- I have to get rest. I have to -- I
3    may not sleep constant -- I mean like a
4    regular -- like every day you go to bed or you go
5    to sleep or what have you, but I have to maintain
6    some rest. I have to get rest. And the periods
7    of rest are sometimes frequent.
8    Q    Anything else?
9    A    It's been such a standard thing until -- I
10   think that's about it.
11   Q    Okay.
12   A    You know, assertions. You know, assert
13   yourself physically.
14   Q    You wrote something down.
15   A    Yeah. The company provided breaks for --
16   as a company benefit. I was required to get a
17   note from my doctor justifying my need to take an
18   occasional ten-minute break, work break.
19   Q    And you felt that was evidence of racial
20   discrimination?
21   A    Yes. And also disability discrimination.
22   Q    Okay. And who required you to do that?
23   A    Karen Holmes.
24   Q    And why did you think it was racial and

Page 269

1    disability discrimination?
2    A    Because other people were not being asked
3    to justify their need to take a ten-minute work
4    break. And after I -- the first -- my doctor
5    wrote the -- or type -- printed his note on
6    letter -- on paper that was not letterhead, and I
7    was required to go back and get letterhead, get
8    him to write his note, his request for me to have
9    an occasional ten-minute work break on
10   letterhead. So that was two appointments that I
11   had to do for a company benefit that everyone got
12   without any say-so --
13   Q    You --
14   A    -- without --
15   Q    You had actual appointments for that?
16   A    I had -- Yes.
17   Q    You didn't call in and request a letter?
18   A    I did not.
19   Q    Neither time?
20   A    Neither time.
21   Q    Any other instances that you feel like
22   were evidence of retaliation, something that
23   people did to you specifically in retaliation for
24   something that you did?

Page 270

1    A    Retaliation for something I did?
2    Q    Mm-hmm.
3    A    I don't know of anything that I would have
4    been re -- that would warrant a -- something that
5    I did as far as retaliation.
6    Q    Do you feel like you were retaliated
7    against by anybody else?
8    A    I feel I was re -- mistreated, that I
9    didn't receive the same treatment that other
10   people in the group or for that matter within
11   the -- the company. I would be -- I don't know
12   if anyone else was told to justify their need for
13   a work break. Considering how many and the
14   duration of some of the smoking breaks that went
15   on with the people there, I know not -- of not
16   one instance where a smoker was told to bring a
17   note from their doctor to justify them standing
18   outside smoking.
19   Q    Okay. Other than --
20   A    And I --
21   Q    I'm sorry. Go ahead.
22   A    That -- That's okay.
23   Q    Other than the issue of the raise, is
24   there anything -- is there any other instance of

Page 271

1    retaliation that you can recall for any reason?
2    A    I think I was retaliated against because
3    of my race and also my disability when I was
4    fired for being absent three days in September.
5    I was told that I -- I was given an FMLA
6    certificate. I was told I had 12 weeks under --
7    protection under the FMLA. There was text in the
8    employee manual that said FMLA ran for -- I mean
9    you had 12 weeks of protection and that you may
10   have to use vacation time or personal business
11   for absences that were not paid.
12        That text gave me the impression that if I
13   were out on -- during my FMLA term of 12 weeks,
14   if I had, say, to be out for something that was
15   not covered by CU as far as the sick time policy,
16   the sick time policy and then the short-term
17   policy and then the long-term policy, that I
18   would have to -- in order to not experience a
19   paycheck missing one day or what have you, I
20   would have to use a vacation day for that. So
21   that gave me the impression also that I was -- I
22   had 12 weeks of protection, like Michael Sisto
23   told me, to be absent --
24   Q    Did you --

Page 340

1  other personnel told me that the other managers, the
2  managers were instructed to not give, not use, at a
3  certain time -- excuse me. I'm sorry. Start over
4  again.
5       Personnel told me in a meeting that
6  performance reviews given in year 2000 were not to
7  be given on forms that the 1999 reviews were given
8  on.
9       So, I'm saying that I was treated
10 differently from what the other employees that
11 received performance reviews in 2000.
12    Q. And you felt that was because of your race?
13    A. Yes.
14    Q. Okay. You also mentioned previously that
15 you felt the fact that you never received your
16 retroactive raise to 1999 was evidence of racial
17 discrimination, is that correct?
18    A. Yes.
19    Q. You also testified that the fact that Ellen
20 Elliot and Mary Russo were allowed to arrive at work
21 later than you was evidence of racial
22 discrimination?
23    A. I believe I said that they arrived around
24 the same time that I did, and they left earlier than

Page 341

1  I did. They left earlier -- they left without
2  putting in a seven-and-a-half-hour workday.
3     Q. And you felt that that was racially
4  discriminatory?
5     A. Right. Because they were allowed to do it
6  and not I.
7        I had an accommodation agreement that
8  was not being honored. And they didn't have to have
9  an accommodation agreement in order to have those
10 hours.
11    Q. You also indicated that Karen Holmes'
12 requiring you to get a doctor's note in order to
13 take breaks was racial discrimination?
14    A. Yes.
15       And disability.
16    Q. Okay.
17    A. It was a company policy.
18    Q. And I also have written down that you
19 testified that you felt it was racial discrimination
20 that you were fired for using your FMLA leave.
21       Is that correct?
22    A. Say that again, please.
23    Q. You felt it was an incidence of racial
24 discrimination that you were terminated for using

Page 342

1  your FMLA leave?
2       MS. HILL: Objection.
3     A. No, I didn't say that.
4     Q. Do you believe you were fired -- do you
5  believe your being fired for using your FMLA leave
6  was evidence of racial discrimination?
7     A. And disability discrimination, racially and
8  disability discrimination.
9     Q. Why racial?
10    A. Because other employees were not -- Dan
11 Paige is an employee on the same floor that I was
12 on. And Dan Paige told me that his doctor wrote a
13 note to the company requesting that he be allowed to
14 leave work any time he felt the need for it.
15       Dan Paige was still an employee when I
16 was fired.
17       Dan Paige's absences -- I witnessed
18 myself him leaving -- were not being tracked or
19 regulated the way my absences were being tracked.
20       Dan Paige was a recovering cancer
21 patient.
22       I had an ongoing heart condition. And I
23 considered that his treatment and the treatment that
24 I received, I considered my treatment to be racial

Page 343

1  and also disability.
2     Q. Who did Dan Paige report to, do you know?
3     A. I can't recall his name.
4     Q. Do you know --
5     A. Her name.
6     Q. Did he report to Karen Holmes?
7     A. No.
8     Q. Did he report to Mike Sisto?
9     A. No.
10    Q. Did he report to Monica Scanlon?
11    A. No.
12    Q. How do you know that his absences weren't
13 tracked?
14    A. I know what Dan Paige told me.
15    Q. Did Dan Paige tell you that his absences
16 were not recorded?
17    A. Dan Paige told me that he didn't have to
18 make up any of his time because it was a
19 health-related absence from the job.
20    Q. How do you know that his absences weren't
21 tracked?
22    A. All I am saying is what Dan Paige told me.
23 And that's the extent of my knowledge.
24    Q. So, you don't necessarily know that his

Page 344

1 absences weren't tracked?
2    A. That's correct.
3    Q. Anything other than what I've mentioned
4 today and you've mentioned in the past that is an
5 instance or evidence of the fact that you were
6 racially discriminated against?
7    A. I can't recall anything else.
8    Q. You don't recall any other comments to you?
9    A. Other than the tar baby instance?
10   Q. Right.
11   A. And up yours?
12   Q. Uh-huh.
13   A. If my memory is jogged, maybe I would, but
14 at this point...
15   Q. Do you recall overhearing comments said
16 about other people but not you that were racially
17 motivated?
18        MS. HILL: Objection to the form.
19   A. No.
20   Q. Did you understand my question?
21   A. No.
22   Q. You didn't understand my question?
23   A. I understood your question.
24       The answer is no.

Page 345

1    Q. Okay. Thanks. Okay.
2        I want to do the same thing with racial
3 discrimination, I want to do that with disability
4 discrimination to make sure we've got everything.
5        So, I'm going to go through, and you can
6 tell me yes or no.
7        I think you said this just a moment ago
8 that Ellen Elliot and Marianne Russo having more
9 flex time was evidence of disability discrimination?
10   A. In the sense that I had to submit proof from
11 my doctors and get approval, and they didn't.
12   Q. Do you know for a fact that they didn't?
13   A. I know what they said to me.
14   Q. Okay. And what they said was they didn't
15 have to submit anything from a doctor?
16   A. Yes.
17   Q. You also mentioned that you felt like your
18 termination was disability discrimination.
19       Can you tell me exactly why?
20   A. It was disability discrimination because I
21 had an insurance premium being deducted from my
22 check, long-term disability insurance premium.
23       I felt that the company created fraud by
24 allowing, telling me that if I were to purchase the

Page 3-

1 protection of long-term disability insurance in case
2 I became disabled on a long-term basis, that certain
3 provisions would be provided to me because of this
4 insurance that I was taking.
5        The company -- nowhere in any document
6 that was given to me did it say that I could not be
7 sick, that I could not take a sick day during the
8 period I was on probation.
9        Michael Sisto's letter of July -- excuse
10 me -- September 27, 2000 stated as one of the
11 reasons that I was terminated was because I called
12 in sick September, I believe it was 11, 12 and 13.
13       His reason for terminating me within
14 that letter said because I called in sick in
15 violation of my probation.
16       And I'm saying, that was not my
17 probation. Nowhere did it say that I could not be
18 sick during the entire time that I was on probation.
19 The insurance premium for disabled, long-term
20 disability was being taken out of my check.
21       I even had a payment taken out of the
22 last check that was cut especially to give to me
23 when I was terminated, at the termination meeting,
24 and a disability payment was taken out of that.

Page 347

1    Q. Okay.
2    A. And I didn't know after I was, after I
3 became disabled, after I was fired, if I was covered
4 or not.
5        And no documentation that the company
6 sent me indicated one way or the other if I still
7 had coverage from the insurance premiums that I was
8 paying for when they terminated me.
9        Also, I was told by Michael Sisto that
10 FMLA would give me, I believe it was 12 weeks or 14
11 weeks, I'm not sure, of protection, that sick
12 absences would not be charged against me. In other
13 words, occurrences or what have you of absences
14 would not be charged against me.
15       And that proved not to be true because
16 two weeks after I took sick time, I was terminated
17 with a letter saying that the reason was because I
18 called in sick.
19   Q. Okay. I'm going to pick that apart a little
20 bit and ask you some questions about some things you
21 just said.
22   A. Certainly.
23   Q. On September 11, September 12 and September
24 13 of 2000, when you were ill, did you believe those

Bernadine T. Griffith

Page 348

1  days should have been covered under your long-term
2  disability plan?
3      A. No.
4          May I expand?
5      Q. Sure.
6      A. OneBeacon had a sick time policy, short-term
7  disability, which was five days or more, and then
8  long-term disability that clicked in off the
9  short-time disability phase.
10         So, I believed that I was covered under
11 those three plans, sick time plans.
12     Q. Okay. But the three days that you were out,
13 the 11th, the 12th and the 13th --
14     A. Fell under Commercial Union -- OneBeacon --
15     Q. I know what you're talking about.
16     A. -- OneBeacon's sick time policy.
17     Q. Okay.
18     A. That's what I believed.
19     Q. Was it your understanding that the FMLA
20 covered --
21     A. Excuse me.
22     Q. Sure.
23     A. I'd like to qualify that last statement.
24         I believe that I still had sick time

Page 349

1  policy privileges, FMLA sick time privileges for the
2  September 11, 12th and 13th.
3          It was not in my head to indicate what
4  absence, what category those absences would have
5  been placed in. That was something that personnel
6  did or Karen did or Michael did.
7          My only obligation was to report that I
8  was sick, use the category report that I was sick.
9          And I believe that I was covered, more
10 than covered by what Michael Sisto told me.
11     Q. Did Michael Sisto give you any documents
12 that talked to you about the FMLA?
13     A. No, he didn't.
14     Q. Did he refer you to a person or make an
15 appointment for you to talk to somebody about the
16 FMLA?
17     A. No, he didn't.
18     Q. Now, I want to talk to you about retaliation
19 and things that you've recounted that happened and
20 you felt they were retaliation.
21         Okay?
22     A. Okay.
23     Q. You mentioned the retroactive raise to 1999
24 that you never received. You felt that that was

Page 350

1  retaliation, the fact that you didn't receive it was
2  retaliation.
3          Is that accurate?
4      A. Yes.
5      Q. You mentioned the fact that you were forced
6  to lift heavy carts and computer parts was
7  retaliatory?
8      A. Yes.
9      Q. The fact that you were fired for using or
10 being out sick, you felt that was retaliatory as
11 well?
12     A. Yes.
13     Q. Was there anything else?
14     A. Not at this time.
15     Q. I'm going to ask you some more questions
16 about your disability.
17         Okay?
18     A. Okay.
19     Q. At any time, did you tell or have a
20 physician tell OneBeacon that you were disabled to
21 the point that you couldn't perform certain tasks?
22     A. Say that again, please.
23     Q. At any time, did you tell them personally or
24 instruct your physician to tell anyone at OneBeacon

Page 351

1  that you were disabled to a point where you couldn't
2  perform certain tasks?
3      A. I did not.
4          By certain tasks, you mean the tasks --
5  can you tell me what you mean by certain tasks?
6      Q. I mean anything.
7          You couldn't do anything, any sort of
8  activity?
9      A. Within my job description or outside of my
10 job description?
11     Q. Within your job description.
12     A. I did not.
13     Q. We've talked about some of the
14 accommodations you requested?
15     A. Yes.
16     Q. Whether they were received or not. I want
17 to make sure we're on the same page.
18         Earlier in your testimony in February, I
19 believe, you mentioned that Mr. Freeman granted you
20 late arrival, is that correct?
21     A. No, no.
22     Q. Okay. So, when you requested to come in
23 late and Mr. Freeman was your supervisor, you
24 weren't permitted flexibility in the time of your

Page 372

1  During what time did Michael Sisto not
2  comply with the request as set forth by Kathleen
3  Moynihan in the memo?
4  A. When he -- before and after Monica Scanlon's
5  employment, during the time I reported to Karen
6  Holmes, Monica Scanlon, Michael Sisto.
7  Q. Do you know if Michael Sisto was aware of
8  your hour restrictions?
9  A. In -- by -- I don't know.
10 Q. Okay. Was there ever a time when you
11 reported directly to Michael Sisto?
12 A. No.
13 Q. So, there was always someone in between you
14 and Michael Sisto?
15 A. Correct.
16 Q. And that person in between you and Michael
17 Sisto, were they your primary supervisor?
18 A. Yes.
19 Q. Okay. They were the person that saw you on
20 a day-to-day basis?
21 A. Yes.
22 Q. So, when you described or when you said that
23 Michael Sisto didn't honor your time requirements,
24 I'm curious as to how he didn't do that if he really

Page 373

1  didn't see you on a day-to-day basis?
2  A. I had forgotten in a meeting that I had with
3  Karen Holmes and Michael Sisto, I informed him of
4  what my accommodations were.
5      I also informed him that I had a
6  handicap placard that was issued by the State of
7  Massachusetts. It was during that meeting.
8  Q. Okay. Was this a meeting that took place in
9  2000?
10 A. Yes.
11 Q. My understanding in 2000 was that your hours
12 were as reflected in Exhibit 4, from 10:00 a.m. to
13 6:15 p.m.?
14 A. Not all the time.
15     Wait a minute. I'm sorry.
16     (Pause.)
17 A. Okay. I informed -- in a meeting that I had
18 with Michael Sisto, that was in 2000, I was
19 attempting to address the issues that Monica Scanlon
20 referred to in her memo to, that should go to my
21 file, where she -- and also my performance review.
22     I was attempting in that meeting to
23 inform -- I didn't know what Michael Sisto knew or
24 didn't know.

Page 374

1  And in that meeting, I had documents
2  that I was ready to submit to him so that he could
3  see that I did complete my job assignments, and I
4  didn't have any problems in completing the
5  assignments.
6      And I also indicated to him about the
7  Saturday projects that were given to me and also
8  what my hours were at that time.
9  Q. Okay. But that was all when you were
10 reporting to Monica directly, correct?
11     (Interruption.)
12 A. Okay. By that, you're referring to what I
13 was telling Michael Sisto?
14 Q. Correct.
15 A. Right. Because Michael Sisto attached to my
16 file the memo from Monica Scanlon with the
17 allegations that were in them.
18     I took the first opportunity I had to
19 try to prove what my point was and that I did do my
20 work.
21 Q. Okay. Let me see if I understand what
22 you're saying.
23     Are you saying that some time in 2000,
24 you spoke with Michael Sisto about the fact that in

Page 375

1  1999 and before then, you had had a certain time,
2  you had certain time restrictions that either were
3  or were not honored?
4  A. Correct.
5  Q. So, am I correct then in saying that Michael
6  Sisto never, never violated your restrictive hours?
7  A. Michael Sisto did not, that I am aware of,
8  have input in that area.
9      I was attempting to get Michael Sisto to
10 see that I should not have been placed on probation.
11 Q. Okay.
12 A. And I, at that time, in 2000, I was being
13 placed on probation from allegations that came from
14 1999.
15 Q. Okay. We'll get to that.
16 A. Okay. But at that point, to answer, to go
17 back to answer your questions, that's when I let
18 Michael Sisto know that I had certain hours and
19 restrictions that were not honored, and that I did
20 my job anyway.
21 Q. But he wasn't the person who violated the
22 restrictive time frame, is that correct?
23 A. Well, in a sense, he was, because Monica
24 reported to him.

Page 376

1  Q. But he was never there on a day-to-day basis
2  to say to you, you know, come in before 9:30 and
3  stay after 7:00?
4  A. I don't know what his duties were or what
5  duties he chose to involve himself in or not, but I
6  was concerned with the duties of him issuing to me
7  that I was late.
8      He said that to me, that I was tardy and
9  that I had these absences.
10 Q. Okay.
11 A. And that's when he got involved in that and
12 saying that to me.
13     Then that's when I got involved in
14 trying to prove to him that this did not happen.
15     I can remember asking Michael Sisto
16 directly, what method did Karen Holmes use to keep
17 attendance, and where was the attendance report that
18 they used as a basis to put me on probation.
19 Q. Okay. Ms. Griffith, I'm going to stop you
20 right now, just because I don't want us to get ahead
21 of ourselves.
22 A. Okay.
23 Q. We're going to talk about the meetings in
24 2000. I think they were in the summer of 2000 and

Page 377

1  being on probation, but right now, I want to make
2  sure we're just talking about your accommodations.
3  A. And who knew what and when?
4  Q. Right. And how we got here, I asked you a
5  question whether or not someone at OneBeacon or any
6  of its other names promised you some sort of
7  accommodation and then didn't deliver it for you.
8      And you said to me that Kathleen
9  Moynihan did because she wrote this memo and
10 included the time frame, and that for a week after
11 she had written the memo, when Ed Freeman was your
12 supervisor, he didn't abide by that time frame.
13     And then you mentioned --
14 A. I had a problem with the promise. I
15 remember saying that, because I didn't know if
16 Kathleen Moynihan writing that memo was, in essence,
17 a promise by the company.
18 Q. Okay. That's fair enough.
19 A. So, that's the only stipulation that I would
20 put on that.
21 Q. Okay.
22 A. Because I don't know if that was, indeed, a
23 promise.
24     All I know is that they said they would

Page 378

1  honor -- no -- support my doctor's recommendation.
2  Q. Okay. Right after I asked you that, I asked
3  if there was anyone else who told you they would
4  support any kind of accommodation or would honor a
5  request for an accommodation, and then didn't
6  deliver on that statement.
7      And you mentioned Monica Scanlon,
8  Michael Sisto and Karen Holmes.
9  A. Exactly.
10 Q. And I just -- with regard to Michael Sisto,
11 did Michael Sisto ever tell you he was going to
12 honor some request for an accommodation and then not
13 do it?
14 A. Michael Sisto refused to discuss with me the
15 accommodation agreement that I had from personnel.
16 That's as factual as I can get.
17 Q. Okay. Now, are you -- when you say that,
18 are you saying that in 2002, during a meeting,
19 Michael Sisto would not engage you about the
20 accommodations that were granted in 1999?
21 A. Right.
22     And all this came about during the
23 January, first of the year, around the performance
24 review time.

Page 379

1  Q. Okay. Other than that, was there a time
2  when Michael Sisto didn't honor his statement to you
3  that he would provide you with some sort of
4  accommodation?
5  A. Yes.
6      Well, he promised me that he would give
7  me an attendance report that he based his, that he
8  based his -- I'm trying -- I'm sorry. I lost track
9  -- that he based his, the written warning on.
10 Q. Okay. When you talk about the attendance
11 report, do you feel like the attendance report was
12 some sort of accommodation, or was this just an
13 instance of him saying he would do something and
14 then didn't do it?
15 A. You mean that after him giving -- I'm not
16 sure what you're saying.
17     Are you saying the act of him giving me
18 an attendance report is the promise, I mean, in the
19 same line as accommodation?
20 Q. Let's start over. The question I asked you
21 was this.
22     Was there ever a time that Michael Sisto
23 said to you that he would honor or support your
24 request for an accommodation and then he didn't do