**Page 81**

1  supervision?
2  A  Yes.
3  Q  Which is a table, and you chart the
4     vacation days and sick days?
5  A  It's an Excel spreadsheet --
6  Q  Okay.
7  A  -- in Excel. And so when I get up here
8     where it says "Allocated" (pointing) --
9  Q  Okay.
10 A  -- all it does is -- this is Bernadine
11    (pointing). So you can see that she has
12    8.5 vacation days that are carryover, so
13    she starts out with that. And as you put a
14    minus 1 in, you know, each time it -- it
15    either adds or subtracts so that the
16    employees -- I could know, you know, how
17    much time they had left. Because most
18    people, you know, didn't keep track of --
19    they didn't keep track of their own
20    vacation, and they would come and say, "How
21    many days do I have left?"
22 Q  Okay. Was this particular table kept on
23    your computer system, or was it on your
24    secretary's computer system?

**Page 82**

1  A  This is mine.
2  Q  On yours?
3  A  Yes.
4  Q  Okay. And did you distribute copies of
5     attendance records to any other employee at
6     CU?
7     MS. MOORE: Objection.
8  A  Just their own. I was -- I tried to at
9     least, you know, two or three times a year
10    give this sheet to each individual --
11 Q  Okay.
12 A  -- so that they knew, you know, what they
13    had.
14 Q  Was there any other system or procedure you
15    kept for tracking of an employee's
16    attendance --
17    MS. MOORE: Objection.
18 Q  -- other than this table that we have
19    before us?
20 A  I created a job performance record.
21 Q  Okay. And what's the job performance
22    record that you -- please describe that.
23 A  That was a sheet I made to keep track of
24    specific employees' arrival times and when

**Page 83**

1     they called in.
2  Q  Their arrival times?
3  A  Their arrival times.
4  Q  Did you also keep track of their departure
5     time?
6  A  No.
7  Q  Just the arrival?
8  A  Just the arrivals.
9  Q  How was it that you were able to be
10    certain, if at all, that an individual had
11    worked a full day?
12    MS. MOORE: Objection.
13 A  Well, if I got into work at 8:30, I knew
14    that, you know, there were people already
15    in or watched when people came in, then I
16    knew what time they were to go home.
17 Q  But you didn't check specifically to see if
18    they had left?
19 A  No. Because -- because there were
20    different people that came in later, and
21    I'm not -- you know, I didn't stay until
22    7:00 every night to monitor that. So, no,
23    I kept no record of when people left.
24 Q  Did you require the employees under your

**Page 84**

1     supervision to check in with you when they
2     arrived each morning?
3  A  No.
4     MS. MOORE: Objection.
5  Q  So how is it that you were able to be
6     certain whether an individual had duly
7     arrived each morning?
8  A  Because I walked around the floor.
9  Q  You walked around the floor?
10 A  Yeah, the area where we all sat.
11 Q  How long did it take you to walk around the
12    floor each morning?
13 A  Ten seconds --
14 Q  Okay.
15 A  -- barring "good morning" or a chat with
16    someone.
17 Q  And what time did you walk around the floor
18    each morning?
19    MS. MOORE: Objection.
20 A  I don't recall. Several times.
21 Q  When's the first time in which you walked
22    around the floor to check to see if your
23    employees were present each morning?
24    MS. MOORE: Objection.

Page 85

1  A   Around 9:30ish.
2  Q   Approximately 9:30 you would walk around
3      the floor to make certain that the
4      individuals in the group were present and
5      working?
6  A   Correct.
7  Q   Okay. Did you also walk around subsequent
8      to 9:30 if an individual or one of your
9      members wasn't present at that time?
10 A   Yes.
11 Q   Okay.
12            THE WITNESS: Kathleen -- I'm
13     sorry -- can we take a break?
14            MS. HILL: Sure.
15            (Off the record)
16            (A break was taken.)
17            (Back on the record)
18            MS. HILL: Could I have the
19     next one marked as Exhibit 4.
20            (Exhibit No. 4, the 4/12/00
21            performance job record for
22            Bernadine Griffith, was marked
23            for identification.)
24 Q   Ms. Holmes, on your break, the next

Page 86

1      document was marked Exhibit No. 4. If you
2      would take a look at that document, Exhibit
3      No. 4, and identify that with the Bates
4      numbers; and state what that document
5      pertains to, if you would, please
6      (handing).
7  A   It's job performance record, and it's
8      DEF 0093 and DEF 0094.
9  Q   It's your performance job record?
10 A   Yes.
11 Q   Is this the typical performance job report
12     that you kept and maintained on each of the
13     employees under your supervision?
14 A   No.
15 Q   This format. I'm sorry?
16 A   No.
17 Q   Did you create performance job records for
18     any other employees under your supervision?
19 A   Yes.
20 Q   Okay. And what's the difference between
21     their job performance record, if any, and
22     this particular record?
23 A   The only difference would be the facts
24     inside the spreadsheet.

Page 87

1  Q   Okay.
2  A   These pertain to Bernadine. The other ones
3      would be the days, dates, and times of the
4      other person.
5  Q   Right. That's what I mean. Is this your
6      standard procedure for tracking of
7      employees' job performance under your
8      control?
9            MS. MOORE: Objection.
10 A   Yes.
11 Q   And what was the purpose of generating a
12     performance job report -- or performance
13     job record? I'm sorry.
14 A   I had some concerns about the patterns with
15     two employees. Bernadine was one of them.
16 Q   And who was the other employee?
17 A   Mary Ann Russo.
18 Q   Okay.
19 A   You know, having excessive absenteeism or
20     tardiness.
21 Q   So you created a performance job record
22     with regards to Mary Ann Russo and
23     Bernadine Griffith?
24 A   Yes, I did.

Page 88

1  Q   Any other individuals did you generate a
2      performance job record?
3  A   No, I did not.
4  Q   Okay. All right. Directing your attention
5      to the Bates No. 93, the first page of this
6      record -- the first date on this record is
7      April 12, 2000. Is that the first date and
8      time that you entered in 2000 in
9      Ms. Griffith's performance job record?
10 A   Yes.
11 Q   So prior to April 12, 2000, there was no
12     performance job record on Ms. Griffith?
13 A   That's correct.
14 Q   Directing your attention to Exhibit
15     No. 3 -- is that the only documentation of
16     Ms. Griffith's attendance record that you
17     personally created prior to April 12, 2000?
18            MS. MOORE: Objection.
19 A   Are you asking me if --
20 Q   Take a look at that.
21 A   I need to be clear on what you're asking.
22     Are you asking me if this document -- I'm
23     talking about the 2000 attendance for
24     Bernadine Griffith, DEF 91 and DEF 92,

**Page 89**

1 Exhibit 3 -- I need -- please ask the
2 question again.
3 Q  Sure. I was directing your attention first
4 to Exhibit No. 4.
5 A  Correct.
6 Q  And I had noted that you started keeping a
7 written record of Ms. Griffith's
8 performance job record on April 12, 2000.
9 A  Correct.
10 Q  And you had established that you did not
11 keep any other performance job record
12 pertaining to Ms. Griffith prior to
13 April 12, 2000.
14 A  Correct.
15 Q  So my question, then, is: With regards to
16 her attendance record -- directing your
17 attention to Exhibit No. 3 -- is this the
18 only written form of documentation that you
19 kept with regards to Ms. Griffith's
20 attendance?
21     MS. MOORE: Objection.
22 A  I believe so.
23 Q  Okay. So apart from Exhibit No. 3 and
24 Exhibit No. 4, did you have a system in

**Page 90**

1 place to keep record of Ms. Griffith's
2 attendance or job performance, other than
3 these two documents that we have before us?
4 A  No. This is how I did it.
5 Q  Okay. All right. So directing your
6 attention to Exhibit No. 4 --
7 A  Yes.
8 Q  Prior to April 12, 2000, was Ms. Griffith
9 tardy on any date?
10 A  Yes.
11     MS. MOORE: Objection.
12 Q  And when was Ms. Griffith tardy?
13 A  I couldn't tell you.
14 Q  How do you know she was tardy prior to
15 April 12, 2000?
16 A  Because I started this after noticing a
17 late time of arrival with her.
18 Q  And what was Ms. Griffith's arrival time in
19 year 2000?
20 A  It was supposed to be 10 a.m.
21 Q  And why was Ms. Griffith's arrival time
22 supposed to be at 10 a.m.?
23 A  Her doctor requested it.
24 Q  And when did her doctor request her arrival

**Page 91**

1 time be at 10 a.m.?
2     MS. MOORE: Objection.
3 A  I don't remember.
4 Q  Okay.
5 A  I was given a note. Bernadine gave me a
6 note.
7 Q  And when did Ms. Griffith give you the
8 note?
9 A  I don't remember. I --
10 Q  Okay.
11     MS. MOORE: Were you finished
12 answering?
13     THE WITNESS: Yes.
14 A  When she gave me the note, I accommodated
15 the note.
16 Q  Okay. And when Ms. Griffith gave you the
17 note sometime in 2000 for her start time to
18 be at 10 a.m., did you discuss the arrival
19 of Ms. Griffith being able to arrive at
20 10 a.m., with any other employee --
21     MS. MOORE: Objection.
22 Q  -- at CU?
23 A  I don't know.
24 Q  Did you discuss it with Michael Sisto?

**Page 92**

1 A  Yes.
2 Q  And when did you discuss it with Michael
3 Sisto?
4 A  I don't remember.
5 Q  Did you make the decision yourself solely
6 to permit Ms. Griffith to come in at
7 10 a.m.?
8     MS. MOORE: Objection.
9 A  Yes.
10 Q  Okay. Is that something that CU afforded
11 the supervisors -- I'm sorry. Strike that.
12     Did the supervisor have
13 discretion to grant late arrival time?
14     MS. MOORE: Objection.
15 A  Yes.
16 Q  Ms. Scanlon, in her deposition, referred to
17 it as flex time. Is that your
18 understanding of what you were providing
19 Ms. Griffith was flex time?
20     MS. MOORE: Objection.
21 A  I guess you could call it that.
22 Q  Okay. When Ms. Griffith requested to come
23 in at 10 a.m., did you speak with
24 Ms. Griffith about how long her workday

**Page 93**

1  should be?
2  A  The standard workday is seven and a half
3     hours -- or was seven and a half hours at
4     that time, I believe.
5  Q  Okay. And how late did you work to in
6     2000?
7           MS. MOORE: Objection.
8  A  It was different every day.
9  Q  What was your usual departure time in 2000?
10 A  I departed probably anywhere from around
11    5:30 to 6:30 --
12 Q  Okay.
13 A  -- most often.
14 Q  And most often was Ms. Griffith present
15    when you departed?
16 A  Yes.
17 Q  Did you ever speak with Ms. Griffith at any
18    time in 2000 about your concern of her
19    arriving late?
20 A  Yes, I think I did.
21 Q  And when did you speak with her in 2000?
22 A  I don't remember.
23 Q  Do you recall having a specific meeting
24    with her and any other individual about

**Page 94**

1     late arrival time --
2           MS. MOORE: Objection.
3  Q  -- in 2000?
4  A  There were probably several meetings, so
5     I -- you have to be -- that's a broad
6     question. I'm not clear on that.
7  Q  I realize that. I'll clarify it.
8  A  Okay.
9  Q  Prior to your generating this performance
10    job record -- you earlier testified you
11    noticed that she was being tardy, thus the
12    reason why you would create this
13    performance job record.
14 A  Right.
15 Q  When you decided to create this job record,
16    okay, on April 12, prior to that time,
17    whether it be April or March or February or
18    January of that year, did you discuss with
19    Michael Sisto or any other individual about
20    your concerns of Ms. Griffith arriving
21    late; and if so, when?
22          MS. MOORE: Objection.
23 A  I would have spoken to Mike Sisto, but I
24    don't -- somewhere between January and

**Page 95**

1     April 12, I would have spoken to him about
2     it.
3  Q  Okay. All right. And Mike Sisto's
4     position at CU is what?
5           MS. MOORE: Objection.
6  Q  Is he a manager?
7           MS. MOORE: Objection.
8  A  He no longer works there.
9  Q  No. I'm sorry. In 2000, what was Michael
10    Sisto's position with CU?
11          MS. MOORE: Objection.
12 A  Manager? I don't know his exact title.
13 Q  Manager over your department -- your group?
14 A  Yes. Manager of Monica's -- Mike was
15    Monica's -- in '99 --
16 Q  Right.
17 A  -- Mike was Monica's manager. Tom Danforth
18    and I reported to Monica. In 2000, Tom
19    Danforth and I reported directly to Mike
20    Sisto.
21 Q  So Monica Scanlon's position was
22    eliminated, and your direct supervisor was
23    Michael Sisto?
24          MS. MOORE: Objection.

**Page 96**

1  Q  Is that correct?
2  A  Yes.
3  Q  Okay. And when you spoke with Michael
4     Sisto about your concerns due to
5     Ms. Griffith's late arrival time, what
6     recommendations did Michael Sisto make in
7     dealing with this issue?
8           MS. MOORE: Objection.
9  A  I think we discussed putting something like
10    this document together.
11 Q  Okay.
12 A  Because this wasn't something that I had
13    ever done in the past.
14 Q  You've never kept a performance job record
15    pertaining to someone's tardiness or late
16    arrivals or absences, as this record
17    reflects?
18          MS. MOORE: Objection.
19 A  Prior to this time, no; but then there were
20    two employees.
21 Q  Subsequent?
22 A  Yes. Both Bernadine and Mary Ann Russo.
23 Q  Mary Ann Russo's performance job record --
24    did that pertain to a change in performance

**Page 97**

1  that pertained to absence and tardiness as
2  well as --
3  A  Yes, it did.
4  Q  -- Ms. Griffith?
5     And what, if any, steps did
6  you take with Mary Ann Russo in addressing
7  her issue of tardiness and absenteeism?
8     MS. MOORE: Objection.
9  A  I met with her, and she was also given a
10 written warning to her personnel file about
11 her tardiness.
12 Q  And did Mary Ann Russo -- I'm sorry. Would
13 you please for me -- could you describe who
14 Mary Ann Russo is by her age, sex, and
15 race?
16    MS. MOORE: Objection.
17 Q  Well, obviously, female.
18 A  She's a female. At the time I don't know
19 what her exact age was. 30s maybe.
20 Q  Okay. And what is her race?
21    MS. MOORE: Objection.
22 A  I guess Caucasian. I ...
23 Q  Okay. All right. And is Mary Ann Russo --
24 was she still employed in your group in

**Page 98**

1  2000 -- by the end of 2000?
2  A  No.
3     MS. MOORE: Objection.
4  Q  Was she terminated in 2000?
5     MS. MOORE: Objection.
6  A  No.
7  Q  Did she voluntarily leave CU on her own
8  accord?
9  A  No.
10    MS. MOORE: Objection.
11 Q  When did Mary Ann Russo leave CU?
12    MS. MOORE: Objection.
13 A  I don't know.
14 Q  Okay. Was she transferred out of your
15 group in 2000?
16 A  No.
17 Q  Well, I believe I've already asked, was she
18 employed at the end of 2000? Was she
19 employed at the end of 2000 with CU?
20    MS. MOORE: Objection.
21 A  Yes. I'm sorry. I'm confused.
22 Q  That's what I thought.
23 A  She was employed.
24 Q  She was still employed by the end of 2000?

**Page 99**

1  A  She was still employed by whatever our
2  company name was then.
3  Q  CU -- well, OneBeacon Insurance.
4     Was Mary Ann Russo employed in
5  2001 with CU?
6  A  I don't know.
7  Q  Okay. And was Mary Ann Russo still in your
8  group in 2001?
9  A  No.
10    MS. MOORE: Objection.
11 Q  When was she transferred out of your group?
12    MS. MOORE: Objection.
13 A  She wasn't transferred.
14 Q  What are the circumstances that she would
15 have no longer been under your supervision?
16 A  She went out on maternity leave in, I
17 believe, late August; and she was -- I'm
18 trying to think. Within a few short weeks,
19 the team had -- had pretty much picked up
20 her responsibilities.
21    She was due back, I believe,
22 early December. She did not return at that
23 time. At that time human resources told me
24 I had options to either fill her position

**Page 100**

1  with someone else, dissolve the position,
2  or hold the position for her. I chose to
3  dissolve her position.
4  Q  Okay.
5  A  So I don't understand -- I mean, she was
6  still employed by the company; she just
7  wasn't on my team.
8  Q  She wasn't on your team. Was she a member
9  of any other team subsequent to December of
10 2000?
11 A  No, not that I know of. I mean, she was
12 on -- she was on maternity leave or
13 disability leave, and so I don't know what
14 the company procedures are when someone
15 comes back. I mean, I know that they hold
16 something because she was still getting her
17 benefits. I have no idea.
18 Q  Did Mary Ann Russo return from her
19 maternity leave and to CU at some point in
20 time?
21    MS. MOORE: Objection.
22 A  Not that I know of.
23 Q  Okay. You had mentioned that Mary Ann
24 Russo received a warning. Explain to me

**Page 125**

1         MS. MOORE: Objection.
2  A   No.
3         MS. MOORE: Counsel, I would
4   just like to state for the record that
5   we're now using legal terms of art; and,
6   again, Ms. Holmes is not aware --
7         MS. HILL: This is a lay
8   person and her understanding of
9   "accommodation." If she doesn't understand
10  what "accommodation" is, then she can
11  define that to the best of her ability.
12 Q   Do you understand what "accommodation" is?
13  What is your understanding of
14  "accommodation"?
15        MS. MOORE: Objection.
16 A   I -- I don't know. Giving him, you know,
17  flexible work hours or something. I don't
18  know. I knew who Dan was, but I didn't --
19  he didn't work on our team, and I didn't --
20  I don't know about any disability. I
21  didn't know he was considered disabled.
22  But I never worked with him.
23 Q   Okay. Earlier we discussed about
24  Ms. Griffith coming in at 10 a.m., that she

**Page 126**

1   had asked for that request.
2  A   (Nodding.)
3  Q   By Ms. Griffith asking for the request to
4   come in at 10 a.m., is that an
5   accommodation that you provided
6   Ms. Griffith?
7         MS. MOORE: Objection.
8  A   Yes, I would consider that an
9   accommodation.
10 Q   Okay.
11 A   Maybe better -- is that what you mean by
12  "accommodation"?
13 Q   No, no, no. It's your testimony.
14 A   Okay. But I'm just saying --
15 Q   That's why I'm saying it's important for
16  you to define.
17 A   I mean, that's what I'm thinking it means.
18  But if you're asking me a question, and
19  "accommodation" means something different,
20  then I don't know what it means.
21 Q   Right. That's fine. As you defined it,
22  your understanding of an "accommodation" is
23  providing someone something to be able to
24  do their job?

**Page 127**

1  A   (Pause.)
2  Q   I think you said providing them something.
3   Go ahead and define "accommodation," to
4   your understanding.
5  A   Ensuring that they're able to do their work
6   if there was some special consideration
7   like -- I don't know -- maybe he needed a
8   special keyboard or -- I don't know.
9   That's what I think an "accommodation"
10  meant.
11 Q   Right. That's fine.
12        All right. Are you aware of a
13  CU policy that affords an employee to
14  exchange time working -- coming in late and
15  working -- I'm sorry -- yes, coming in late
16  and working late?
17        MS. MOORE: Objection.
18 Q   Was there a plan --
19        MS. MOORE: Objection.
20 Q   -- to allow an employee to -- well, I'm
21  sorry. Strike that, actually.
22        What were the normal working
23  hours at CU?
24        MS. MOORE: Objection.

**Page 128**

1  A   The normal hours were 8 -- were 8:30 to
2   4:30 type thing -- I mean 8:30 to 5,
3   whatever. That's what they considered
4   normal.
5  Q   And that's the time that an employee was
6   expected to be -- arrive at 8:30 and could
7   leave at 4:30?
8         MS. MOORE: Objection. I
9   think she just said 8:30 to 5.
10 A   Not necessarily.
11 Q   Well, what is your understanding of what
12  are the hours that an individual is to work
13  in your particular group?
14        MS. MOORE: Objection.
15 A   I allowed flex hours up to 9:30, so that
16  that person would work until, you know,
17  5:30 or 6, whatever. I'm not doing the
18  math right now, but up to 9:30 people
19  coming in. Because then that meant we also
20  had coverage later on the other end,
21  because we were supporting offices not only
22  on the East Coast, but on the West Coast.
23        So by the time we went home,
24  it was still, you know, 2 and 3:00 in the