117

| | |
|---|---|
| 1 Q. | But you didn't ask Ms. Griffith if that is |
| 2 | what she understood that to mean, did you? |
| 3 | MS. MOORE: Objection. |
| 4 A. | Again, the process I was told was to sit |
| 5 | down Ms. Griffith and we were to explain |
| 6 | this to her. She had the opportunity to ask |
| 7 | questions if she didn't understand anything. |
| 8 | That was the purpose of the meeting. I |
| 9 | would have been more than happy to go |
| 10 | through this line by line, word by word |
| 11 | until she was clear. She did not ask any |
| 12 | questions, as I recall. She did not sign |
| 13 | that she agreed with it. She gave me no |
| 14 | indication that she cared. And then she |
| 15 | started on her tangent with other issues |
| 16 | that were not related to this, so I don't |
| 17 | feel it's my responsibility to assume that |
| 18 | she doesn't understand this. |
| 19 Q. | Did you ask her, though, specifically if she |
| 20 | understood those three steps? |
| 21 | MS. MOORE: Objection. |
| 22 A. | I don't recall specifically, but what I |
| 23 | normally do, okay, or how we normally handle |
| 24 | this, you go through it, and then as you're |

SHEA COURT REPORTING SERVICES
(617) 227-3097

118

| | |
|---|---|
| 1 | going through, "Do you understand? Do you |
| 2 | have any questions?" You give people the |
| 3 | opportunity to ask that. "Do you |
| 4 | understand? Do you have any questions?" |
| 5 | Again, we had an HR representative involved |
| 6 | to make sure we were doing things correctly. |
| 7 | I am sure Lisa would have asked the |
| 8 | question, "Do you have any questions? What |
| 9 | don't you understand?" Again, you know, |
| 10 | there was no questions written down here, no |
| 11 | indication that she did not understand, so |
| 12 | my assumption was that she understood it. |
| 13 | Why would she then go on a tangent about how |
| 14 | related to this -- how other issues tied |
| 15 | into this if she didn't understand what we |
| 16 | were telling her? I mean, so -- |
| 17 Q. | At this meeting did you discuss with |
| 18 | Ms. Griffith what she should do if she is |
| 19 | ill? |
| 20 A. | I do not recall. I believe the reason why |
| 21 | we had human resources in there is to |
| 22 | explain if she has an illness, she has |
| 23 | options. And again, I'm not a human |
| 24 | resource knowledgeable person. There were |

SHEA COURT REPORTING SERVICES
(617) 227-3097

119

| | |
|---|---|
| 1 | avenues she could take if she had to be -- |
| 2 | not come to work, which was FMLA, and we had |
| 3 | disability policies, short-term disability |
| 4 | policies that she could use to cover those |
| 5 | situations. |
| 6 Q. | Directing your attention back to Exhibit |
| 7 | No. 5, Exhibit No. 5 on the corrective |
| 8 | steps, are those the same corrective steps |
| 9 | on Exhibit No. 5 as are on Exhibit No. 6? |
| 10 A. | I will have to compare them one to one. |
| 11 Q. | Sure. |
| 12 | MS. HILL: If I could have this |
| 13 | marked as the next exhibit, please? |
| 14 | (Exhibit 9, Letter dated July 1, |
| 15 | 1997, so marked.) |
| 16 | (Exhibit 10, Work Clearance Note, |
| 17 | so marked.) |
| 18 | (Exhibit 11, Lahey Clinic document |
| 19 | dated 1-20-00, so marked.) |
| 20 Q. | Are those two corrective actions the same or |
| 21 | are those two separate meetings? |
| 22 A. | From the best of my ability here, they |
| 23 | appear to be the same. |
| 24 Q. | Now I am handing you what is marked as |

SHEA COURT REPORTING SERVICES
(617) 227-3097

120

| | |
|---|---|
| 1 | Exhibit No. 9. Would you please take a look |
| 2 | at Exhibit No. 9 and read it, if you didn't |
| 3 | see it this morning, please? |
| 4 | (Witness reading over document.) |
| 5 A. | Okay. |
| 6 Q. | Could you identify that document? |
| 7 A. | It looks like, again, Bernadine Griffith/ |
| 8 | Request for Accommodation, title of the |
| 9 | document. |
| 10 Q. | What's the date and who's the author and |
| 11 | who's it written to? |
| 12 | MS. MOORE: Objection. |
| 13 A. | The date, July 1, 1997. The author seems to |
| 14 | be Erin M. O'Toole. |
| 15 Q. | Do you know who those two individuals are, |
| 16 | the author and Erin O'Toole? |
| 17 A. | Clarify? You said "two individuals." |
| 18 Q. | Yes, I am sorry. Well, Erin O'Toole, do you |
| 19 | know who she is? |
| 20 A. | I do not know who Erin is. |
| 21 Q. | How about Miss Moynihan? |
| 22 A. | Miss Moynihan was head of human resources or |
| 23 | a human resource person, I can't recall what |
| 24 | capacity, for CGU or CU human resources. |

SHEA COURT REPORTING SERVICES
(617) 227-3097